```
 1                    UNITED STATES DISTRICT COURT

 2                    WESTERN DISTRICT OF NEW YORK

 3

 4

 5
      - - - - - - - - - - - - - X
 6    UNITED STATES OF AMERICA            17-CR-78(G)

 7    vs.
                                          Buffalo, New York
 8    LAMEL WILLIAMS, LATISHA             February 28, 2018
      WILLIAMS AND IRIS CENTENO,          9:38 a.m.
 9              Defendants.
      - - - - - - - - - - - - - X
10

11                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JEREMIAH J. MCCARTHY
12                UNITED STATES MAGISTRATE JUDGE

13

14

15

16
      AUDIO RECORDER:    Debbie Zamito
17

18
      TRANSCRIBER:        Christi A. Macri, FAPR-CRR
19                        Kenneth B. Keating Federal Building
                          100 State Street, Room 2120
20                        Rochester, New York 14614

21
      (Proceedings recorded by electronic sound recording,
22    transcript produced by computer).

23

24

25
```

2

1                          **A P P E A R A N C E S**

2
   JAMES P. KENNEDY, ESQ.
3  United States Attorney
   BY: LAURA HIGGINS, ESQ.
4  Assistant United States Attorney
   138 Delaware Avenue
5  Buffalo, New York 14202

6
   DANIEL M. GRIEBEL, ESQ.
7  106 Grayton Road
   Tonawanda, New York 14150
8  Appearing on behalf of Lamel Williams

9

10 MICHAEL G. O'ROURKE, ESQ.
   112 Franklin Street
11 Buffalo, New York 14202
   Appearing on behalf of Latisha Williams
12

13
   NELSON S. TORRE, ESQ.
14 438 Main Street
   Suite 910
15 Buffalo, New York 14202
   Appearing on behalf of Iris Centeno
16

17

18

19

20

21

22

23

24

25

3

1                          **I N D E X**

2  **WITNESS FOR THE GOVERNMENT**

3  Patrick McMahon
        Direct examination by Ms. Higgins          Page    7
4       Cross-examination by Mr. Griebel           Page   84
        Cross-examination by Mr. Torre             Page  109
5       Cross-examination by Mr. O'Rourke          Page  147

6

7

8

9

10
   **EXHIBIT              RECEIVED**
11
   Government  1           11
12 Government  2           12
   Government 35           17
13 Government  4           27
   Government  5-21        33
14 Government 28-32        65
   Government 36           81
15

16

17

18

19

20

21

22

23

24

25

1                   **P R O C E E D I N G S**

2                        *    *    *

3              (**WHEREUPON**, all defendants are present).

4              **THE CLERK:** All rise.

5              **MAGISTRATE JUDGE MCCARTHY:** Good morning.  Please be

6   seated.

7              **THE CLERK:** On the record, this is United States vs.

8   Lamel Williams, Latisha Williams and Iris Centeno, case No.

9   17-CR-78(G).

10             For the Government, Laura Higgins.

11             Daniel Griebel for defendant Lamel Williams.

12             Michael O'Rourke for defendant Latisha Williams.

13             And Nelson Torre for defendant Iris Centeno.

14             We are here for an evidentiary hearing, the

15   Honorable Jeremiah J. McCarthy presiding.

16             **MAGISTRATE JUDGE MCCARTHY:** Good morning everyone.

17             **MR. O'ROURKE:** Good morning, Judge.

18             **MR. TORRE:** Good morning, Judge.

19             **MR. GRIEBEL:** Good morning, Judge.

20             **MS. HIGGINS:** Good morning, Judge.

21             **MAGISTRATE JUDGE MCCARTHY:** All right, is there

22   anything that I need to address before we begin?  Any

23   logistics or anything of that sort?

24             **MR. TORRE:** Judge, I didn't get -- sorry, Nelson

25   Torre on behalf of Iris Centeno.  I got an exhibit list

1  yesterday, I think, by e-mail when I was in Rochester, but I

2  don't have a witness list.  I don't know if the Government --

3         **MS. HIGGINS:** Judge, the --

4         **MAGISTRATE JUDGE MCCARTHY:** They did file one.

5         **MS. HIGGINS:** The witness list was filed at document

6  104.  It was actually filed back in December.

7         **MR. TORRE:** Oh.

8         **MS. HIGGINS:** And just for everyone's awareness, the

9  Government did file a witness list with I think five or six

10  different witnesses.  We're actually only planning on calling

11  two today.  In preparation we were able to streamline the

12  testimony a bit so we're going to be calling first Pat McMahon

13  and then second Adam Imiolo.

14         **MAGISTRATE JUDGE MCCARTHY:** Okay, that's good.  Let

15  me just say for everyone's benefit as well, I have reviewed

16  the video of the confidential informant's interview a couple

17  times and what I think should be done -- obviously not today,

18  but at some point prior to post-hearing briefing -- is to have

19  the Government prepare a transcript of his statement.

20         And there's portions of that transcript that I

21  think need to be redacted in order to protect that person's

22  identity, but there are other portions relative to how that

23  person identified the location of the apartment that I think

24  would be of benefit to everyone because as you know, that's

25  one of the issues here why the apartment number was deleted

1    and so forth.

2              So we can talk about that at the conclusion of the

3    hearing, but at this point I think that would be appropriate

4    and can be done without identifying the informant.

5              So with that we may proceed.

6              **MS. HIGGINS:** Thank you, Judge.  Just to be clear,

7    the Government is not prepared to elicit testimony with regard

8    to the specifics of the *in camera* testimony today.

9              I do intend to elicit some information about the

10   efforts made by law enforcement using the confidential

11   informant to identify the location, but that's going to be

12   specifically limited to things that happened not *in camera*,

13   but -- but separate and apart from -- from the meeting with

14   the judge.

15             So to the extent that the witnesses do testify

16   about the confidential informant, we still maintain his

17   identity or her identity should not be disclosed and any

18   cross-examination which may elicit that information we would

19   specifically object to.

20             **MAGISTRATE JUDGE MCCARTHY:** Okay.  We'll take that

21   up as we proceed.

22             **MS. HIGGINS:** Thank you.

23             **MAGISTRATE JUDGE MCCARTHY:** Okay.

24             **MS. HIGGINS:** So the Government is prepared to call

25   its first witness, Patrick McMahon, of the Erie County

1  Sheriff's Office.

2         **MR. TORRE:** Move to exclude any other witnesses if

3  there be any.

4         **MAGISTRATE JUDGE MCCARTHY:** Are there any other

5  witnesses?

6         **MS. HIGGINS:** No, not in the courtroom.

7         <u>**GOVERNMENT'S WITNESS, PATRICK MCMAHON, SWORN**</u>

8                  <u>**DIRECT EXAMINATION**</u>

9         **THE CLERK:** Would you state your name for the

10  record?  And I need the microphone near you.

11         **THE WITNESS:** Patrick McMahon.

12         **THE CLERK:** Thank you very much.

13         **MS. HIGGINS:** May I proceed, Your Honor?

14         **MAGISTRATE JUDGE MCCARTHY:** Yes.

15  **BY MS. HIGGINS:**

16  Q.   How are you employed?

17  A.   I'm a detective with the Erie County Sheriff's Office.

18  Q.   How long have you been employed that way?

19  A.   Ten years.

20  Q.   And is that -- does that fully comprise your experience at

21  the Erie County Sheriff's Office those ten years?

22  A.   Yes.

23  Q.   Can you briefly describe, just summarize the training that

24  you have had for that position?

25  A.   I was in the Central Police Services Academy as well as

1  many in-service trainings with the Erie County Sheriff's and

2  many drug trafficking trainings through DEA and

3  U.S. Attorney's Office.

4  Q.   And did you -- were you hired as a detective or did you

5  start out at patrol?

6  A.   I was hired as a deputy.

7  Q.   Okay. At some point in the March -- in March of 2017, did

8  you become involved in an investigation involving Lamel

9  Williams?

10  A.   Yes.

11  Q.   Specifically I want to direct your attention to March

12  21st, 2017.  Did you seek and obtain a search warrant relating

13  to that investigation?

14  A.   Yes.

15  Q.   What premise was that search warrant for?

16  A.   198 Potomac, Apartment 4, which is the upper right

17  apartment.

18  Q.   Can you briefly describe, just summarize what led you to

19  seek the search warrant?

20  A.   Information was obtained and we were able to determine

21  that Lamel Williams was utilizing that residence to secrete

22  and distribute cocaine.

23  Q.   Without going into specifics, was the information secured

24  from a confidential informant?

25  A.   Yes.

1   Q.   And in the -- in your efforts to seek a search warrant,

2   was that confidential informant produced for a New York State

3   Supreme Court judge?

4   A.   Yes.

5   Q.   And did that person give *in camera* testimony?

6   A.   Yes.

7   Q.   Was the New York State Supreme Court judge specifically

8   Judge Bargnesi?

9   A.   Yes.   I'm not sure if he's a Supreme Court judge or

10  Erie County Court judge, but it was Judge Bargnesi.

11  Q.   Thank you.   So based on the content of the warrant and the

12  information provided from the CI, did Judge Bargnesi

13  ultimately issue a search warrant for 198 Potomac Avenue, the

14  upper right apartment?

15  A.   Yes.

16  Q.   And that was slightly different than what was applied for,

17  correct?

18  A.   Yes.

19  Q.   What was applied for?

20  A.   It was for Apartment No. 4 at 198 Potomac, the upper right

21  apartment.

22  Q.   And then ultimately the search warrant was issued for just

23  the upper right apartment, correct?

24  A.   Correct.

25  Q.   I want to show you what's been marked as Government's

1   Exhibit 1 and Government Exhibit 2.  Do you recognize these

2   two documents?

3   A.   Yes.

4   Q.   Let's start with Government Exhibit 1.  What is that?

5   A.   A search warrant application.

6   Q.   And specifically is that the search warrant application

7   that you submitted for 198 Potomac Avenue, Buffalo, New York,

8   the upper right apartment?

9   A.   Yes, it is.

10  Q.   And that's from March 21st, 2017, correct?

11  A.   Yes, it is.

12  Q.   Is that a fair and accurate copy of the application

13  actually submitted to Judge Bargnesi that day?

14  A.   Yes, it is.

15          **MS. HIGGINS:** I'd now offer Government Exhibit 1

16  into evidence.

17          **MAGISTRATE JUDGE MCCARTHY:** Any objection?

18          **MR. TORRE:**  Only with the stipulation that that's

19  not the entire application as we all know.

20          **MAGISTRATE JUDGE MCCARTHY:** Meaning that there was a

21  confidential informant?

22          **MR. TORRE:**  Apparently there's other sworn

23  testimony or other information that was provided to the judge

24  *in camera*, yes, Judge.

25          **MAGISTRATE JUDGE MCCARTHY:** Well, okay.  But

1 | Government Exhibit 1 will be in evidence then.

2 |       (**WHEREUPON**, Government Exhibit 1 was received into

3 | evidence).

4 |       **MS. HIGGINS:** I'll just also mention for the record,

5 | Judge, that that *in camera* testimony is mentioned in the

6 | application and so thereby incorporated by reference.

7 | **BY MS. HIGGINS:**

8 | Q.   Now I want to direct your attention to Government Exhibit

9 | 2.  Do you recognize that document?

10 | A.   Yes.

11 | Q.   What is it?

12 | A.   It's a search warrant for 198 Potomac.

13 | Q.   Is that for the upper right apartment and was it issued on

14 | March 21st, 2017?

15 | A.   Yes, it was.

16 | Q.   And does it bear the judge's signature?

17 | A.   Yes, it does.

18 |       **MS. HIGGINS:** I'd now offer into evidence Government

19 | Exhibit 2.

20 |       **MAGISTRATE JUDGE MCCARTHY:** Any objection?

21 |       **MR. GRIEBEL:**  Judge, I'd like to know what the

22 | basis is for the conclusion that it is the judge's signature.

23 | **BY MS. HIGGINS:**

24 | Q.   Were you present at the time the judge signed the search

25 | warrant?

1  A.   Yes, I was.

2  Q.   And did you personally observe him sign this document?

3  A.   Yes, I did.

4  Q.   Does the signature that appears on the exhibit in front of

5  you appear to be the same signature in the same condition as

6  it was when it was signed on March 21st, 2017?

7  A.   Yes.

8        **MS. HIGGINS:** I now tender Government Exhibit 2 into

9  evidence.

10       **MR. GRIEBEL:** I have no objection, Judge.

11       **MAGISTRATE JUDGE MCCARTHY:** All right, Government

12  Exhibit 2 is in evidence.

13       (**WHEREUPON**, Government Exhibit 2 was received into

14  evidence).

15  **BY MS. HIGGINS:**

16  Q.   What time was the search warrant issued on March 21st,

17  2017?

18  A.   8:57 p.m..

19  Q.   Okay.  So was this search warrant ultimately executed?

20  A.   Yes.

21  Q.   So prior to submitting the application for the search

22  warrant, did a member of law enforcement actually visit the

23  premise with the confidential informant?

24  A.   Yes.

25  Q.   And did you include that information in the application?

1  A.    Yes, I did.

2  Q.    I'm just gonna publish for the Court page 2 of Government

3  Exhibit 1 and there's a paragraph numbered number 4 at the

4  top.  If you could, Deputy McMahon, just start with the second

5  sentence of paragraph 4 and read it aloud?

6          **MAGISTRATE JUDGE MCCARTHY:** Just a second, because

7  on that page there are two paragraph 4's.  One at the very top

8  and one in the middle.  So which one are you referring to?

9          **MS. HIGGINS:** Thank you, Judge.  It's the paragraph

10  at the very top labeled paragraph 4.

11          **MAGISTRATE JUDGE MCCARTHY:** Okay.

12          **MS. HIGGINS:** It's indented.

13          **MAGISTRATE JUDGE MCCARTHY:** Okay.

14          **THE WITNESS:** On that same date the cooperating

15  source was driven to the area of Potomac Avenue, Buffalo, New

16  York and did point out 198 Potomac Avenue, Buffalo, New York,

17  as the residence being utilized by Lamel Williams to

18  distribute cocaine.

19  **BY MS. HIGGINS:**

20  Q.    And did you learn specifically that the confidential

21  informant had been taken to 198 Potomac?

22  A.    Yes.

23  Q.    And did you learn how the confidential informant

24  identified which of the apartments was the target?

25  A.    Yes.

1  Q.    What did you learn?

2  A.    The confidential source stated that the upper right

3  apartment of the building was being utilized by Lamel

4  Williams.

5  Q.    I'd now like to show you what's been marked as Government

6  Exhibit 35.  Do you recognize that photograph?

7  A.    Yes, I do.

8  Q.    What is it?

9  A.    It's a photograph of 198 Potomac Avenue, Buffalo, New

10 York.

11 Q.    Is it a fair and accurate depiction of the way that 198

12 Potomac Avenue appeared back in March of 2017?

13 A.    Yes.

14 Q.    And you personally traveled to 198 Potomac at some point

15 right, correct?

16 A.    Yes.

17 Q.    You've seen it in person?

18 A.    Yes.

19 Q.    Is there anything different about the way this photograph

20 appears from when you observed the property?

21 A.    No, not that I recall.

22 Q.    The photograph appears to be taken during the daytime,

23 correct?

24 A.    Yes.

25 Q.    What time of day did you visit the premise?

1    A.    It was at night.

2    Q.    So aside from the lighting?

3    A.    Yes.

4              **MS. HIGGINS:** I'd now offer Government Exhibit 35

5    into evidence.

6              **MR. GRIEBEL:** Judge, if I could do a *voir dire* on

7    this?

8              **MAGISTRATE JUDGE MCCARTHY:** Yes.

9              **MR. GRIEBEL:** Thank you.

10             Good morning, Officer.

11             **THE WITNESS:** Good morning.

12             **MR. GRIEBEL:** Dan Griebel on behalf of Mr. Williams.

13   Now, in this photograph number 35 obviously there's foliage on

14   the trees.  That's -- was there foliage on the trees in March

15   of 2017?

16             **THE WITNESS:** I don't recall.

17             **MR. GRIEBEL:** And it's daylight, correct?

18             **THE WITNESS:** The picture, yes.

19             **MR. GRIEBEL:** Now, over to the far left do you see

20   on Exhibit 35 on the side of the building about halfway up it

21   looks to be there's a surveillance camera on the building

22   attached to the side of the building there?  Do you see that?

23             **THE WITNESS:** I do see it.

24             **MAGISTRATE JUDGE MCCARTHY:** Excuse me, are you

25   talking about right at the corner of the building there?

1          **MR. GRIEBEL:** Right at the corner of the building as

2    you go up the side of the building about halfway above the

3    shrub, just above the shrub there looks to be a surveillance

4    camera.

5          Was that surveillance camera there?

6          **THE WITNESS:** I don't recall.

7          **MR. GRIEBEL:** Okay.  And then as far as the -- I

8    don't have a blow up here, but it looks that on the front door

9    area there might be some sort of keypad.

10         Do you know was there a keypad by the front door on

11   that day?

12         **THE WITNESS:** Not that I recall.

13         **MR. GRIEBEL:** So when you're saying that this

14   building fairly -- this picture fairly and accurately

15   represents the building as it looked on March 2017, some of

16   these items I pointed out you just don't recall whether or not

17   that, in fact, was how the building looked on that day?

18         **THE WITNESS:** I don't recall that.  As I said, it

19   was nighttime when we were there.

20         **MR. GRIEBEL:** Thank you.  Judge, I would object

21   because I know he testified initially that it was a fair and

22   accurate representation, but obviously there's some -- with

23   the surveillance camera and then the items there on the side

24   of the door, both of those seem to be material possible

25   variations and so I don't believe that it's a fair and

1    accurate representation of the -- how the building looked on

2    the 21st.

3            **MAGISTRATE JUDGE MCCARTHY:** Why would they be

4    material variations to the issue in this hearing, which I

5    guess is which apartment were we talking about?

6            **MR. GRIEBEL:** Yeah, again, I mean, he testifies that

7    it -- it goes to his knowledge of the building, that he said

8    well, this is how it looked, but then obviously when we get

9    into the detail this isn't how it looked.

10           **MAGISTRATE JUDGE MCCARTHY:** Okay, fair enough.  I

11   think that -- that can be taken into account in assessing

12   credibility, but I'm going to allow the exhibit to be admitted

13   and you can cross further or you can argue in post-hearing

14   briefs that it's not how the building looked and I'll consider

15   that at the time, okay?

16           **MR. GRIEBEL:** Okay, thank you, Judge.

17           **MAGISTRATE JUDGE MCCARTHY:** So Government Exhibit 35

18   is in evidence.

19           (**WHEREUPON**, Government Exhibit 35 was received into

20   evidence).

21   **BY MS. HIGGINS:**

22   Q.   So to be clear, what street is this photograph -- what

23   perspective is this photograph taken from?

24   A.   Potomac Avenue.

25   Q.   Okay.  And it appears that the premise is on the corner of

1  two streets intersecting, correct?

2  A.   Yes.

3  Q.   What is the intersecting street?

4  A.   Herkimer.

5  Q.   So is this perspective that the photograph is taken from

6  the front perspective?

7  A.   Yes.

8  Q.   In other words, the door that we see in this photograph is

9  considered the front door?

10  A.   Correct.

11  Q.   At least by you?

12  A.   Yes.

13  Q.   Is --

14          **MR. TORRE:** Pardon me, I don't want to interrupt.

15  Can you hold it up so we can figure out what street you're

16  talking about?

17          **MS. HIGGINS:** Exhibit 35, it's marked --

18          **MAGISTRATE JUDGE MCCARTHY:** Can we use the ELMO?

19          **MS. HIGGINS:** We can use it.

20          **MAGISTRATE JUDGE MCCARTHY:** Yeah.  We got this

21  expensive equipment, you might as well.

22          **MS. HIGGINS:** I'll take advantage, Judge.

23          **MAGISTRATE JUDGE MCCARTHY:** Okay.

24  **BY MS. HIGGINS:**

25  Q.   Here we have Government Exhibit 35 published on the ELMO.

1  Is this the perspective that you learned the confidential

2  informant viewed the premise with law enforcement?

3  A.   Yes.

4  Q.   And when the confidential informant viewed this premise

5  with law enforcement from this perspective, how did the

6  confidential informant identify the target premise?

7  A.   As the upper right apartment while looking at the building

8  from Potomac Avenue.

9  Q.   Okay. I believe -- I believe your screen is a touch

10 screen, so could you just mark by pressing on the screen which

11 apartment you're indicating?

12           Okay, so if we take the front of the premise as a

13 rectangle, it's the upper right side of that rectangle,

14 correct?

15 A.   Correct.

16 Q.   Thank you.

17           **MAGISTRATE JUDGE MCCARTHY:** Excuse me.  So are

18 both -- both upper right windows, the far upper right window

19 and the -- the window over the porch, are those both -- did

20 you circle both of those?

21           **THE WITNESS:** Yes, I believe that was all part of

22 the same apartment.

23           **MR. GRIEBEL:** And, Judge, I would object to that

24 line of questioning because I believe the testimony was is

25 that the informant identified some -- some part of the

1  building as the upper right, but without the informant here we

2  have no idea as to what was identified.

3        I think this witness is speculating as to what the

4  witness meant when he meant upper right because obviously

5  there's a series of windows on this -- this side of that

6  building.

7        **MAGISTRATE JUDGE MCCARTHY:** I think that's a fair

8  inquiry.

9        **MS. HIGGINS:** I can clarify.

10        **MAGISTRATE JUDGE MCCARTHY:** Maybe you can clarify,

11  okay.

12  **BY MS. HIGGINS:**

13  Q.   Did you personally have an opportunity to go to 198

14  Potomac Avenue?

15  A.   Yes.

16  Q.   And when you personally visited, did you learn the

17  association of the windows to the apartments on the interior

18  of the building?

19  A.   Yes.

20  Q.   And did you learn about whether the two upper right

21  windows that we see to the right side of the main entrance, if

22  those were associated with the upper right apartment?

23  A.   Yes.

24  Q.   And were they?

25  A.   Yes, I believe so.

1  Q.   At the time the search warrant was applied for, did you

2  necessarily know which windows were associated with which of

3  the apartments?

4  A.   Not essentially the exact windows, no.

5  Q.   Okay.  So the information that you gleaned from the

6  confidential informant did not necessarily specify which

7  windows went with which apartments?

8  A.   No, not that I was told.

9  Q.   It was essentially to identify the premise, not --

10  A.   Correct.

11  Q.   -- all windows and attachments, correct?

12          **MR. TORRE:** Objection to leading the witness.

13          **MAGISTRATE JUDGE MCCARTHY:** Yeah, please don't lead.

14  **BY MS. HIGGINS:**

15  Q.   Prior to submitting the application for the search

16  warrant, were you aware that Lamel Williams was under federal

17  pretrial supervision by the United States Probation Office?

18  A.   Yes.

19  Q.   Did the Erie County Sheriff's Office make efforts to

20  confirm his current residence at the time in March 2017 by

21  contacting federal agents?

22  A.   Yes.

23  Q.   Who made that contact?

24  A.   Chief D.J. Granville.

25  Q.   And do you know with whom he spoke?

1  A.    Shane Nastoff, Special Agent with the DEA.

2  Q.    And, in substance, what did he learn?

3  A.    That Lamel Williams was under supervised release and home

4  confinement at 198 Potomac Avenue, Apartment 4.

5  Q.    And that information was specific to Apartment 4, correct?

6  A.    Yes.

7  Q.    So ultimately did you execute the search warrant at 198

8  Potomac, upper right apartment?

9  A.    Yes.

10 Q.    And when did you execute that warrant?

11 A.    March 21st.  I don't recall the time offhand.

12 Q.    Okay. And would anything refresh your recollection as to

13 what time the search warrant would be executed?

14 A.    Yes.

15 Q.    What is that?

16 A.    Property receipts.

17 Q.    Okay. I'm just going to show the witness what's been

18 marked as Government Exhibit 4.  Just review that document and

19 look up when you're done.

20        Does it refresh your recollection as to what time?

21 A.    Yes.

22 Q.    What time was the search warrant executed?

23 A.    10:09 p.m..

24 Q.    Thank you.

25        **MAGISTRATE JUDGE MCCARTHY:** Would you just identify

1    what Exhibit 4 is?

2    **BY MS. HIGGINS:**

3    Q.    What is Government Exhibit 4?

4    A.    Erie County Sheriff's Office property receipt.

5    Q.    How many officers participated in the execution of the

6    search warrant?

7    A.    I would say between -- approximately ten in the entry as

8    well as some Buffalo Police uniformed officers as well as Erie

9    County Sheriff's Office uniformed officers.

10    Q.    Is it customary for uniformed Buffalo Police Department

11    officers to accompany Erie County Sheriff's Office when they

12    execute a search warrant in the City of Buffalo?

13    A.    Yes, we always try to make them aware as much as we can.

14    Q.    And aside from those two agencies, the Erie County

15    Sheriff's Office and Buffalo Police Department, were any other

16    agencies participating?

17    A.    No, not that I recall.

18    Q.    How did you make entry into 198 Potomac?

19    A.    We made forced entry through the front door as well as

20    forced entry into the upper right apartment, which is number

21    4.

22    Q.    What do you mean by forced entry?

23    A.    We use either a ram or a pry and pry open the door or

24    force open the door.

25    Q.    And can you describe once inside the front door of the

1    building, how you accessed up to the apartment, the number 4

2    apartment?

3    A.    There was a set of stairs on the right-hand side that we

4    went up to and we encountered the door to the apartment.

5    Q.    And how was that door oriented with respect to the stairs

6    that you went up?

7    A.    On the right-hand side of the stairs.

8    Q.    And was it the first door you encountered?  The second

9    door?

10   A.    It was the -- there was a door downstairs, I believe, and

11   it was the first door that we encountered when we got to the

12   upstairs.

13   Q.    And it was on the right side of the hallway?

14   A.    Correct.

15   Q.    Once inside the apartment -- did you personally go inside

16   the apartment?

17   A.    Yes.

18   Q.    What did you see once you got in there?

19   A.    There were several individuals that were detained inside.

20   I believe we walked in and you were in a hallway, kitchen and

21   a bathroom off of it, as well as a bedroom and a living area.

22   Q.    And were any items of contraband found?

23   A.    Yes.

24   Q.    I just want to go back to when you first entered the

25   apartment.  You said there were at least three people in the

1 apartment?

2 A.    Yes.

3 Q.    And they were all detained?

4 A.    Yes.

5 Q.    Was the apartment also cleared?

6 A.    Yes.

7 Q.    What does it mean for an apartment to be cleared?

8 A.    We clear any rooms, doors, closets, things like that to

9 make sure that there are no persons or weapons or anything

10 that could potentially hurt us.

11 Q.    And is that in the interest of safety?

12 A.    Yes.

13 Q.    And generally how is that -- I guess how is that process

14 completed, the clearing?  Does one officer just go around and

15 do all that or are multiple officers tasked with that purpose?

16 A.    It's simultaneous.  We go to try and clear the rooms as

17 fast as possible of any persons or weapons, things like that.

18 Q.    Okay. So once inside were any items of contraband found?

19 A.    Yes.

20 Q.    Can you briefly summarize the items that were recovered?

21 A.    Cocaine, firearm, scales, packaging, some various

22 paperwork.

23 Q.    Was a quantity of U.S. currency also recovered?

24 A.    Correct.

25 Q.    Were all of the items that were recovered within this

1    apartment at 198 Potomac, Apartment 4 recorded in any manner?

2    A.    Yes.

3    Q.    How were they recorded?

4    A.    On an Erie County Sheriff's Office property receipt.

5    Q.    Who recorded them?

6    A.    I did.

7    Q.    I'm going to show you Government Exhibit now marked 4.

8    You already identified that you recognize this.  Do you

9    recognize it to be the property receipt that you created on

10   March 21st, 2017?

11   A.    Yes.

12   Q.    Does it bear the record of all the items seized within the

13   apartment?

14   A.    Yes.

15   Q.    Is this a fair and accurate copy of the record you created

16   on March 21st, 2017?

17   A.    Yes.

18   Q.    Are there any differences between the document you created

19   and the one that sits in front of you today?

20   A.    No.

21             **MS. HIGGINS:** Now offer Government Exhibit 4 into

22   evidence.

23             **MR. GRIEBEL:** Judge, I would object because it seems

24   just from its face it contains a lot of hearsay.  I know he

25   prepared it, but if you look at it, it refers to other

1  officers and I guess other individuals.

2          And so I think she's trying to lay a foundation for

3  a business record, but hearsay within hearsay is a problem in

4  this case.

5          **MS. HIGGINS:** Judge, this is a hearing.

6          **MAGISTRATE JUDGE MCCARTHY:** Pardon?

7          **MS. HIGGINS:** This is a hearing and hearsay is

8  permissible.

9          **MAGISTRATE JUDGE MCCARTHY:** Right.

10         **MS. HIGGINS:** I mean, I can ask some more questions

11 about how -- the creation of this document if the Court

12 requires.

13         **MAGISTRATE JUDGE MCCARTHY:** Well, he's testified

14 that he created the document.  I'm going to allow its

15 admission.  As to what weight I give to its contents, you can

16 cross-examine, Mr. Griebel, and I'll defer on that for down

17 the road.

18         But as indicated, the rules of evidence don't

19 strictly apply in a hearing of this sort.

20         **MR. GRIEBEL:** Thank you, Judge.

21         **MAGISTRATE JUDGE MCCARTHY:** So Government Exhibit 4

22 is in evidence.

23         (**WHEREUPON**, Government Exhibit 4 was received into

24 evidence).

25 **BY MS. HIGGINS:**

1  Q.    Okay.  So I'd like to go through this property receipt

2  with you, Deputy McMahon, and it doesn't make sense to read it

3  in full all four pages, so what I'd like to do is in

4  conjunction with reviewing the property receipt show you some

5  photographic items of evidence.

6              So I'd like to start -- I'm going to leave the

7  exhibit up with you and I'd like to direct your attention now

8  to Government Exhibit 5.

9              I'm going to do this all at once, Judge.  I'm going

10  to hand you Government Exhibit 5 through Government Exhibit

11  21.  Please take a moment and flip through those exhibits and

12  look up when you're done.

13             Do you recognize these exhibits?

14  A.    Yes.

15  Q.    What are they?

16  A.    Photographs taken from the apartment for the execution of

17  the search warrant.

18  Q.    And were they taken at the time the search warrant was

19  being executed?

20  A.    Yes.

21  Q.    Do you know who took the photographs?

22  A.    I don't recall.

23  Q.    Were you present during the search of the apartment and

24  the taking of these photographs?

25  A.    Yes.

1    Q.    And have you had an opportunity to go through each of

2    these photographs in advance of today's testimony?

3    A.    Yeah, we've had a disk of them, yes.

4    Q.    And are each of these photographs fair and accurate

5    depictions of the way the apartment appeared on March 21st,

6    2017 while you were in the apartment?

7    A.    Yes.

8              **MS. HIGGINS:** I'd now offer into evidence Exhibits 5

9    through 21.

10             **MR. GRIEBEL:** Judge, if I could just *voir dire* on

11   the last question, fair and accurate representation?

12             **MAGISTRATE JUDGE MCCARTHY:** Sure.

13             **MR. GRIEBEL:** Thank you.

14             Detective, I'd like to refer you to your property

15   receipt there that's been identified as Exhibit 4.

16             **THE WITNESS:** Yeah.

17             **MR. GRIEBEL:** If you go down to item 2, that refers

18   to a DigiWeigh scale located by you in a bedroom, correct?

19             **THE WITNESS:** Correct.

20             **MR. GRIEBEL:** Item 3 refers to green leafy substance

21   located by you in a bedroom, correct?

22             **THE WITNESS:** Correct.

23             **MR. GRIEBEL:** Going to the next page, item 7 refers

24   to a flip phone that's located by you in a bedroom, correct?

25             **THE WITNESS:** Correct.

1          **MAGISTRATE JUDGE MCCARTHY:** It says two flip phones,

2    right?

3          **MR. GRIEBEL:** Yeah, some flip phones.

4          Then to the next page, if you could go to item 13?

5    It refers to a plastic container with a blue top located in

6    child bedroom by you, correct?

7          **THE WITNESS:** Correct.

8          **MR. GRIEBEL:** And then if you go to the next page to

9    item 20, it refers to black plastic bags located in bedroom

10   dresser by you, correct?

11         **THE WITNESS:** Correct.

12         **MR. GRIEBEL:** Then item 17 is a black CR digital

13   scale in bedroom dresser by you in a bedroom, correct?

14         **THE WITNESS:** Correct.

15         **MR. GRIEBEL:** Okay.  All those references are you in

16   a bedroom.  So my question to you is how do you know that

17   these pictures are fair and accurate representations when it

18   seems that you're only in the bedroom?

19         **THE WITNESS:** The evidence officer, whoever took

20   these pictures that day, was -- that was their job.  They took

21   pictures, we put them on a disk that night and they were

22   memorialized there.

23         **MR. GRIEBEL:** But you don't know that, in fact,

24   they're fair and accurate representations because you weren't

25   there?  You were in the bedroom?

1          **THE WITNESS:** I was all over the apartment that

2    night.

3          **MR. GRIEBEL:** But -- okay, but as far as actually

4    being there when these photos were taken, you weren't there,

5    correct?

6          **THE WITNESS:** Not for all of them, no.

7          **MR. GRIEBEL:** Okay, thank you.

8          Judge, I object because I don't think he's

9    competent to testify as to the entire collection of

10   photographs as being fair and accurate representations.

11         **MS. HIGGINS:** Judge, a person doesn't need to be

12   present at the moment a photograph is taken in order to be

13   able to say that the place they were in is fairly depicted

14   within a photograph taken maybe in a moment that they weren't

15   necessarily in that room.

16         **MAGISTRATE JUDGE MCCARTHY:** Yeah, but the photos are

17   of specific items in the premises.

18         **MS. HIGGINS:** Right.

19         **MAGISTRATE JUDGE MCCARTHY:** I guess -- well, I have

20   a more general question, which is -- I mean, we're considering

21   whether the -- whether the search was properly done.

22         What specifically was found in the search, why is

23   that relevant to today's hearing?

24         **MS. HIGGINS:** Judge, it's the Government's burden to

25   show the parameters of the search that was executed was

1  ultimately reasonable and so showing the Court photographs of

2  the premise that was searched, the places that the items that

3  are subject to suppression were found is absolutely essential

4  to meeting our proof.

5          **MAGISTRATE JUDGE MCCARTHY:** But this officer has

6  said he was in the bedroom, he doesn't know --

7          **MS. HIGGINS:** That's not the testimony, Judge.  The

8  officer said he was in the bedroom and he was -- he was all

9  over the apartment.

10          The items that are listed on the property receipt

11 he notes as having been recovered by him, but he was all over

12 the apartment.  He may not have been present the moment the

13 photograph that sits here before us was taken, but he was all

14 over the apartment and he has said that the pictures that are

15 before him fairly and accurately depict the way the apartment

16 appeared when he was inside of it.

17          **MR. GRIEBEL:** And, Judge, with all due respect to

18 the assistant, I think the officer testified that he wasn't

19 present when these photographs were shot.

20          And so he simply doesn't even meet the first

21 standard of admissibility under the Federal Rules, which is a

22 witness with personal knowledge --

23          **MS. HIGGINS:** Judge, that's --

24          **MR. GRIEBEL:** -- on these things.  So I -- I --

25          **MAGISTRATE JUDGE MCCARTHY:** All right, counsel,

1  again, we're not bound by the Federal Rules here.

2            I'm going to allow it, but I will -- I've got to go

3  back and listen, I'll review the transcript of what was said

4  and I'll consider it at that time, but for now I will allow

5  it.

6            **MR. GRIEBEL:** Thank you, Judge.

7            **MAGISTRATE JUDGE MCCARTHY:** So we're talking about

8  Exhibits 5 through 21; is that correct?

9            **MS. HIGGINS:** That's correct.

10           **MAGISTRATE JUDGE MCCARTHY:** Okay.

11           **THE CLERK:** They're in evidence, Judge?

12           **MAGISTRATE JUDGE MCCARTHY:** Yes.

13           **THE CLERK:**  Okay.

14            (**WHEREUPON**, Government Exhibits 5-21 were received

15  into evidence).

16  **BY MS. HIGGINS:**

17  Q.   Okay.  So I'm going to take Government Exhibit 5, you

18  recognize this picture, correct?

19  A.   Yes.

20  Q.   What is it?

21  A.   That is a picture of the exterior door of the -- the

22  interior door for the Apartment No. 4 at 198 Potomac.

23  Q.   So where was this picture taken from?  What perspective?

24  A.   From the outside of the apartment.

25  Q.   So are we standing in a hallway right now?

34

1   A.    Yes.

2   Q.    And I see some, I guess, some exposed wood underneath what

3   appears to be a deadbolt in the middle of the door in the very

4   center of the picture.  What is that?

5   A.    Marks from using a ram to make forced entry.

6   Q.    Okay. So we see that the door is ajar in this photograph?

7   A.    Yes.

8   Q.    So this was after the forced entry was completed, correct?

9   A.    Correct.

10  Q.    And this number 4 that we see here on the molding, was

11  that number 4 there the way that it appears to be in the

12  photograph?

13  A.    Yes.

14  Q.    Did you personally observe that number 4 when you entered?

15  A.    Yes.

16  Q.    Now, I'd like to direct your attention to Government

17  Exhibit 6, what do we see in this photograph?

18  A.    Black Sentry safe.

19  Q.    Okay. And I want to now direct your attention to

20  Government Exhibit 4, which is in front of you.  Do you see

21  this item on the property receipt?

22  A.    Yes.

23  Q.    What item number is it listed as?

24  A.    1.

25  Q.    Okay. And ultimately was the safe opened?

1  A.    Yes.

2  Q.    How was it opened?

3  A.    I believe --

4  Q.    Do you know?

5  A.    -- we had two safes; one was forced open and one we were

6  provided the code for by Lamel Williams.

7  Q.    Okay. Do you know which the safe is, whether it was forced

8  open or whether it was --

9  A.    I believe it was forced open.

10 Q.    And does the item that we see laying on the floor next to

11 the safe, what is that item?

12 A.    It's a Halligan tool.

13 Q.    A what?

14 A.    Halligan tool.

15 Q.    Is that -- what does that item do?

16 A.    It's a pry.  It's used to pry things open.

17 Q.    So was that the item used to open the safe?

18 A.    Yes.

19 Q.    I'm now going to direct your attention to Government

20 Exhibit 7.  What do we see in this photograph?

21 A.    That is the pried open Sentry safe.

22 Q.    And do we see contents within it?

23 A.    Yes.

24 Q.    Are those contents listed on the property receipt?

25 A.    Yes, they are.

1  Q.    Are they included in the description of item 1?

2  A.    Yes.

3  Q.    Who was the recovering officer for this item?

4  A.    Adam Day.

5  Q.    And where was this item recovered?

6  A.    In a bedroom.

7  Q.    Do we see in Government Exhibit 7 the safe appear to be

8  sitting on top of a bed?

9  A.    Yes.

10 Q.    Turning your attention back now to Government Exhibit 6,

11 does it appear that the safe is sitting alongside of a bed?

12 A.    Yes.

13 Q.    I'm now going to direct your attention to Government

14 Exhibit 8.  What do we see in this photograph?

15 A.    That is a wallet with some various paperwork and U.S.

16 currency.

17 Q.    Okay. And where did these items come from?

18 A.    The black Sentry safe.

19 Q.    Okay. So they're also described in item 1 on the property

20 receipt in Government 4, correct?

21 A.    Yes.

22 Q.    And Government Exhibit 9, what is this?

23 A.    A close-up of the wallet that was recovered from the black

24 Sentry safe.

25 Q.    Okay. Do we appear --

1      **MAGISTRATE JUDGE MCCARTHY:** I'm sorry, close up of a

2  what?

3      **THE WITNESS:** The wallet that was recovered from the

4  black Sentry safe.

5      **MAGISTRATE JUDGE MCCARTHY:** Oh.

6  **BY MS. HIGGINS:**

7  Q.   So we see some items of paperwork with identification on

8  them in this photograph, correct?

9  A.   Correct.

10  Q.   Whose name do we see on the items of paperwork?

11  A.   Lamel Williams.

12  Q.   And now just going back to Government Exhibit 8, do we see

13  a quantity of U.S. currency in this photograph?

14  A.   Yes, we do.

15  Q.   And actually to the left (inaudible) here I made a red dot

16  on the left side of the photograph.  Do we see a $100 bill

17  there?

18  A.   Yes.

19  Q.   Was -- do you know approximately how much currency is in

20  this quantity depicted in this photograph?

21      **MAGISTRATE JUDGE MCCARTHY:** Are you still on 9?

22      **MS. HIGGINS:** I'm sorry, Judge, I went back to 8.

23  Government Exhibit 8.

24      **MAGISTRATE JUDGE MCCARTHY:** Oh, okay, okay.

25  **BY MS. HIGGINS:**

1  Q.   So we're discussing the quantity of currency on the left

2  side of this photograph.   Do you know approximately how much

3  money there is there?

4  A.   In totality all the rubber banded?

5  Q.   Yeah.

6  A.   I believe it was around $18,000.

7  Q.   Okay.

8  A.   We don't count the money.

9  Q.   And that means you don't count the money the day that

10 you're doing the search warrant, correct?

11 A.   Right.   We would submit it to the -- either through the

12 FBI or DEA and the bank does the official count.

13 Q.   Thank you.   I now want to direct your attention to

14 Government Exhibit 10.   What do we see here?

15 A.   A backpack on top of a bed.

16 Q.   And is this backpack referenced on the property receipt

17 somewhere?   Just directing your attention to the first page of

18 the property receipt.

19 A.   Yes, it is.

20 Q.   And where is it listed?

21 A.   It's item number 3.

22 Q.   Okay. And do we actually also see it mentioned in item

23 number 2's description?

24 A.   Yes.

25 Q.   So who recovered this item?

1  A.    Myself.

2  Q.    And where did you recover it?

3  A.    On top of the bed in the bedroom.

4  Q.    Is this as we see it appearing in Government Exhibit 10?

5  A.    Yes.

6  Q.    I'm going to show you Government Exhibit 11.  What do we

7  see in this photograph?

8  A.    A bag of marijuana inside the backpack on top of the bed.

9  Q.    So the backpack we see in Government Exhibit 11 is the

10 same one we saw in Government Exhibit 10, correct?

11 A.    Yes.

12 Q.    We're still on top of the bed in the bedroom, correct?

13 A.    Correct.

14 Q.    And this item that we see towards just left of the center

15 in this photograph, what is that item?

16 A.    Plastic knotted bag containing marijuana.

17 Q.    Directing your attention now to Government Exhibit 12,

18 what do we see in this photograph?

19 A.    A black DigiWeigh scale.

20 Q.    And in your training and experience, do you know whether

21 digital scales play a role in the trade of drug trafficking?

22 A.    Yes, they do.

23 Q.    What role do they play?

24 A.    Weigh out certain amounts that could be packaged for sale.

25 Q.    Okay. So are they used for -- by drug distributors to take

1  bulk quantities, break them down and distribute them into

2  smaller quantities?

3  A.   Yes.

4        **MAGISTRATE JUDGE MCCARTHY:** I'm sorry, I'm sorry, my

5  bad.  You're on 12?  Okay, I was looking at 13 -- oh, your

6  folder has them transposed so...okay, got it.  I'm good.

7        **MS. HIGGINS:** Do you have Government Exhibit 12,

8  Judge?  I'm sorry, are you missing --

9        **MAGISTRATE JUDGE MCCARTHY:** I have it, it's under

10  the -- under the tab for 11, but I'm good.

11        **MS. HIGGINS:** Thank you, Judge.

12  **BY MS. HIGGINS:**

13  Q.   So now I'm going to direct your attention to the property

14  receipt item 2, was there a description about this scale

15  provided by you on the property receipt?

16  A.   Yes.

17  Q.   What did it say?

18  A.   Black DigiWeigh scale with white powdery residue in

19  backpack on top of bed in bedroom by ECSO Pat McMahon.

20  Q.   Okay. Was that description provided by you because you saw

21  it?

22  A.   Yes.

23  Q.   I'm now going to direct your attention to Government

24  Exhibit 13.  Do you recognize this photograph?

25  A.   Yes.

41

1  Q.   What is it?

2  A.   It's a picture of the kitchen at 198 Potomac, Apartment 4.

3  Q.   Were you personally in the kitchen ever during the

4  execution of the search warrant?

5  A.   Yes, I was.

6  Q.   And is this -- does this picture depict the kitchen the

7  way it appeared to you when you were personally inside of it?

8  A.   Yes.

9  Q.   And obviously when you were inside the kitchen did you

10  make a specific note of each and every item within the

11  kitchen?

12  A.   Not each and every item, no.

13  Q.   But generally you were able to take in the appearance of

14  the kitchen when you were inside, correct?

15  A.   Yes.

16  Q.   And is this general appearance appear the way that you

17  observed it March 21st, 2017?

18  A.   Yes.

19  Q.   Do you see people in this photograph who were present at

20  the time the search warrant was executed?

21  A.   Yes.

22  Q.   Do you recognize those people?

23  A.   I believe the individual here is a Buffalo Police

24  lieutenant, and I cannot tell the other individual there.

25  Q.   Okay. So the witness just for the record indicated the

1   first person, the detective from Buffalo Police, was the man

2   in the doorway on the left side of the photograph; and the

3   person he wasn't sure of was the partial arm that we see on

4   the very right edge of the photograph.

5            Okay, now I want to direct your attention to

6   Government Exhibit 14.  Do you recognize this?

7   A.   Yes.

8   Q.   What is it?

9   A.   It's a black Ruger pouch that was recovered.

10  Q.   And do you know where we are in the apartment?

11  A.   By the picture, no, but I could tell from the property

12  receipt.

13  Q.   Okay.  And what is noted on the property receipt?

14           **MR. GRIEBEL:** Judge, I would object because he's not

15  competent to testify to that.  He's just relying on a piece of

16  paper.

17           **MS. HIGGINS:** Judge, the testimony is evident that

18  he's testifying from an item -- an item of evidence that's

19  clear and the Court can assess the weight of the evidence

20  based on the fact that he's testifying by reading off the

21  property receipt.

22           **MAGISTRATE JUDGE MCCARTHY:** I'll allow it.  You can

23  cross at the appropriate time.

24           **THE WITNESS:** Black Ruger pouch case containing two

25  live rounds in the closet in kitchen by ECSO Tim Carney.

1  BY MS. HIGGINS:

2  Q.    Okay.  Were you personally present when Tim Carney

3  recovered this?

4  A.    No.

5  Q.    At any point did you have an opportunity to personally

6  observe this item?

7  A.    Yes.

8  Q.    And where was it that you personally observed it?

9  A.    I did the property receipts.  The way that we do things

10  when things are recovered, they are photographed, I was the

11  evidence officer that night, everything was brought to me, I

12  observed it and I documented it on the property receipt.

13  Q.    Okay. So as the evidence officer your role is to record

14  every item that is seized from the premise, correct?

15  A.    Correct.

16  Q.    And sometimes you rely on information you have personally

17  gathered, correct?

18  A.    Yes.

19  Q.    Other times you rely on information provided to you by

20  your fellow officers, correct?

21  A.    Yes.

22  Q.    And you clearly note for each and every item who you've

23  relied upon for information that you didn't necessarily

24  personally observe, correct?

25  A.    Yes.

44

1    Q.    So specifically with this Ruger pouch, did you have an

2    opportunity to see this Ruger pouch as it lays in this

3    picture?

4    A.    No, I did not.

5    Q.    Okay. But you -- you observed it after-the-fact later?

6    A.    Yes.

7    Q.    While you were recording this property receipt, correct?

8    A.    Correct.

9    Q.    When you observed it did it appear in the same way it does

10    in this photograph?

11    A.    Yes.

12    Q.    Anything different about the pouch that you saw and the

13    pouch you see in this photograph?

14    A.    No.

15    Q.    The size, the shape, the color, the markings are all the

16    same?

17    A.    Right.

18    Q.    I'd now like to direct your attention to this -- this item

19    in the very center of the photograph, it's the larger of the

20    two black pouches.  What is that?

21    A.    A black gun holster.

22    Q.    And is that recorded on the property receipt?

23    A.    Yes, it is.

24    Q.    What number item is it?

25    A.    Number 5.

1  Q.    Who was it recovered by?

2  A.    Tim Carney.

3  Q.    Where was it recovered from?

4  A.    In the closet in the kitchen.

5           **MR. GRIEBEL:** Again, Judge, he answered the

6  question.  I just wanted to note my objection because it's

7  based on -- not on his personal knowledge of where it was

8  recovered.

9           **MAGISTRATE JUDGE MCCARTHY:** Noted.

10           **MR. GRIEBEL:** Thank you, Judge.

11  **BY MS. HIGGINS:**

12  Q.    I'd like to direct your attention to Government Exhibit

13  15.  Do you recognize this photograph?

14  A.    Yes.

15  Q.    What is it?

16  A.    It's a loose round on the floor.

17  Q.    Okay. And is that noted somewhere on the property receipt?

18  A.    Yes.

19  Q.    Where is it noted?

20           **MR. GRIEBEL:** Judge, once again, I would object

21  because obviously the witness is searching through papers and

22  he doesn't know where this has been recovered.

23           **MS. HIGGINS:** That's not the question.  The question

24  is is it noted on the property receipt.

25           **MAGISTRATE JUDGE MCCARTHY:** Okay.  The comment is

1  noted and -- but I will allow the testimony.

2          **MR. GRIEBEL:** Thank you.

3          **THE WITNESS:** Item number 4.

4  BY MS. HIGGINS:

5  Q.    Okay.  So item number 4 refers to two live rounds?

6  A.    Two live rounds.

7  Q.    And this is one of those two?

8  A.    I believe so.

9  Q.    Okay. And I just want to briefly pause here and notice the

10 tile that it appears this live round is sitting on top of and

11 direct your attention now back to Government Exhibit 13, which

12 is the photograph of the kitchen, correct?

13 A.    Correct.

14 Q.    Do we see the same tiling in Government Exhibit 13 on the

15 floor as we see here in Government Exhibit 15?

16 A.    Yes, it would appear so.

17 Q.    I'd like to direct your attention to Government Exhibit

18 16.  Do you recognize these items?

19 A.    Yes.

20 Q.    What are they?

21 A.    There are some Pyrex dishes along with a digital scale

22 inside a box.

23 Q.    And were these items recovered from 198 Potomac?

24 A.    Yes.

25 Q.    Where were they recovered from?  Are you referring to

1  Government Exhibit 4?

2  A.    Yes.   In the kitchen.

3  Q.    Who recovered them?

4  A.    Tim Carney.

5  Q.    Did you have an opportunity to observe them personally?

6  A.    Yes.

7  Q.    Did you observe them in the apartment or some time

8  thereafter?

9  A.    In the apartment.

10  Q.    And did they appear in the same way they appear in this

11  photograph?

12  A.    Yes.

13  Q.    I'm now going to direct your attention to Government

14  Exhibit 17.   What is this?

15  A.    It's a Pyrex dish with some white powder inside.

16  Q.    And does -- do Pyrex dishes play some role in the trade of

17  drug trafficking?

18  A.    Yes.

19  Q.    What role do they play?

20  A.    They are used to mix and cook crack cocaine.

21  Q.    All right.   And can you describe what we see inside of

22  this Pyrex dish?

23  A.    A white powdery residue.

24  Q.    Is this consistent with what you've seen in your training

25  and your experience of Pyrex dishes being used for the mixing

1  of controlled substances?

2  A.    Yes.

3  Q.    Do you based on your training and experience suspect that

4  the substance inside this Pyrex as it appears here is a

5  controlled substance?

6  A.    Yes.

7  Q.    I'm now going to direct your attention to Government

8  Exhibit 18.  Do you recognize this?

9  A.    Yes.

10  Q.    And what is it?

11  A.    A knotted off plastic bag containing a white powdery

12  substance.

13            **MAGISTRATE JUDGE MCCARTHY:** Containing I'm sorry?

14            **THE WITNESS:** A white powder substance.

15  **BY MS. HIGGINS:**

16  Q.    Okay.  Is this recorded on the property receipt?

17  A.    Yes.

18  Q.    And do you know what item it is?

19  A.    Number 9.

20  Q.    That's on page 3, correct?

21  A.    Yes.

22  Q.    Okay. Where does the property receipt state that it was --

23  where does it say it was recovered from?

24  A.    On the kitchen floor by Jack Graham.

25  Q.    Who is Jack Graham?

1  A.    He's a senior detective with the Sheriff's Office.

2  Q.    And in this photograph Government Exhibit 18 where do we

3  see the item sitting?

4  A.    It appears to be on a counter.

5  Q.    So by inference can you conclude that it was picked up

6  from the floor and put on the counter before it was

7  photographed?

8  A.    Yes.

9  Q.    Were you personally there when that took place?

10  A.    No.

11  Q.    Did you have an opportunity to see this item after or at

12  the time that you were executing the search warrant?

13  A.    Yes.

14  Q.    And where did you see it?

15  A.    Inside the apartment.

16  Q.    Okay. Did you see it when it was on the floor or on the

17  counter?

18  A.    On the counter.

19  Q.    And did it appear in the same way it appears in this

20  photograph?

21  A.    Yes.

22  Q.    Any differences?

23  A.    No.

24  Q.    Okay. I'm now going to direct your attention to Government

25  Exhibit 19.  Do you recognize this?

1    A.    Yes.

2    Q.    What is it?

3    A.    Looks to be a plastic cup with a knotted off plastic bag

4    with white powder or rock-like substance inside it.

5    Q.    And does it appear on the property receipt?

6    A.    Yes.

7    Q.    Where does it appear?

8    A.    I believe number 11.

9    Q.    And so where does the property receipt denote that it was

10   recovered from?

11   A.    Behind the bathroom hamper by Jack Graham.

12   Q.    Okay.  And actually before we go further on Government

13   Exhibit 19, I want to show you Government Exhibit 20.  Do you

14   recognize Government Exhibit 20?

15   A.    Yes.

16   Q.    What is that?

17   A.    A plastic bag containing powdered substance that was on

18   the floor.

19   Q.    Okay.  What do we see here on the left side of that

20   photograph?

21   A.    Appears to be a hamper.

22   Q.    So is it item -- I want to direct your attention now back

23   to the item number 11 on the property receipt.  Is item number

24   11 depicted in Government Exhibit 20 or 19 or both?

25   A.    I'm sorry, what exhibit is the one in your hand?

1  Q.    I'm holding 20 -- so this is 20?

2  A.    Exhibit 20.

3  Q.    Okay. So this is 20 and that's -- that's item number 11 on

4  the property receipt?

5  A.    Correct.

6  Q.    Item -- the item that appears in Government Exhibit 19, is

7  that also item 11 from the property receipt or is it a

8  different item?

9  A.    I believe it's a different item.

10 Q.    Okay. I'm just gonna move past Government Exhibit 19 and

11 direct your attention back to Government Exhibit 20.  What

12 room was item 20 -- sorry, the item in Government Exhibit 20

13 recovered from?

14 A.    Bathroom.

15 Q.    Okay. And Government Exhibit 21, what do we see here?

16 A.    A knotted off plastic bag containing looks like baggies of

17 white powdered substance.

18 Q.    Is it the same item that we saw here in Government Exhibit

19 20?

20 A.    Yes, appears so.

21 Q.    And what about it allows you to recognize it, that it's

22 the same one?

23 A.    The red bags with tan -- that contain tan powder residue.

24 Q.    How many officers participated in the actual search of the

25 apartment?

1  A.    I would say at least ten.

2  Q.    Is it fair to say that they collaborate in that search?

3  A.    Yes.

4  Q.    And what is the protocol for you as the evidence officer

5  for keeping track of the evidence items?

6  A.    Everything that is brought to me is documented on a Erie

7  County Sheriff's Office property receipt where it was

8  recovered and by whom it was recovered.

9  Q.    And I want to talk to you a little bit about the general

10 condition of the apartment and I want to show you Government

11 Exhibits 28 through 32.  Do you recognize that?

12 A.    Yes.

13 Q.    Are those -- those -- what are they?

14 A.    Pictures of the apartment room to room of 198 Potomac,

15 Apartment 4.

16 Q.    And do those photographs accurately depict the general

17 condition of the apartment while you were in it during the

18 execution of the search warrant on March 21st, 2017?

19 A.    Yes.

20 Q.    Do you know specifically the placement of each and every

21 item inside of those photographs?  Do you remember the

22 placement independently in your own mind?

23 A.    No.

24 Q.    But the general appearance of the apartment is accurate as

25 far as your memory of being inside of that apartment, correct?

1   A.   Yes.

2            **MS. HIGGINS:** I'll offer Government Exhibits 28

3   through 32 into evidence.

4            **MAGISTRATE JUDGE MCCARTHY:** Any objection?

5            **MR. GRIEBEL:** Bear with me, Judge.  What numbers?

6            **MS. HIGGINS:** 28 to 32.

7            **MR. GRIEBEL:** Judge, could I do a *voir dire*?

8            **MAGISTRATE JUDGE MCCARTHY:** Yes.

9            **MR. GRIEBEL:** Thank you.

10           Officer, referring to Exhibit 32, do you have that

11  there?

12           **THE WITNESS:** Yes.

13           **MR. GRIEBEL:** Okay.  That appears to be an exterior

14  door to the apartment?

15           **THE WITNESS:** Yes, it's the door going into the

16  apartment from a hallway.

17           **MR. GRIEBEL:** Okay.  And which hallway is it?

18           **THE WITNESS:** Hallway off the kitchen.

19           **MR. GRIEBEL:** So that's -- that's technically not

20  part of the apartment that door, correct?

21           **MS. HIGGINS:** Objection, this is beyond the scope of

22  authenticating the photograph.

23           **MR. GRIEBEL:** She said she was introducing them as

24  conditions of the apartment.

25           **MAGISTRATE JUDGE MCCARTHY:** Right, I'll allow it.

1              **THE WITNESS:** I'm sorry, could you repeat the

2     question?

3              **MR. GRIEBEL:** That door is technically not part of

4     the apartment, correct?

5              **THE WITNESS:** The door itself is part of the

6     apartment.  You access that door to gain entry into the

7     kitchen.

8              **MR. GRIEBEL:** But that hallway, the vantage point is

9     not part of the apartment, correct?

10             **THE WITNESS:** Vantage point is from outside the

11    apartment.

12             **MR. GRIEBEL:** Okay, thank you.  And so on the door

13    we see an exterior lock, correct?

14             **THE WITNESS:** Yes.

15             **MR. GRIEBEL:** Okay.  And then as far as the

16    general -- how can I put it?  The way that the items are sort

17    of heaped up in items 31, 30, 29 and 28, obviously -- and

18    picture 28 there's a sheriff's deputy it looks to be standing

19    there, correct?

20             **THE WITNESS:** Correct.

21             **MS. HIGGINS:** Objection, this is a compound

22    question.

23             **MR. GRIEBEL:** So --

24             **MAGISTRATE JUDGE MCCARTHY:** Wait, wait, wait.

25             **MR. GRIEBEL:** I'm sorry, Judge.

1          **MAGISTRATE JUDGE MCCARTHY:** What's compound about

2  it?

3          **MS. HIGGINS:** He listed a battery of exhibit numbers

4  and then asked about a specific --

5          **MAGISTRATE JUDGE MCCARTHY:** All right.

6          **MR. GRIEBEL:** I could rephrase it, Judge.

7          **MAGISTRATE JUDGE MCCARTHY:** Okay.

8          **MR. GRIEBEL:** In picture 28 there looks to be a

9  sheriff's deputy standing there?

10          **THE WITNESS:** Yes.

11          **MR. GRIEBEL:** So picture 28 we know was taken after

12  you had entered -- the Sheriff's Department had entered,

13  correct?

14          **THE WITNESS:** Correct.

15          **MR. GRIEBEL:** And was it executed -- was that

16  picture taken before or after, if you know, if you know, the

17  search warrant was executed?

18          **THE WITNESS:** It was after we made entry --

19          **MR. GRIEBEL:** After.  So what we're seeing in

20  picture 28 is what things looked like after the search warrant

21  was executed, correct?

22          **THE WITNESS:** The picture was probably taken during

23  the -- it was after the execution, the entry, yes.

24          **MR. GRIEBEL:** And same with picture 29, taken after

25  the entry?

1          **THE WITNESS:** Yes.

2          **MR. GRIEBEL:** And it looks like on the bed there at

3  the bottom of picture 29 there's a bunch of looks like

4  electronics or something that's kind of heaped up at the foot

5  of the bed?

6          **THE WITNESS:** Mm-hmm.

7          **MR. GRIEBEL:** So those look to have been collected;

8  is that a fair statement?

9          **THE WITNESS:** There were cellular telephones that

10  were collected, yes.

11          **MR. GRIEBEL:** So that would be consistent with

12  having taken that picture after the search warrant was

13  executed?

14          **THE WITNESS:** Yes, after we made entry.

15          **MR. GRIEBEL:** And then paragraph 30 we see that the

16  toilet seat is down and then on number 31 we see the --

17          **MS. HIGGINS:** Objection.  Was there a question?

18          **MR. GRIEBEL:** No, I was just observing.  No

19  question.  I'll withdraw that.

20          **MS. HIGGINS:** Then I object and ask for it to be

21  stricken from the record.

22          **MAGISTRATE JUDGE MCCARTHY:** He just withdrew it.

23          **MS. HIGGINS:** No, he made a comment making an

24  observation about an exhibit and I'm asking for that comment

25  to be withdrawn.

1           **MAGISTRATE JUDGE MCCARTHY:** The exhibit is in

2    evidence and I believe the exhibit shows the toilet seat being

3    down and that was his comment.

4           **MS. HIGGINS:** Right, it's not a matter --

5           **MAGISTRATE JUDGE MCCARTHY:** He's withdrawn his

6    comment so we're left with the exhibit to determine whether

7    the toilet seat was up or down and I guess I'll consider that

8    at a later date.

9           **MR. GRIEBEL:** And then on Exhibit 31, again, that

10   shows items being kind of heaped up in the center of that room

11   there; is that correct?

12          **THE WITNESS:** Appears so.

13          **MR. GRIEBEL:** And that would have been taken after

14   the search warrant was executed?

15          **THE WITNESS:** After we made entry, yes.

16          **MR. GRIEBEL:** Judge, insofar as the -- these

17   exhibits are offered for purposes of establishing the

18   condition of the house before the search warrant was executed,

19   I would object.

20          But if they're just being offered to show the

21   condition of the house after the search warrant was executed,

22   I don't think I have any objection on that basis.

23          **MAGISTRATE JUDGE MCCARTHY:** Okay.  So --

24          **MS. HIGGINS:** I'm offering it for all purposes,

25   Judge.  I'm offering it for the purpose of understanding the

1  orientation of all the rooms, and I'm also offering it for the

2  condition that the rooms are in.

3          Now the testimony has made clear that this is the

4  condition of the rooms after the execution of the search

5  warrant while it's being occupied by law enforcement.

6          **MAGISTRATE JUDGE MCCARTHY:** Right.

7          **MS. HIGGINS:** There's no dispute about it.

8          **MAGISTRATE JUDGE MCCARTHY:** Okay.  But to the extent

9  that it becomes relevant what was the condition or the

10 location of certain items prior to the execution of the search

11 warrant, I think the testimony and the photographs are of the

12 condition after the execution of the search warrant.

13         So I will allow them for that purpose.

14         **MS. HIGGINS:** Thank you, Judge.

15         **MR. GRIEBEL:** Thank you, Judge.

16         **MAGISTRATE JUDGE MCCARTHY:** Okay.

17 BY MS. HIGGINS:

18 Q.   So I want to direct your attention first to Government

19 Exhibit 28 and -- sorry, Judge, are we -- Government Exhibits

20 28 through 32 are in evidence?

21         **MAGISTRATE JUDGE MCCARTHY:** Oh, yes.

22         **MR. TORRE:** Judge, I had one issue about 28 through

23 32.

24         **MAGISTRATE JUDGE MCCARTHY:** Okay.

25         **MR. TORRE:** If I may just clarify --

1          **THE CLERK:** Mr. Torre, could you move the mic?

2          **MR. TORRE:** Yeah, just a brief --

3          **MAGISTRATE JUDGE MCCARTHY:** Exhibit 28?

4          **MR. TORRE:** Let's see, it would actually be not

5    quite all of them, but specifically I'd like to ask the

6    witness one question about Exhibit 31.

7          **MAGISTRATE JUDGE MCCARTHY:** Okay.

8          **MR. TORRE:** *Voir dire.*  Detective McMahon, was all

9    the property and belongings and mattresses heaped up and

10   standing against the wall when the police first made entry or

11   is that a product of a search?

12         **THE WITNESS:** I believe it's combination of both.

13   These pictures were taken after we made entry and probably

14   during part of the search when all the officers were about the

15   apartment.

16         **MR. TORRE:** Just so the judge knows, I mean, was the

17   apartment in complete disarray with all these belongings

18   thrown in the middle of the room as shown in 31 or did that

19   wind up, you know, as you're tossing the apartment, is this

20   where things wound up?

21         **THE WITNESS:** Like I said, I'm sure it's a product

22   of both.  It wasn't the nicest or most well kept apartment

23   I've ever been in.

24         **MR. TORRE:** Similar question for that other exhibit

25   number, just so we know, 28, was all of that property depicted

 1  there -- cardboard boxes and looks like a handle of a snow

 2  blower, but was that all stacked in the middle of the room

 3  near where that deputy is standing or is that again after

 4  having had the police moved it all into that position so they

 5  could search?

 6          **THE WITNESS:** It was a product of both.  It was a

 7  cluttered apartment with many people running through a small

 8  apartment, and to safely maneuver through the apartment things

 9  are moved during that search.

10          **MR. TORRE:** All right. So is it safe to say that the

11  clutter was gone through and centralized as depicted in this

12  Exhibit 28?

13          **THE WITNESS:** Like I said, it's probably a product

14  of the search itself and being able to maneuver safely through

15  the apartment as well as secure the residence when we were

16  making execution of the search warrant.

17          **MR. TORRE:** Thank you.  That's all I wanted to

18  clarify, Judge.

19          **MAGISTRATE JUDGE MCCARTHY:** All right. So just we're

20  all clear, I'm admitting Government Exhibits 28 through 32 --

21  oh, yes.

22          **MR. O'ROURKE:** I'm a little confused, Your Honor.

23  Officer, it is clear that say, for instance, Exhibit 28, that

24  is the condition of the apartment after the search warrant has

25  been executed?

1          **THE WITNESS:** Yes, after we made entry.

2          **MR. O'ROURKE:** 29 would be a picture of a room in

3   the apartment after the execution of the search warrant?

4          **THE WITNESS:** Correct, after we made entry.

5          **MR. O'ROURKE:** And then 29 there are a number of

6   items piled up on the bed that you can see in that photograph,

7   correct?

8          **THE WITNESS:** Correct.

9          **MR. O'ROURKE:** And of your own personal knowledge

10  you don't know where those items came from, do you?

11         **THE WITNESS:** I don't know if they were placed

12  there, if there was -- they were already there when the

13  picture was taken, no, my own personal knowledge, no, I don't

14  know.

15         **MR. O'ROURKE:** Right, you have no idea whether they

16  were there prior to the search warrant being executed?

17         **THE WITNESS:** Correct.

18         **MR. O'ROURKE:** And you have no idea where they came

19  from?

20         **THE WITNESS:** Correct.

21         **MR. O'ROURKE:** They could have been transported in

22  to the apartment after the execution of the search warrant?

23         **THE WITNESS:** Highly unlikely.

24         **MR. O'ROURKE:** It may be highly unlikely, but you

25  don't know otherwise of your own personal knowledge?

1           **THE WITNESS:** Personally, no, I can't say it for

2    100% sure -- certainty.

3           **MR. O'ROURKE:** Okay.  And if you take Exhibit 31,

4    that would seem to be a photograph that was taken after the

5    execution of the search warrant?

6           **THE WITNESS:** Yes, after we made entry into the

7    apartment.

8           **MR. O'ROURKE:** And obviously the apartment -- or

9    maybe it's not so obvious, but when you entered the apartment

10   the items in the apartment were in a much more orderly

11   fashion --

12          **MS. HIGGINS:** Objection, this question has been

13   asked and answered.

14          **MR. O'ROURKE:** -- than they appear in that

15   particular photograph?

16          **MAGISTRATE JUDGE MCCARTHY:** Don't answer yet, I'm

17   sorry.

18          **MS. HIGGINS:** Objection.  This question has been

19   well asked and well answered regarding the condition of the

20   room --

21          **MAGISTRATE JUDGE MCCARTHY:** Yeah, my recollection is

22   that the witness has testified that it wasn't a particularly

23   neat apartment before the execution, but that the photos show

24   the condition of the apartment after the execution.  And for

25   everyone's benefit, that's the -- I'm allowing their admission

1  for that limited purpose, to show the condition of the

2  apartment after the execution.

3          What the condition of the apartment was immediately

4  prior to the execution, these photos do not show.

5          **MR. O'ROURKE:** Just if I could, Your Honor, just a

6  couple more questions for clarification and I'll finish up

7  here.

8          In Exhibit 31 again there's a number of items that

9  are what I would describe as strewn around the floor there.

10 You have no knowledge, personal knowledge whether or not those

11 items were in the apartment prior to the execution of the

12 search warrant?

13         **THE WITNESS:** No, not from that particular room.

14         **MR. O'ROURKE:** They could have been -- they could

15 have been transported in to the apartment say from the outer

16 hallway or something like that after the search warrant was

17 executed and before this picture was taken, correct?

18         **THE WITNESS:** Again, highly unlikely, but I can't

19 say 100% certainty.

20         **MR. O'ROURKE:** Again, I understand that you feel

21 it's highly unlikely.  And then for Government Exhibit 32, it

22 would be the same situation as I have been asking you about,

23 pretty much there's a lot of clutter there and you don't know

24 what was there prior to the execution of the search warrant

25 and at least there is a possibility that some of those things

1  may have been brought into the apartment after the execution

2  of the search warrant?

3          THE WITNESS: Brought into the apartment?  No,

4  nothing that -- we don't bring any evidence or anything like

5  that into the apartment at all.

6          MR. O'ROURKE: All right. Well, let's take one of

7  those -- let's take Exhibit 31.  There appears to be some cups

8  and debris -- cups or items, let me put it that way, on the

9  floor in the foreground of that picture.  You can see like a

10 plastic cup there?

11         THE WITNESS: Yes.

12         MR. O'ROURKE: Of your own personal knowledge, do

13 you know whether or not that plastic cup was brought into the

14 apartment after the execution of the search warrant?

15         THE WITNESS: Nothing would be brought into the

16 apartment after the execution of the search warrant, no.

17         MR. O'ROURKE: You mean to tell me that -- how many

18 officers did you have in there rummaging around?

19         THE WITNESS: Roughly ten, if not more.

20         MR. O'ROURKE: If an officer had a coffee cup in his

21 hand could that have -- could he have walked in the apartment

22 with a coffee cup in his hand?

23         THE WITNESS: Of course it's possible, but it's our

24 procedure that we don't bring anything into a search warrant.

25         MR. O'ROURKE: I understand that.  But of your own

1  personal knowledge on just that one particular item, you don't

2  know whether that was brought in prior to or after the

3  execution of the search warrant, correct?

4           **THE WITNESS:** Correct.

5           **MR. O'ROURKE:** All right. Thank you.

6           **MAGISTRATE JUDGE MCCARTHY:** Okay.  As indicated, I'm

7  admitting Government Exhibits 28 through 32 in evidence for

8  the limited purpose of showing the condition of the apartment

9  following execution of the search warrant.

10          (**WHEREUPON**, Government Exhibits 28-32 were received

11 into evidence).

12          **MR. TORRE:** Judge, I'm sorry, I hate to interrupt

13 the proceedings, but my client has a -- somewhat of an issue,

14 she needs a short break.

15          **MAGISTRATE JUDGE MCCARTHY:** Okay.

16          **MR. TORRE:** And it's --

17          **MAGISTRATE JUDGE MCCARTHY:** Ten minutes?

18          **MR. TORRE:** We've held off.  I've encouraged her to

19 hold off, but it's become urgent.

20          **MAGISTRATE JUDGE MCCARTHY:** Ten minutes sufficient?

21          **MR. TORRE:** I believe so.

22          **MAGISTRATE JUDGE MCCARTHY:** Okay.  Let's break until

23 five to 11:00, okay?  You may step down.

24          (**WHEREUPON**, there was a pause in the proceeding.)

25          **THE CLERK:** All rise.

1          **MAGISTRATE JUDGE MCCARTHY:** Please be seated.

2          **THE CLERK:**  We're back on the record, United States

3   vs. Williams, et al., case number 17-CR-78(G).  All parties

4   are present, our witness is still under oath.

5          **MS. HIGGINS:** May I proceed?

6          **MAGISTRATE JUDGE MCCARTHY:** Yes.

7   BY MS. HIGGINS:

8   Q.   Detective, you've been asked a lot of questions about the

9   condition of the apartment and the items that we see in

10  Government's Exhibits 28 through 32, specifically about the

11  possible likelihood of items in these pictures having been

12  brought into the apartment.

13          As far as you're aware, were any items of

14  contraband nature or not brought into this apartment?

15  A.   No.

16  Q.   Are any items that are photographed in these photographs

17  as far as you're aware from a place outside of the apartment?

18  A.   No.

19  Q.   In your ten years of experience how many search warrants

20  have you participated in approximately?

21  A.   Well over 500.

22  Q.   And in those approximately 500 executions of search

23  warrants have you ever seen any of the members of the Erie

24  County Sheriff's Office or the Buffalo Police Department for

25  that matter carry items of evidence or items not evidence into

1  the search warrant premise?

2  A.    No.

3  Q.    And why not?

4  A.    We don't want to contaminate the scene.  We don't want to

5  bring any evidence or anything from the outside into a search

6  warrant.

7  Q.    And as the evidence officer at this scene in particular,

8  did you have a particular concern for accurately observing and

9  recording the location of items of contraband found?

10  A.    Yes.

11  Q.    And do the other deputies who participated in the

12  execution of the search warrant, are they aware that you are

13  the evidence officer?

14  A.    Yes.

15  Q.    And do they bring to your attention all pertinent

16  information about the location of items inside, outside the

17  premise or the room inside of the premise that they are found?

18  A.    Yes.

19  Q.    And you record that information?

20  A.    Yes.

21  Q.    And if there's any confusion or clarity required, do you

22  ask follow-up questions?

23  A.    Yes.

24  Q.    And you personally examine all of the items of evidence

25  that you ultimately document on your property receipt,

1    correct?

2    A.    Yes.

3    Q.    And specifically are you responsible for organizing the

4    transport of those items of contraband back to 45 Elm Street

5    where they are inventoried?

6    A.    Yes.

7    Q.    And is that what happened in this case?

8    A.    Yes.

9    Q.    Were those items inventoried at 45 Elm Street?

10   A.    They were documented on a property receipt at the search

11   warrant, they are transported back to 45 Elm Street where

12   they're gone through again, evidence that needs to be

13   submitted to the lab is then done so.

14   Q.    Okay. So the property receipt was actually completed at

15   the search location?

16   A.    Yes.

17   Q.    Okay. Looking at Government Exhibit 28, what room of 198

18   Potomac, Apartment 4 are we looking at?

19   A.    The living room.

20   Q.    Government Exhibit 29?

21   A.    Bedroom.

22   Q.    Government Exhibit 30?

23   A.    Bathroom.

24   Q.    And what room does the bathroom open out into?

25   A.    The kitchen.

1   Q.   So is the photographer standing in the kitchen here?

2   A.   Yes.

3   Q.   What room are we looking at in Government Exhibit 31?

4   A.   Another small bedroom.

5   Q.   And Government Exhibit 32?

6   A.   That is in to the kitchen.

7   Q.   So where are we standing or where is the photographer

8   standing?

9   A.   On the landing in the hallway outside of the kitchen.

10  Q.   Okay. And what hallway are we talking about?

11  A.   The back hallway.

12  Q.   Okay.  So is this the hallway you used to access the

13  apartment?

14  A.   No, it's not.

15  Q.   What hallway did you use?

16  A.   The front hallway.  We went in through the front door.

17  Q.   Looking back at Government Exhibit 5, this photograph was

18  taken from the perspective of the front hallway which is how

19  you accessed it, correct?

20  A.   Correct.

21  Q.   Government Exhibit 32 is the back hallway which is not the

22  way you accessed it, correct?

23  A.   Correct.

24  Q.   Did any officer access this apartment through this hallway

25  in Government Exhibit 32?

1  A.    To gain entry to the residence, no.

2  Q.    How is it that law enforcement managed to enter this

3  hallway in Government Exhibit 32?

4  A.    In clearing the residence we clear all locked doors, shut

5  doors, bedrooms, closets, anything that would be an access

6  point by anybody inside the residence.

7  Q.    Okay. So it was asked of you about the locking mechanism

8  on this door.  Does it appear to be a deadbolt?

9  A.    Yes.

10 Q.    Are you aware of any locking mechanism on the handle

11 itself?

12 A.    No.

13 Q.    Do you know how this door became ajar?

14 A.    It was opened from the inside from the kitchen.

15 Q.    Okay. And so no member of law enforcement was ever inside

16 that back stairwell in order to access it from the outside of

17 the apartment?  It was only from the inside that it was

18 opened?

19 A.    Yes.

20           **MR. TORRE:** Objection to leading the witness.

21           **MAGISTRATE JUDGE MCCARTHY:** Please try not to lead.

22           **MS. HIGGINS:** Thank you.

23 **BY MS. HIGGINS:**

24 Q.    So comparing now -- sorry, looking still at Government

25 Exhibit 32, you said this door opens into what room of the

1  apartment?

2  A.    Kitchen.

3  Q.    Okay. So now let's go to Government Exhibit 13.  Here we

4  are in the kitchen.  Where is that door in Government Exhibit

5  13?

6  A.    I believe it is over this way.

7  Q.    Okay. So for the record the witness has indicated a place

8  to the very right edge of the photograph.

9            So we can't actually see the door in this picture;

10 is that fair to say?

11 A.    Yes.

12 Q.    Okay. The person who we can partially see on the right

13 edge, are they standing nearby that door?

14 A.    Yes.

15 Q.    How close do you think they are to the door?

16 A.    Within a couple feet.

17 Q.    And so the area depicted in this photograph in the

18 kitchen, does this nearly capture the whole kitchen?

19 A.    Yes.

20 Q.    Is the kitchen much larger than what we can see here?

21 A.    Not that much larger, no.

22 Q.    Did you personally ever go into that rear hallway?

23 A.    No.

24 Q.    Did you become aware of what's in that rear hallway?

25 A.    Yes.

1  Q.    What's in it?

2  A.    What was recovered?

3  Q.    No, sorry.  Did you become -- is it a hallway or a

4  stairwell?

5  A.    It's a stairwell that there's a little like common area

6  type thing, not even a common area.  Just a storage area and a

7  landing and then a stairwell that goes downstairs.

8         **MR. GRIEBEL:** Judge, I object.  I don't think this

9  witness is competent.  I know his first response was that he

10 had never been there, he was never in the back hallway.

11        And then the next series of questions are him

12 describing this back hallway and it just seems to me that you

13 can't have it both ways.  You can't be -- not be someplace and

14 then somehow describe it as if you've been there.

15        **MAGISTRATE JUDGE MCCARTHY:** Point well-taken.  You

16 can attempt to clarify.

17        **MS. HIGGINS:** Thank you.

18 **BY MS. HIGGINS:**

19 Q.    Did you personally ever go into that back stairwell?

20 A.    No.

21 Q.    Did you learn that it was a stairwell?

22 A.    Yes.

23 Q.    Based on its orientation to the apartment that you were

24 inside of, did you understand it to be a rear stairwell?

25 A.    Yes.

1  Q.   And did you learn -- sorry.  Did you ever learn whether

2  any other apartment accessed that rear stairwell?

3  A.   No.

4  Q.   Because you didn't personally go there, correct?

5  A.   Correct.

6  Q.   So did you ever learn that there was any other doorway to

7  that rear stairwell?

8  A.   No.

9  Q.   So you don't know whether there was or was not any other

10 doorway?

11 A.   I do not.

12 Q.   And do you know for certain whether that rear stairwell

13 actually led to a rear entrance of the building?

14 A.   I don't.

15 Q.   Did you --

16          MR. GRIEBEL: Judge, I object to this whole line of

17 questioning because now she's trying to prove a negative.

18          MAGISTRATE JUDGE MCCARTHY: He's just saying --

19          MS. HIGGINS: I'm not.

20          MAGISTRATE JUDGE MCCARTHY: -- he doesn't know.

21          MR. GRIEBEL: Yeah, so I don't even know why we're

22 having this line of questioning because she's establishing a

23 negative by a series of negatives and he's not competent to

24 testify to any of it.  It just is irrelevant.

25          MAGISTRATE JUDGE MCCARTHY: She's establishing that

1  he doesn't know.

2          **MR. GRIEBEL:** It just strikes me that it's

3  irrelevant testimony.

4          **MAGISTRATE JUDGE MCCARTHY:** Well, so far I would

5  agree with you.

6          **MR. GRIEBEL:** So I would ask that it be stricken.

7          **MAGISTRATE JUDGE MCCARTHY:** It's harmless.  It's not

8  showing anything at this point.

9          **MR. GRIEBEL:** Okay.

10          **MAGISTRATE JUDGE MCCARTHY:** I'm not going to strike

11  it.  I'll allow Ms. Higgins to take us toward the direction

12  she wants to go and I'll see if she can get there.  I don't

13  know.

14  **BY MS. HIGGINS:**

15  Q.   Did you ultimately learn that items of contraband were

16  recovered from this rear stairwell?

17  A.   Yes, I did.

18  Q.   Did you personally recover those items?

19  A.   No, I did not.

20  Q.   Do you know who participated in the recovery of those

21  items?

22  A.   I believe Chief D.J. Granville.

23  Q.   And did anyone else?

24  A.   And Detective Adam Imiolo.

25  Q.   So it's your -- it's your knowledge that they accessed the

1  rear stairwell?

2  A.   Correct.

3  Q.   At the time you applied --

4         **MAGISTRATE JUDGE MCCARTHY:** I'm sorry, excuse me.

5  You said Chief Imiolo and Detective Imiolo ?

6         **THE WITNESS:** Chief D.J. Granville and Detective

7  Imiolo.

8         **MAGISTRATE JUDGE MCCARTHY:** Okay, okay.

9  **BY MS. HIGGINS:**

10 Q.   At the time you applied for and obtained the search

11 warrant for 198 Potomac, upper right apartment, did you know

12 that there was a rear entrance to this building?

13 A.   No.

14 Q.   Did you later learn that there was a rear entrance?

15 A.   Yes.

16 Q.   And was that during the execution of the search warrant

17 itself?

18 A.   Yes.

19 Q.   I'm going to show the witness what's been marked as

20 Government Exhibit 36.  Do you recognize that photograph?

21 A.   Yes.

22 Q.   What is it?

23 A.   It's a picture of the Herkimer side and rear side of 198

24 Potomac Avenue.

25 Q.   Okay. Is it in the same respects as Government Exhibit 35

1  different because of the lighting and the time you visited the

2  building versus the way it appears in the photograph?

3  A.   Yes, it's daylight in the photograph.  It was nighttime

4  when we were at the residence.

5  Q.   Is it in the same or substantially the same condition the

6  building itself, is the building itself in the same or

7  substantially the same condition as when you observed it on

8  March 21st, 2017?

9  A.   Yes, it appears so.

10            **MS. HIGGINS:** Now offer Government Exhibit 36 into

11  evidence.

12            **MR. GRIEBEL:** Judge, if I could do a brief

13  *voir dire*?

14            **MAGISTRATE JUDGE MCCARTHY:** Yes.

15            **MR. GRIEBEL:** Thank you.

16            **MAGISTRATE JUDGE MCCARTHY:** Let me ask

17  preliminarily, is this photograph taken from Herkimer?

18            **THE WITNESS:** This is on the Herkimer side, yes.

19            **MAGISTRATE JUDGE MCCARTHY:** Okay.  So the person who

20  took the photograph would be standing on Herkimer Street not

21  on Potomac, correct?

22            **THE WITNESS:** Correct.

23            **MAGISTRATE JUDGE MCCARTHY:** Okay, go ahead.

24            **MR. GRIEBEL:** Officer --

25            **MAGISTRATE JUDGE MCCARTHY:** You know, Mr. Griebel,

1    if you want, you can do it from counsel table, whatever you

2    prefer.  It's --

3              **MR. GRIEBEL:** Judge, I just want to be respectful to

4    the Court.

5              **MAGISTRATE JUDGE MCCARTHY:** You always are and so it

6    doesn't --

7              **MR. GRIEBEL:** Entirely up to you.  Sometimes

8    standing at the podium --

9              **MAGISTRATE JUDGE MCCARTHY:** Okay, okay, okay.

10             **MR. GRIEBEL:** One foot at the podium.  Officer, you

11   testified that there -- this apartment -- this photograph on

12   No. 36 is a fair and accurate representation of how the

13   apartment looked on the day in question, correct?

14             **THE WITNESS:** In its totality, yes.

15             **MR. GRIEBEL:** Okay. Now I'd like to direct your

16   attention to the utility feeds at the bottom of that

17   photograph.  Do you see those?

18             **THE WITNESS:** I do.

19             **MR. GRIEBEL:** How many electric meters do you see

20   there?

21             **THE WITNESS:** Appears there are five.

22             **MR. GRIEBEL:** Five, okay.  And so were there five

23   apartments or four apartments on that day?

24             **THE WITNESS:** Four apartments, I believe.

25             **MR. GRIEBEL:** Okay.  In your experience does the

1  electric company run utilities, separate meters to places for

2  which there's no one to use that electricity?

3          **THE WITNESS:** In my experience there's all different

4  things: People steal electricity; people, you know, the gas

5  company will turn things off; sometimes doubles only have one

6  meter.  It all varies.

7          **MR. GRIEBEL:** Okay.  So -- but there are five

8  utility feeds going into that apartment?

9          **THE WITNESS:** There are five, yes.

10         **MR. GRIEBEL:** Thank you.

11         **MAGISTRATE JUDGE MCCARTHY:** Going into the building?

12         **MR. GRIEBEL:** Yeah, going into the building.  Okay.

13         Judge, I don't think it's a fair and accurate

14  representation because obviously it looks to me like there's

15  actually five apartments in this building, not four.

16         And so I don't know how they would determine the

17  state of affairs this being a fair and accurate representation

18  how it looked on that particular day.

19         **MS. HIGGINS:** Judge, I don't know how the

20  witness's -- how that fact undermines the witness's testimony

21  that he's looking at the photograph and it's a fair and

22  accurate representation of the building that he saw.

23         The fact that there are different meters is a point

24  Mr. Griebel can use on cross-examination, he can make the

25  argument if it's somehow relevant at a later stage, but it

1  doesn't undermine the authenticity of it.

2              **MAGISTRATE JUDGE MCCARTHY:** Okay.  Let me just ask a

3  couple questions.  Sir, the execution was at night, correct?

4              **THE WITNESS:** Correct.

5              **MAGISTRATE JUDGE MCCARTHY:** You weren't on Herkimer,

6  right?

7              **THE WITNESS:** No.

8              **MAGISTRATE JUDGE MCCARTHY:** So you -- whether

9  these -- whether there were four or five or any electric

10 meters on the building at that time you wouldn't know, right?

11             **THE WITNESS:** Correct.

12             **MAGISTRATE JUDGE MCCARTHY:** I guess, Ms. Higgins,

13 what is the photo being offered for?

14             **MS. HIGGINS:** Judge, in this photograph you can see

15 the rear entrance of the building.  So it's to establish that

16 there is --

17             **MAGISTRATE JUDGE MCCARTHY:** Where is it?

18             **MS. HIGGINS:** It's in the very center.  If I could

19 (inaudible).

20             **MAGISTRATE JUDGE MCCARTHY:** Okay.

21             **MS. HIGGINS:** Just waiting for it to focus.

22             You can see ralings here, Judge, and an entrance

23 there.

24             **MAGISTRATE JUDGE MCCARTHY:** Where is the entrance

25 door?  I'm sorry, where?  I'm not trying to be cute here, I

1  just -- I don't see an entrance door.  Where is it?  I see two

2  windows.

3          **MS. HIGGINS:** (Inaudible) I believe, I can let the

4  witness try if he wants.

5          **MAGISTRATE JUDGE MCCARTHY:** Yeah, could you --

6          **THE WITNESS:** A door here and you can see a small

7  railing in the picture.

8          **MS. HIGGINS:** Judge, I mean, I'd like to proffer --

9          **MAGISTRATE JUDGE MCCARTHY:** I'm not doubting you --

10          **MS. HIGGINS:** -- I'd like to proffer some

11  information, Judge.  This -- this photograph is evidently --

12  sorry, is evidently from an angle.

13          So it's looking between these two buildings.

14          **MAGISTRATE JUDGE MCCARTHY:** Yeah.

15          **MS. HIGGINS:** We're not standing broadside on the

16  side of the building.  So we're -- we're not looking square at

17  this doorway.

18          **MAGISTRATE JUDGE MCCARTHY:** Oh, I see.  So is --

19  does part of the building -- part of the rear of the building

20  jut out further than the remainder and that's why the door

21  can't be seen?  Is that what you're saying?

22          **MS. HIGGINS:** I'd prefer the witness to answer the

23  question, Judge, because I haven't personally observed it.

24          **MAGISTRATE JUDGE MCCARTHY:** All right.

25          **THE WITNESS:** Yes, Judge, the side of the building

1    protrudes out a little bit and then kind of comes back in and

2    that's why it kind of blocks that rear entrance.

3              **MAGISTRATE JUDGE MCCARTHY:** Okay, because honestly I

4    can't see it --

5              **THE WITNESS:** Yeah, it's very tough to tell from

6    that angle.

7              **MS. HIGGINS:** You can't see the door itself, Judge.

8              **MAGISTRATE JUDGE MCCARTHY:** All right, Mr. Griebel,

9    do you have further --

10              **MR. GRIEBEL:** No, Judge, I'm finished.  I just --

11    just wanted to ask those questions on *voir dire*.

12              **MAGISTRATE JUDGE MCCARTHY:** Okay, so I'm -- you're

13    offering the exhibit, right?

14              **MS. HIGGINS:** Yes.

15              **MAGISTRATE JUDGE MCCARTHY:** I'm allowing it for the

16    purpose of showing the building, showing -- I would take it

17    that it's undisputed that there is a rear door to the

18    building.

19              As far as whether the utility meters were in place

20    at the time or how many there were, I'm not allowing it for

21    that purpose.

22              **MR. GRIEBEL:** Thank you, Judge.

23              **MAGISTRATE JUDGE MCCARTHY:** All right.

24              (**WHERUPON,** Government Exhibit 36 was received into

25    evidence).

1  BY MS. HIGGINS:

2  Q.   While we're speaking of the utilities, Detective, did law

3  enforcement make inquiry of any utility about this building

4  prior to the application of a search warrant?

5  A.   No.

6  Q.   And why not?

7  A.   It was after hours, we would not be able to get ahold of

8  anybody at National Fuel to help us out.

9  Q.   And, again, what time was the search warrant signed?

10 A.   8:57 p.m..

11 Q.   So Government Exhibit 36 is already in evidence and I

12 believe you did mark, but we'll do it for the record now,

13 could you just show where the rear entrance is located on the

14 rear of the building?

15          Okay, for the record the witness has indicated a

16 place beyond the brown fence with the open door just above

17 sort of the center of that fence there's a place on the

18 building that appears to be -- there appears to be some white

19 trim and railing coming out from that location.

20          **MAGISTRATE JUDGE MCCARTHY:** Okay.

21 BY MS. HIGGINS:

22 Q.   So you came to learn that there was actually a rear

23 entrance of the building on the day that you executed the

24 search warrant, correct?

25 A.   Correct.

1  Q.   Prior to that this view of the building was never -- never

2  noted by law enforcement, correct?

3  A.   No.

4  Q.   So the CI wasn't taken to this vantage point, correct?

5  A.   No.

6  Q.   So do you know whether this rear entrance accesses the

7  rear stairwell that we were discussing previously?

8  A.   I don't.

9  Q.   Do you know whether any other units inside of this

10 building had access to that rear stairwell?

11 A.   I don't.

12 Q.   Was any force used to open the door that accesses that

13 rear stairwell?

14 A.   No.

15 Q.   I'm just going back to Government Exhibit 32.

16          **MAGISTRATE JUDGE MCCARTHY:** Government Exhibit 32?

17          **MS. HIGGINS:** Yeah, this is the doorway that we're

18 discussing, Government Exhibit 32.

19          **MAGISTRATE JUDGE MCCARTHY:** Oh, right, okay.

20 **BY MS. HIGGINS:**

21 Q.   This doorway, Detective, leads off of the kitchen of the

22 apartment?

23 A.   Yes.

24 Q.   Correct?

25 A.   Yes.

1   Q.   And in to a rear stairwell, correct?

2   A.   Yes.

3   Q.   But you don't know as you sit here now whether or not that

4   rear stairwell leads to the rear entrance we see in Government

5   Exhibit 36, correct?

6   A.   Correct.

7         **MS. HIGGINS:** I have no further questions for this

8   witness.

9         **MAGISTRATE JUDGE MCCARTHY:** Thank you.  Anyone wish

10  to cross further?

11        **MR. GRIEBEL:** I do, Judge.  I guess just as a matter

12  of housekeeping, what exhibits are in evidence?  Because I --

13        **MAGISTRATE JUDGE MCCARTHY:** Okay, Exhibits --

14  Government Exhibits 1, 2, 4, 5 through 21, 28 through 32, and

15  35 and 36 according to my notes.

16        **MR. GRIEBEL:** Okay, thank you.  Would you like me to

17  start, Judge, or I don't know --

18        **MAGISTRATE JUDGE MCCARTHY:** I have no preference as

19  to --

20        **MR. GRIEBEL:** I don't know about counsel, okay.

21                  **<u>CROSS-EXAMINATION</u>**

22  **BY MR. GRIEBEL:**

23  Q.   Officer, Dan Griebel for Mr. Williams doing the

24  questioning.

25         Was XXX XXX the informant?

1              **MS. HIGGINS:** Objection.

2              **MAGISTRATE JUDGE MCCARTHY:** Yeah, why?  I'm not --

3              **MR. GRIEBEL:** Just based on information we've

4     gathered, just he may not be confidential.

5              **MS. HIGGINS:** Judge, I specifically objected to

6     this.

7              **MAGISTRATE JUDGE MCCARTHY:** I'm going to sustain

8     that objection.  If you want to make some further post-hearing

9     argument I'll consider it, but not at this point.

10             **MR. GRIEBEL:** Okay.

11             **MR. GRIEBEL:**  Just so I understand --

12             **MS. HIGGINS:** Judge --

13             **MR. GRIEBEL:** -- what's the basis for the -- to

14    sustain the objection?

15             **MAGISTRATE JUDGE MCCARTHY:** Confidentiality of the

16    informant, safety.

17             **MS. HIGGINS:** Judge, I move to strike --

18             **MAGISTRATE JUDGE MCCARTHY:** What?

19             **MS. HIGGINS:** I'm sorry.  I move to strike the

20    question from the record so that that name is not part of the

21    public record in the event that Mr. Griebel is right or wrong,

22    I'm not confirming that information, I just don't think any

23    name should be attached to that information.

24             **MAGISTRATE JUDGE MCCARTHY:** I'm not going to strike

25    it.  I'll seal it, I'll seal that portion.

1          **MS. HIGGINS:** Thank you.

2     **BY MR. GRIEBEL:**

3     Q.   Now, Officer, in connection with the warrant application,

4     did you disclose the informant's criminal history?

5          **MS. HIGGINS:** Objection.  Judge, I specifically

6     noted that this hearing is not about the *in camera* proceeding

7     and I didn't -- this is well beyond the scope of what I talked

8     about in direct and it is not pertinent to the information --

9     to the -- to the contested issue for this hearing, which is

10    the -- which is what happened -- the scope of the search

11    warrant and execution.

12         **MAGISTRATE JUDGE MCCARTHY:** I'm going to sustain

13    that objection.

14         **MR. GRIEBEL:** And just so I can get some guidance,

15    Judge, I take it that would you sustain any objection that I

16    make to anything regarding the informant's warrant application

17    and what was done there?

18         **MAGISTRATE JUDGE MCCARTHY:** Well, as I indicated

19    previously, I am going to direct the Government to furnish a

20    transcript, a portion of which will be provided to defense

21    counsel, that portion which relates to the location of the

22    apartment  because there was some commentary and questions, I

23    think, legitimate questions as to why the apartment number was

24    deleted.

25         But beyond that I'm not going to allow -- and, yes,

1  so I would -- I would sustain an objection to any question

2  which would tend to disclose the identity of the informant.

3          **MR. GRIEBEL:** Okay, thank you, Judge.

4  **BY MR. GRIEBEL:**

5  Q.   Now, Officer, did you make any statements regarding what

6  you testified or the warrant execution, what you've testified

7  to today, reports, anything like that?

8  A.   In regards to?

9  Q.   Did you prepare police reports relative to this?

10 A.   I prepared a police report, yes.

11 Q.   Where are those reports?

12 A.   In our terms, records keeping system.

13 Q.   Have they been supplied to the U.S. Attorney's Office? The

14 U.S. Attorney's Office has taken over the prosecution of this

15 case, correct?

16 A.   Yes.

17         **MR. GRIEBEL:** I'd like those, Judge, under Rule 28,

18 26(2).

19         **MS. HIGGINS:** Judge, they were provided and marked,

20 they're Government Exhibit 3 for this hearing.

21         **MR. GRIEBEL:** Has the witness seen Government

22 Exhibit 3?

23         **MAGISTRATE JUDGE MCCARTHY:** I don't know.

24         **MS. HIGGINS:** You can ask him.

25         **MR. GRIEBEL:** Sure. (Inaudible).

1    **MAGISTRATE JUDGE MCCARTHY:**  You may.

2    **BY MR. GRIEBEL:**

3    Q.   Show you what's been marked as Government Exhibit 3

4    (inaudible)?

5    **THE CLERK:** I can't pick you up on the mic.

6    **BY MR. GRIEBEL:**

7    Q.   Okay, I'm going to show you what's been marked as

8    Government's Exhibit 3 and also show the witness.  After

9    you've had a chance to review that, could you let me know?

10   A.   Yes.

11   Q.   Is that a report that you prepared?

12   A.   Yes.

13   Q.   Did you prepare any other reports?

14   A.   No, not that I believe so.

15   Q.   Did you make any other statements?

16   A.   No.

17   Q.   Did you testify to a grand jury?

18   A.   I did not.

19   Q.   Did you tell anyone who would have taken notes and written

20   them down and put them into another report?

21   A.   No.

22   Q.   That you know of?

23   A.   No.

24   Q.   Okay. And so it's your statement then that Government's

25   Exhibit 3 is the only statement that you've made relative to

1  this?

2  A.   That I recall, yes.

3  Q.   What did you review before you testified today?

4  A.   Pictures, police report, things like that.

5  Q.   And could you tell me what the things like that are?

6  A.   Police report, pictures, search warrant, the application,

7  property receipts.

8  Q.   That's it?  Okay.  Now, in connection with the photographs

9  that were taken that you've testified to previously, were

10  there other photographs that were taken?

11  A.   Not that I'm aware of, no.

12  Q.   So we have all of the photographs?

13  A.   Yes.

14         MS. HIGGINS: Judge, just -- I'm not -- this is not

15  an objection, but essentially I'm asking whether the question

16  is relating only to the photographs that have been tendered in

17  evidence so far or --

18         MR. GRIEBEL: I think it's all the photographs that

19  were marked for exhibits.

20  BY MR. GRIEBEL:

21  Q.   You said you reviewed the photographs?

22  A.   I reviewed a myriad of photographs, yes.

23  Q.   Okay.  I'm going to show you, if I can approach, Judge?

24         MAGISTRATE JUDGE MCCARTHY: You have standing

25  permission to approach, as does anyone else.

1       **MS. HIGGINS:** I didn't mark all the photographs.

2 **BY MR. GRIEBEL:**

3 Q.   I'd like you to look through these photographs and then

4 I'll ask you questions (inaudible).

5       **MAGISTRATE JUDGE MCCARTHY:** Mr. Griebel, just for

6 the record, are the photographs that he's looking at, are

7 those the --

8       **MR. GRIEBEL:** Those are the ones that have been

9 marked I think 5 through the end.

10       **MS. HIGGINS:** No, 5 through 34.

11       **MR. GRIEBEL:** 5 through 34.

12       **MS. HIGGINS:** 35 and 36 were not taken at the search

13 warrant.

14 **BY MR. GRIEBEL:**

15 Q.   Are you finished?

16 A.   Yes.

17 Q.   Now, did you review these photographs before you testified

18 today?

19 A.   I don't believe all of them, no.

20 Q.   Do they comprise all of the photographs that were taken

21 when the search warrant was executed?

22       **MS. HIGGINS:** Objection, Judge, I just told

23 Mr. Griebel that I did not mark all the photographs for this

24 evidentiary hearing. I don't think it's fair to quiz this

25 witness on whether -- I mean, there are upwards of 40 to 50

1  photographs taken during the execution of the search warrant.

2          It's not fair to quiz this witness on whether each

3  of those while he reviews them on the stand are all of the

4  photographs.

5          **MAGISTRATE JUDGE MCCARTHY:** Well, he can be asked

6  whether he knows if there are any other photos.

7          **MR. GRIEBEL:** That's what I'm trying to get to.

8  **BY MR. GRIEBEL:**

9  Q.   Are there other photos besides these that you're aware of?

10 A.   That I'm aware of, I mean, there quite possibly is, yes.

11 Q.   Where would they be?

12 A.   On a disk in evidence in the file or turned over to the

13 U.S. Attorney's Office.

14 Q.   Okay.

15         **MR. GRIEBEL:** Do we have all of the photographs?

16         **MS. HIGGINS:** You do.

17 **BY MR. GRIEBEL:**

18 Q.   And apart from the photographs that are on that disk, were

19 there any other photographs that were ever taken?

20 A.   Not that I'm aware of, no.

21 Q.   Now, Officer, the search warrant before Judge Bargnesi was

22 signed at 8:57, I believe, something like that?

23 A.   Yes.

24 Q.   And your testimony was you had members of the Buffalo

25 Police office -- Buffalo Police Department as well as the

1  Sheriff's Department, correct?

2  A.    Correct.

3  Q.    And about how long after the search warrant was signed did

4  it take you to begin executing that search warrant?

5  A.    I believe it was signed at 8:57 and executed at 10:09, so

6  somewhere a little after an hour after that.

7  Q.    Okay. So in one hour, is it fair to say you somehow

8  assembled a team of say a dozen law enforcement officers?

9  A.    Yes.

10 Q.    Including a SWAT team?

11 A.    No, no SWAT team.

12 Q.    Now, was there -- had you taken work to assemble this team

13 before you had applied for the search warrant?

14 A.    Some things were taken care of, yes.

15 Q.    And what was taken care of beforehand?

16 A.    Talking to, making sure we had enough bodies; if we didn't

17 we reached out to our general Detective Bureau who are made up

18 of detectives who can also execute search warrants; and making

19 phone calls to Buffalo Police telling them that we were

20 anticipating executing a search warrant.

21 Q.    And part of anticipating executing a search warrant was

22 obtaining a search warrant, correct?

23 A.    Correct.

24 Q.    So you knew beforehand that the end result was to get

25 Judge Bargnesi to sign a search warrant, correct?

1  A.   No, we didn't know.

2  Q.   But you had a pretty good idea?

3  A.   We always take precautions that if that -- to do it in a

4  timely fashion, we let people know that that's what we're

5  trying to work on, yes.

6  Q.   Now, as far as take the time to assemble the team, how

7  long -- how many -- when did you first start to put this team

8  into place?

9           MS. HIGGINS: Objection, relevance.

10           MAGISTRATE JUDGE MCCARTHY: What's the relevance?

11           MR. GRIEBEL: The relevance, Judge, is that -- the

12  fact that the gentleman was working on assembling the team

13  before the search warrant was actually applied for, executed

14  would tend to indicate an inherent bias to get the search

15  warrant, and --

16           MAGISTRATE JUDGE MCCARTHY: Well, I mean, if you're

17  applying for a search warrant, of course they want to get it,

18  right?

19           MR. GRIEBEL: I understand, but the mechanics would

20  tend to drive the bus in this case.  In other words, by the

21  time you get the team together, by the time you get everything

22  together you want to get that search warrant so you're gonna

23  slant the information to get the search warrant.

24           MS. HIGGINS: Judge --

25           MAGISTRATE JUDGE MCCARTHY: No, just -- I'll accept

1   your point for what it's worth.  You can argue that, but I

2   don't see the point of going into further factual detail about

3   the fact that they assembled a team and so forth, unless

4   you're trying to suggest that it would have gone forward even

5   had the warrant not been signed and I don't think you're

6   suggesting that.

7              So, yeah, I have your point, Mr. Griebel.

8              **MR. GRIEBEL:** Okay, thank you, Judge.

9              **MAGISTRATE JUDGE MCCARTHY:** I think we'll just leave

10  it at that for now.

11             **MR. GRIEBEL:** Okay.

12  **BY MR. GRIEBEL:**

13  Q.   Now, as far as the -- turning to the execution of the

14  search warrant, which team were you in?  Were you in the --

15  the -- were there two -- was the search executed in two waves?

16  A.   No.

17  Q.   In other words, so --

18  A.   We have people on the outside that usually comprise of the

19  uniformed personnel in case anybody runs out of the house,

20  throws things out windows or tries to discard any evidence;

21  and we have a team that executes the search warrant that makes

22  entry into the residence.

23  Q.   Okay. And before you executed the search warrant, is it

24  fair to say there was a team at the front door?

25  A.   Yes.

1  Q.    And is it fair to say there was a team at the rear of the

2  house?

3  A.    No.

4  Q.    There was no team at the rear of the house?

5  A.    No team.  There were uniformed officers that were on the

6  perimeter.  If they were in the rear, I don't know, because I

7  was in front of the house.

8  Q.    Okay. And as far as a team that went up the rear

9  stairwell, was there a team that went up the rear stairwell?

10 A.    No.

11 Q.    And you know that for a fact?

12 A.    Yes.

13 Q.    And you were at the front stairwell?

14 A.    Yes.

15 Q.    So how do you know for a fact there was no team at the

16 rear stairwell?

17 A.    Nobody accessed the rear of the house, the back kitchen --

18 the kitchen door in that hallway, it was opened from the

19 inside, not from the outside.  If there was a team that

20 entered up that way, they would have entered that back door.

21 Q.    Okay. Do you still have your exhibits there?  Your

22 photographs?

23 A.    I do not.

24 Q.    Okay. I'm going to show you what's been marked as

25 (inaudible).  Can you see on Exhibit 32 that there appears to

1  be some damage to the door jamb going up the right side?

2  A.   I see that there's some wear and tear, yeah.

3  Q.   And you're saying that whatever wear and tear damage, do

4  you know anything about that?

5  A.   No.

6  Q.   Okay. Then I'd like to refer you to Exhibit 13.  There's

7  an officer standing in the corner there I think you testified

8  to?

9  A.   Yes.

10  Q.   There's a white object that's beneath jutting out from the

11  picture underneath the gentleman's hand.  Do you see that?

12  Looks like a fragment of something?

13  A.   I see a white object, yes.

14  Q.   Okay. And you don't know what that is?

15       **MAGISTRATE JUDGE MCCARTHY:** Excuse me, is that on

16  the right side of the picture?

17       **MR. GRIEBEL:** On the right side of the picture.

18       **MAGISTRATE JUDGE MCCARTHY:** Right under his right

19  hand?

20       **MR. GRIEBEL:** Yeah, right under his right hand.

21  **BY MR. GRIEBEL:**

22  Q.   Do you see a fragment there?

23  A.   I see a white object, yes.

24  Q.   You don't know what that is, correct?

25  A.   I do not.

1   Q.   Okay.   Then there's another white object sitting under the

2   cupboard on the floor.   Do you see that?

3   A.   I do.

4   Q.   And that's a fragment of something?

5   A.   Yeah, it's a white object.

6   Q.   You don't know what that is either?

7   A.   No.

8           **MAGISTRATE JUDGE MCCARTHY:** Whoa, whoa, wait.   Where

9   is that?

10          **MR. GRIEBEL:** Over where the gentleman is standing

11  on the right side of the picture.

12          **MAGISTRATE JUDGE MCCARTHY:** Yeah.

13          **MR. GRIEBEL:** There is you see the kitchen cupboard,

14  the white --

15          **MAGISTRATE JUDGE MCCARTHY:** Yeah.

16          **MR. GRIEBEL:** -- and then on the floor there's a

17  white object sitting on the floor.

18          **MAGISTRATE JUDGE MCCARTHY:** Okay.   Is that just to

19  the left of the exhibit?

20          **MR. GRIEBEL:** It's just -- it's over on the right

21  side on the floor, yeah, right by the gentleman -- where the

22  gentleman is standing.

23          **MAGISTRATE JUDGE MCCARTHY:** Okay.

24  **BY MR. GRIEBEL:**

25  Q.   You don't know what that is, correct?

1  A.    No.

2  Q.    Now, when the apartment was secured you said you came in

3  and the apartment was cleared I believe is the word you used?

4  A.    Yes.

5  Q.    Where was -- how many occupants were there in the

6  apartment?

7  A.    Four, I believe.

8  Q.    Okay. As far as Ms. Centeno, where was she taken, do you

9  know?

10  A.    I don't recall.

11  Q.    As far as Ms. Williams, do you know where she was taken?

12  A.    I believe she was in the bathroom.

13  Q.    And she was just kept in the bathroom?

14  A.    No, she would have been removed from the bathroom and

15  detained.

16  Q.    Okay. Where was she detained, do you know?

17  A.    I do not.  I don't know.

18  Q.    Who would know?

19  A.    Whoever detained her.

20  Q.    Okay. When you say they're detained, how are they

21  detained?

22  A.    In handcuffs.

23  Q.    And are they free to move about?

24  A.    No.

25            **MS. HIGGINS:** Objection, relevance.

1  BY MR. GRIEBEL:

2  Q.    Okay.   So --

3              MS. HIGGINS: Objection, relevance.

4              MAGISTRATE JUDGE MCCARTHY: Wait, wait.

5              MR. GRIEBEL: Judge, the relevance is I'm trying to

6  establish the sequence of events here that I believe that the

7  first step is is for everyone to be detained and then the

8  search begins.

9              MAGISTRATE JUDGE MCCARTHY: Okay.

10             MR. GRIEBEL: And that's all I'm just trying to

11  establish where people are detained and to confirm that that,

12  in fact, took place.

13             MS. HIGGINS: I don't know how it's relevant to the

14  question of this evidentiary hearing which is about the scope,

15  the execution of the scope of the warrant.

16             MAGISTRATE JUDGE MCCARTHY: I'll allow it.  We'll

17  see where we go.

18             MR. GRIEBEL: Thank you, Judge.

19  BY MR. GRIEBEL:

20  Q.    So Ms. Williams was detained and handcuffed, correct?

21  A.    Correct.

22  Q.    And was Ms. Centeno detained and handcuffed?

23  A.    Yes.

24  Q.    And then Mr. Williams was detained and handcuffed?

25  A.    Yes.

1  Q.    Do you know where he was detained?

2  A.    I do not.

3  Q.    Okay. And then there was another gentleman I think, a Phil

4  Esskuchen or something like that who was detained, correct?

5  A.    Correct.

6  Q.    And handcuffed?  And you don't know where he was detained?

7  A.    No.

8  Q.    Okay. So once these -- once everyone's detained that's

9  when the search begins, correct?

10 A.    Yes.  Everybody's detained, moved to a safe area that is

11 cleared of any weapons or any hazards towards us and then the

12 search is -- commences.

13 Q.    And as far as the -- is there any log kept of when people

14 are detained and as far as when that happens?  Any

15 videotaping, anything like that?

16 A.    No.

17 Q.    Okay. Now, as far as the objects that were taken, we

18 talked to you earlier about that you were primarily apparently

19 in the bedroom, correct?

20 A.    I was throughout the house, but I recovered evidence in

21 the bedroom, yes.

22 Q.    In the bedroom.  And were officers assigned to specific

23 teams?

24 A.    No.

25 Q.    So how did you -- so in terms of discharging the functions

1  how -- which officer goes where, is it just -- could you

2  explain that?

3  A.   Everybody kind of takes their own thing.  Some people do

4  go from room to room; some people start in a room and that's

5  where they stay.  We search the entire premises as thoroughly

6  as possible.

7  Q.   Is there a methodical way of searching it?  Or is it

8  just --

9  A.   If there's somebody in a bedroom that searches, somebody

10  might come in after them and search because sometimes things

11  are missed and recovered on a secondary search.  We do it as

12  thoroughly as possible.

13  Q.   So it's possible for the same person to search throughout

14  the entire house and other people to search the same area

15  multiple times?

16  A.   Yes.

17  Q.   Okay. Now in this case you don't know how it actually

18  happened?

19  A.   I know that we had several individuals in the residence

20  that were searching.

21  Q.   Okay. So on the property receipt, for instance, if it

22  shows that -- bear with me here -- if it shows that like Tim

23  Carney supposedly recovers the black Ruger pouch in the closet

24  by the kitchen, okay?

25          Would Tim Carney have been throughout the house or

1  would he have only been assigned to the kitchen?

2  A.    He still could have been about the house, yes.

3  Q.    Okay. Okay, so about how long did it take to execute the

4  search warrant?

5  A.    Hmm, I would say in excess of an hour.

6  Q.    So the property receipt, I believe, is timed at 10 o'clock

7  and some change.  Is that at the front end of the search or

8  the back end of the search?

9  A.    It's when we make entry into the residence.

10 Q.    So the property receipt is dated as of the time that you

11 make the entry?

12 A.    Correct.

13 Q.    And it's your testimony that by then 11 o'clock or an hour

14 later all of this property would have been logged?

15 A.    In excess of an hour, yes.  I mean, the search, everything

16 collected and by the time we got everybody out of there and

17 get back to the office.

18 Q.    Okay. And as far as the pouch that you testified, the

19 Ruger pouch, I believe you testified that that -- you were not

20 present when that was recovered?

21 A.    When it was recovered, no.

22 Q.    So you, in fact -- your understanding of where that was

23 recovered is based on what someone told you, correct?

24 A.    Yes, based on the photograph and what was told me to

25 document on the property receipt.

1  Q.    And as far as the bullet that was recovered, the one that

2  you testified to, you're saying that that was based on the --

3  the same based on -- you weren't there when that was

4  recovered, the live round?

5  A.    No, I was not.

6  Q.    It's based on the photograph and based on --

7  A.    What was told to me, yes, to be put on the property

8  receipt and documented.

9  Q.    Okay. And I believe it was your testimony that the bullet

10 fragment was recovered in the kitchen; is that correct?

11 A.    Correct, the Ruger pouch with I believe two live rounds

12 was in the kitchen, closet in the kitchen.

13 Q.    I'm going to show you --

14         **MAGISTRATE JUDGE MCCARTHY:** You got to stay near a

15 mic.

16 **BY MR. GRIEBEL:**

17 Q.    Going to show you (inaudible).

18         Judge, do you use a track recording system here in

19 terms of when we order the transcript, we're gonna be able to

20 recognize my voice if I switch microphones?

21         **THE CLERK:** Yes.

22         **MAGISTRATE JUDGE MCCARTHY:** Yeah, I don't think

23 anybody --

24         **MR. GRIEBEL:** Okay, I wasn't sure about how that

25 works.

1    **MAGISTRATE JUDGE MCCARTHY:** -- will confuse your

2    voice with Ms. Higgins, maybe.

3    **BY MR. GRIEBEL:**

4    Q.   Okay.  Do you have -- if I use this --

5    A.   Yeah, I can see it on the screen.

6    Q.   You can see that?

7         **MR. GRIEBEL:** (Inaudible).

8         **THE CLERK:** That's okay.

9         **MR. GRIEBEL:** I know on these track systems

10   sometimes the microphones assign particular lawyers to

11   particular microphones and then the transcripts come through

12   kind of in a surreal fashion.

13   **BY MR. GRIEBEL:**

14   Q.   Okay.  So I'm going to show you 15, okay?

15   A.   Okay.

16   Q.   And I believe you testified that that bullet fragment

17   was -- that was on the kitchen floor based on the tile,

18   correct?

19   A.   Yeah, picture was taken from the kitchen floor I believe.

20   Q.   Okay. Now, I'd like to show you -- bear with me here for

21   one second.  Okay, I'd like to show you Exhibit 20.  Do you

22   see that?

23   A.   Yes.

24   Q.   And I believe you had testified that that was taken in the

25   bathroom, correct?

1  A.    Correct.

2  Q.    And that tile is --

3          MS. HIGGINS: I'm sorry, I missed the room name.

4          MR. GRIEBEL: That's in the bathroom.

5          THE WITNESS: Yes.

6          MS. HIGGINS: Thank you.

7  BY MR. GRIEBEL:

8  Q.    Fair to say that that tile is identical to the tile that's

9  in the kitchen?

10 A.    It appears so, yes.

11 Q.    And I'd like to show you again Exhibit 34.

12          MS. HIGGINS: This is not in evidence.

13          MAGISTRATE JUDGE MCCARTHY: He can show him and --

14 BY MR. GRIEBEL:

15 Q.    And do you see the tile there on Exhibit 34?

16 A.    Yes.

17          MS. HIGGINS: Objection, this is not in evidence.

18          MAGISTRATE JUDGE MCCARTHY: Wait, I know it's not in

19 evidence, but this is cross-examination, it's been marked for

20 identification, he can -- well, what's the point of the

21 question?

22          MR. GRIEBEL: The point is is that the tile that's

23 in the bathroom is identical to the tile that's in the

24 kitchen.

25          MS. HIGGINS: That point has been established and

1  also asking the witness questions about the photograph which

2  is not in evidence is akin to asking him to read from a

3  document that's not in evidence.

4          **MR. GRIEBEL:** Judge, I'll just move Exhibit 34 --

5          **MAGISTRATE JUDGE MCCARTHY:** The point is that the

6  tile in the bathroom is identical to the tile in the kitchen,

7  is that the point?

8          **MR. GRIEBEL:** That is --

9          **MAGISTRATE JUDGE MCCARTHY:** The Government concedes?

10         **MS. HIGGINS:** Yes.

11         **MR. GRIEBEL:** That's the point.

12 **BY MR. GRIEBEL:**

13 Q.    And the further point is, is that -- and I'm going to go

14 back to No. 15.  On Exhibit 15 here, can you see that okay?

15 A.    Yes.

16 Q.    Okay. Those towels that are on Exhibit 15, would it be

17 fair to say that the one appears to be a terrycloth type of

18 towel?

19 A.    I wouldn't even know.

20 Q.    The dark blue?

21 A.    Yeah, terrycloth on the floor, yes.

22 Q.    Okay. And terrycloth is consistent with something that

23 people use in the bathroom, correct?

24 A.    Could be used in bathroom, kitchen.

25 Q.    Okay. So as far as Exhibit 15 and the bullet fragment,

1  it's identical tile as to what's in the bathroom or the

2  kitchen?

3  A.    Yes, the bathroom is directly off the kitchen.

4  Q.    And the towels are consistent with either a kitchen or

5  bathroom towel, correct?

6  A.    Correct.

7  Q.    And you weren't there when item 15 was taken, correct?

8  A.    No.

9  Q.    And I believe your testimony is you did not search -- you

10 did not search the outside landing, correct?  Off the kitchen?

11 A.    No, I did not.

12 Q.    You were never there, correct?

13 A.    No.

14 Q.    And before you executed the search warrant, did you ever

15 investigate as to any of the other occupants in -- at 198

16 Potomac?

17 A.    In any apartment or --

18 Q.    As to who lived there or anything like that?

19 A.    Yeah, I mean, we tried to determine some other people that

20 may have been staying there.

21 Q.    And what did you learn?

22 A.    Just based on various previous 911 calls that there were

23 different apartments, some were listed as one, two, three,

24 four; some were listed as upper; some were listed as lower.

25 Q.    So there had been previous 911 calls to that particular

108

1  location?

2  A.    To 198 Potomac as a whole, yes.

3  Q.    Okay. And when you say oh, yes, you say that as if it was

4  a frequent location?

5  A.    I said as a whole, yes.

6  Q.    As a whole?

7  A.    Yes.

8  Q.    Okay. As far as Judge Bargnesi, was he the judge that came

9  out on special term for the warrant?

10  A.    I can't recall if he was on special terms or not, but he

11  was the judge that we contacted that night and was able to

12  review the search warrant.

13  Q.    And what's the practice in Erie County?  Is there a judge

14  that's on call 24/7?

15  A.    There is a special terms judge, yes, for evening hours,

16  weekends, things like that.

17  Q.    And was Judge Bargnesi that judge on the 21st if you

18  recall?

19  A.    I don't recall.

20  Q.    Okay. But if you needed to get another search warrant that

21  night, you could have called and gotten another search

22  warrant, correct?

23  A.    Correct.

24  Q.    Do you know when you submitted these documents into

25  evidence -- or these -- the items that you seized into

1    evidence, did you ask for DNA swabs and things like that?

2           **MS. HIGGINS:** Objection, relevance.

3           **MAGISTRATE JUDGE MCCARTHY:** What's the relevance?

4           **MR. GRIEBEL:** Obviously I think the relevance is

5    whether or not they've ever applied for another search

6    warrant.

7           **MS. HIGGINS:** Judge, that's not pertinent to the

8    question of this hearing, which is about the scope of the

9    execution of this search warrant, not about any other search

10   warrant or the future obtaining of other search warrants.

11          **MAGISTRATE JUDGE MCCARTHY:** Yeah, I'm having

12   difficulty seeing the relevance, okay?

13          **MR. GRIEBEL:** Okay, that's fine, Judge.

14          Judge, I don't have any more questions at this

15   time, but I -- depending on the questions asked by co-counsel,

16   I'd reserve my right to ask a few follow-ups.  Thank you.

17          **MAGISTRATE JUDGE MCCARTHY:** Okay.

18          **MR. TORRE:** May I inquire, Judge?

19          **MAGISTRATE JUDGE MCCARTHY:**  You may.

20          **MR. TORRE:** Thank you.

21                      <u>**CROSS-EXAMINATION**</u>

22   BY MR. TORRE:

23   Q.   Good morning, Detective McMahon.

24   A.   Good morning.

25   Q.   Just a couple questions about the matter before the Court

1   here.  Did you give us an approximation of about 10 to 15

2   officers between the Sheriff's Department and the City of

3   Buffalo Police that were at the execution of the warrant?

4   A.   Yes, that's safe to say.

5   Q.   All right. And standard operating procedure was followed

6   that night according to your understanding of that with over a

7   dozen years on the job for you; is that right?

8   A.   Approximately ten years on the job, yes.

9   Q.   So the rear of the building was covered in case anybody

10  was to try to run out or flee when the team came in and broke

11  the door or the doors, right?

12  A.   Correct.

13  Q.   You said that the lower front door was broken open by

14  force which is standard if it's locked, right?

15  A.   True.

16  Q.   All right.  And then were you the first officer through

17  the door?

18  A.   I was not.

19  Q.   All right.  How far behind the first officer, were you?

20  A.   I was probably fourth or fifth in the stack I would say.

21  Q.   All right.  And from your recollection of those premises,

22  after you entered the front door there are stairways that go

23  upstairs, correct?

24  A.   Yes.

25  Q.   And that means one on the right and one on the left,

1  right?

2  A.    We utilized a stairwell to the right.

3  Q.    All right.  And when you entered and made those

4  observations, you saw an apartment door on the first floor to

5  your right, correct?

6  A.    Correct.

7  Q.    All right.  Did it have a number on it?

8  A.    Not that I recall.

9  Q.    All right.  And then you ran up the stairs at your

10  position with the entry team and that would be the stairwell

11  to the right of the entrance hall, right?

12  A.    Yes.

13  Q.    All right.  When you got to the second floor, was the door

14  of the apartment that was subsequently searched already broken

15  open or did you watch that happen?

16  A.    I watched it happen.

17  Q.    All right.  And was the door to the apartment towards the

18  front of the building where you earlier marked the screen and

19  showed two windows that pertain to the apartment you searched

20  that night?

21  A.    I'm sorry, what?

22  Q.    Was the door that was broken open to the apartment, was it

23  closer to the front of the structure where you marked the

24  windows earlier on Exhibit 35 or was it somewhere else on the

25  second floor of the building?

1    A.    If I recall correctly it was somewhere in the middle.

2    Q.    And that stairwell, you ran up, you ran up a flight of

3    stairs, you took a turn on a landing and another flight and

4    now you're on the second floor, is that the way it's laid out?

5    A.    I believe so, yes.

6    Q.    All right.  And when you get to the top of the stairs you

7    arrived at that night, you're about in the center of the

8    building between the front and the back of the building, is

9    that what you're saying?

10   A.    Yes.

11   Q.    All right.  How many apartment doors are at that location

12   when you get off the landing on the second floor of the

13   premises, sir?

14   A.    There was Apartment 4, which is the door that we breached;

15   and I believe that there was another apartment door.

16   Q.    So there's at least one other apartment door on the second

17   floor that you saw once you got upstairs?

18   A.    If I recall correctly, yes.

19   Q.    All right.  Was it on the north side of the building or

20   the south side of the building?

21   A.    It would have been --

22             **MAGISTRATE JUDGE MCCARTHY:** Wait a second.  Which

23   way does the building face?

24             **MR. TORRE:** Judge, Herkimer is east and west;

25   Potomac is -- sorry.

1  **BY MR. TORRE:**

2  Q.    Which way does Potomac Street run, sir?

3  A.    Potomac runs east/west, I believe.

4  Q.    All right.  And at that corner is Herkimer north and

5  south, generally speaking?

6  A.    Herkimer would run north and south I believe.

7  Q.    All right. So the face of the building was on Potomac,

8  right?

9  A.    Yes.

10  Q.    All right.

11          **MAGISTRATE JUDGE MCCARTHY:** So that would be on the

12  south side?

13          **MR. TORRE:** The face of the building being on

14  Potomac, Judge, with Potomac running north and south, it would

15  be on the west side of the building.

16          **MS. HIGGINS:** The face of the building would be

17  facing south.

18          **MAGISTRATE JUDGE MCCARTHY:** Can we just --

19          **THE WITNESS:** Yes.

20          **MAGISTRATE JUDGE MCCARTHY:** -- so I don't get

21  hopelessly confused, can we talk about the front and rear of

22  the building maybe instead of --

23  **BY MR. TORRE:**

24  Q.    The building fronts on Potomac; is that true?

25  A.    Correct.

1  Q.   All right.  And Herkimer actually is on the side of the

2  building, right?

3  A.   Yes.

4  Q.   All right.  So just for purposes of this point, that

5  picture that's in evidence is 36, that shows the side of the

6  building on Herkimer?

7  A.   Okay.

8  Q.   That's the other side of the building from the apartment

9  you searched that night, correct?

10  A.   That would be -- facing the residence, that would be the

11  left side.  We were on the right side.

12  Q.   And so when you got to the top of the stairs is there a

13  hallway on the second floor or just a landing?

14  A.   When we get to the top of the stairs, there's a landing

15  with I guess a little bit of a hallway because there was an

16  extra apartment.

17  Q.   Is it fair to say that what you saw as two apartment doors

18  on the second floor are across the landing or the hallway on

19  the second floor from each other or are they side-by-side?

20  A.   I don't believe they were side-by-side.  I believe they

21  were across from each other.

22  Q.   All right.  And did you breach the door on the north side

23  or the Herkimer side of the building?

24  A.   There is no door on the Herkimer side, no.

25  Q.   All right.  May I show you Exhibit 35?  Are you able to

1  see that, Detective?

2  A.    Yes.

3  Q.    The two automobiles, this pick-up truck here and this car

4  in front of it, those are parked on Potomac, right?

5  A.    Yes.

6  Q.    All right.  And we've already established that this street

7  over here with the corner store, this is Herkimer, right?

8  A.    Yes.

9  Q.    All right.  Indicating the left side of my copy of this

10  exhibit.

11          Now, sir, you circled these two windows as the

12  apartment you searched that night.  Do you remember that?

13  A.    Yes.

14  Q.    All right.  And is it a fact that this center window with

15  the American flag over it is on the landing top of the

16  stairwell where you arrived to search an apartment that night?

17  A.    I don't recall.

18  Q.    All right.  Was there a door across from the apartment

19  door you breached for the apartment or an apartment on the

20  north side of the building or the Herkimer Street side of that

21  building on the second floor?

22  A.    In that hallway, yes, the door I believe that was there to

23  go into an apartment, that was on the Herkimer side.

24  Q.    All right. But you didn't enter it and as you sit here

25  today from your knowledge of the geography of that building

1  you don't even know if the doorway you saw besides the one you

2  broke open pertains to an apartment on the upper left of the

3  building, right?

4  A.   I was never inside that apartment.

5  Q.   You just don't know what that door went to?

6  A.   Can't say for certain, no.

7  Q.   All right.  Now, fair to say that you did some

8  investigation before you went and saw Judge Bargnesi for a

9  search warrant, right?

10  A.   Yes.

11  Q.   All right.  And you already told us you didn't check with

12  any utility companies to find out who lived in what apartment

13  at 198 Potomac or who had the utilities in certain apartments;

14  is that true?

15  A.   True, we were unable to.

16  Q.   All right.  Did you check the United States postal carrier

17  to try to figure out who lived there?

18  A.   No, we did not.

19  Q.   Did you check with the Erie County Clerk's Office to see

20  who owned the building?

21  A.   We looked at the online property records, yes, it was

22  listed as an apartment building.

23  Q.   Very good.  Did you track down the owner and find out who

24  the apartments were leased to?

25  A.   No.

1  Q.   All right.  And in your search warrant application and,

2  indeed, in the search warrant Lamel Williams is named by name;

3  is that true?

4  A.   Correct.

5  Q.   All right.  And to your understanding, the warrant

6  authorized the search of Lamel Williams and premises located

7  at 198 Potomac Avenue, apartment upper right, Buffalo, New

8  York, 14213; is that correct?

9  A.   Yes, and any persons therein or thereat.

10 Q.   All right.  Now, you did tell us you consulted the 911

11 information through CPS to find out if there had been any

12 police calls to that location?

13 A.   To that apartment building, yes.

14 Q.   All right.  And you found out that there were some; is

15 that true?

16 A.   Yes.

17 Q.   Did any of them pertain to the subject of your search

18 warrant by name?

19 A.   No.

20 Q.   Now, did I leave anything out that you did?  The judge

21 doesn't want you to tell us how long you were investigating

22 before the warrant was applied for, but did you do something

23 else that we don't know about besides speaking to an unnamed

24 informant and checking the name of the owner at the clerk's

25 online record and checking the 911 call data from CPS?

1    A.    Positively identifying the photograph of Lamel Williams as

2    well as positively identifying the residence.

3    Q.    All right.  Did you do a drive-by to look at the house?

4    A.    I personally did not, no.

5    Q.    All right.  But other officers that were involved in this

6    detail you say did some type of a drive-by to identify the

7    premises or at least from the outside?

8    A.    Yes.

9    Q.    All right.  Did you do a stake out or any of your officers

10   that were involved in this investigation, did they watch the

11   premises?

12   A.    Not that I recall.

13   Q.    So is there anything else that the judge doesn't know

14   about that you did in order to investigate the premises for

15   the purpose you were investigating it besides what you've

16   already named?

17   A.    No, not that I recall.

18   Q.    All right.  Now, it comes to pass that we all know somehow

19   during the search warrant application process the description

20   of the premises was changed, amended or altered.  Your warrant

21   originally said you sought a warrant for Apartment No. 4 at

22   198 Potomac Street; is that true?

23   A.    Yes.

24   Q.    All right.  That was a warrant that -- application that

25   you yourself signed and authored, correct?

1  A.    Correct.

2  Q.    All right.   So -- now with regard to that, it was actually

3  during the warrant application before the judge that the

4  change was discussed and made; is that true?

5  A.    I'm sorry, can you rephrase that?

6  Q.    The change in the description of the place that you were

7  asking for a warrant for, the change actually took place

8  during the warrant application when you were with Judge

9  Bargnesi; is that true?

10  A.    Yes.

11  Q.    All right.   And was that at your suggestion or the Court's

12  suggestion or somebody else's suggestion to change the

13  premises that you originally called Apartment 4 --

14           **MS. HIGGINS:** Objection.

15  **BY MR. TORRE:**

16  Q.    -- to something different?

17           **MAGISTRATE JUDGE MCCARTHY:** Just a second.   Don't

18  answer yet.

19           What's the basis of the objection?

20           **MS. HIGGINS:** The relevance.   Why does it matter who

21  made the decision to make the change?   The change was made and

22  it's about whether as changed the warrant was lawfully

23  executed.   That is the issue for the search -- for this

24  evidentiary hearing.

25           **MAGISTRATE JUDGE MCCARTHY:** Mr. Torre.

1        **MR. TORRE:** Not exactly, Judge, because it's my

2   contention that there's some confusion about which apartment

3   was actually searched and the nomenclature is pretty

4   important.

5        So I want to know if it was the detective that

6   originally changed the application or if it was perhaps

7   something that was done by the judge because he noticed a

8   discrepancy.

9        **MAGISTRATE JUDGE MCCARTHY:** I'll allow it.

10       **THE WITNESS:** It was the judge.

11  **BY MR. TORRE:**

12  Q.   All right. And you yourself were part of the warrant

13  application, you gave sworn testimony presumably, right?

14  A.   Yes.

15  Q.   All right.  And did what you told Judge Bargnesi include a

16  physical description or layout of the building that you wanted

17  to search an apartment inside of?

18  A.   Yes.

19  Q.   All right.  And you had never been inside that building

20  personally, correct?

21  A.   No.

22  Q.   But you were with somebody who presumably said they

23  were --

24       **MS. HIGGINS:** Objection.

25  **BY MR. TORRE:**

1  Q.   -- previously inside, correct?

2           **MS. HIGGINS:** Objection.

3           **MAGISTRATE JUDGE MCCARTHY:** What's the objection?

4           **MS. HIGGINS:** He's trying to elicit information

5  about what the CI may or may not have said which we

6  specifically constrained.  This is not about the validity of

7  the search warrant.  It's about the execution of the search

8  warrant as issued and whether it was executed within the scope

9  of that search warrant.

10          I understand that there's pending litigation about

11 the validity of the search warrant, but as issued was it

12 lawfully executed.  That's the question for this evidentiary

13 hearing.

14          **MR. TORRE:** Judge, I filed papers controverting the

15 validity of the warrant as issued, the scope of the warrant

16 and the manner of execution.  So I would disagree with that.

17          I'm not seeking to try to identify any -- anything

18 that's subject to confidentiality.  I am asking whether there

19 was any --

20          **MS. HIGGINS:** Mr. Torre asked a question did the

21 CI -- did the CI tell the judge that he or she had been inside

22 of the building.  That is an identifiable item of information,

23 whether a person has been inside or not inside is an

24 identifiable piece of information about that person because

25 the defendant knows who has been inside or who has not been

1    inside and can make inferences by deduction about who the CI

2    person could possibly be.

3            **MR. TORRE:** Judge, number one, I have no interest in

4    that at the moment.

5            Number two, that's not the question I asked.  I

6    said presumably there was someone before Judge Bargnesi that

7    told the judge about what the inside layout of the building

8    was because this detective has acknowledged he was in no

9    position to do that and didn't do that.

10           **MAGISTRATE JUDGE MCCARTHY:** Right.

11           **MR. TORRE:** So I'm just trying to ask him that.

12           **MAGISTRATE JUDGE MCCARTHY:** Well, you've established

13   that the judge made the change, he didn't make the change.

14   You've established that he was not in the building prior to

15   the search warrant being obtained.

16           And I've previously indicated that I'm going to

17   direct the Government to provide a redacted transcript of the

18   confidential informant's statements.  I think we'll leave it

19   at that.

20           **MR. TORRE:** Very well.

21   **BY MR. TORRE:**

22   Q.   Detective McMahon, fair to say that Judge Bargnesi raised

23   an issue or a problem with naming this as Apartment No. 4,

24   correct?

25   A.   I can't speak to what Judge Bargnesi did or what decisions

1 he made or why.

2 Q.   Did you initial where the name Apartment 4 was struck out

3 or is that JB, does that stand for Judge Bargnesi?

4 A.   That's James Bargnesi.

5 Q.   All right.  And, by the way, while we're looking at this,

6 I think it's -- the search warrant itself is Exhibit 1, just a

7 couple of quick questions.

8          **MAGISTRATE JUDGE MCCARTHY:** No, the search warrant

9 is Exhibit 2.

10          **MR. TORRE:** Sorry.

11 **BY MR. TORRE:**

12 Q.   Search warrant Exhibit 2.

13          **MS. HIGGINS:** That's the application --

14 **BY MR. TORRE:**

15 Q.   Search warrant Exhibit 2 before you, Detective, that's the

16 one that strikes Apartment 4 with the initials JB and leaves

17 it as upper right, correct?

18 A.   Correct.

19 Q.   All right.  Now, in the warrant application, Exhibit 1

20 before you, the description is changed in paragraph 2 of the

21 first page similarly with the number Apartment 4 struck out

22 and initials on that document.  Do you see that, sir?

23 A.   Yes, I do.

24 Q.   We've established JB is James Bargnesi for the judge and

25 can you identify this mark next to it?

1  A.    Those are my initials.

2  Q.    All right.  And, sir, this is your search warrant

3  application, is it not?

4  A.    Yes.

5  Q.    All right.  You left the description as Apartment No. 4 in

6  the first paragraph requesting a warrant authorizing the

7  search of Apartment 4, isn't that a fact?

8  A.    Yes, that's how I wrote it, Apartment 4 in the upper

9  right.

10  Q.    All right.  You didn't strike that and initial it as you

11  did lower on the first page of your warrant application,

12  correct?

13  A.    I didn't strike that.

14  Q.    You watched the judge strike it; is that true?

15  A.    I did.

16  Q.    All right.  With regard to page 2 of your warrant

17  application, again, you initialed the change designating it as

18  the upper right apartment that you were applying for legal

19  permission to search as opposed to Apartment No. 4; that's

20  true?

21  A.    I initialed after the judge made his decision and I also

22  acknowledged it.

23  Q.    All right.

24          **MS. HIGGINS:** Objection.  This is getting rather

25  repetitive and I'm not sure the relevance of it.  It's

1  well-established who made the markings on the search warrant

2  application.

3  **BY MR. TORRE:**

4  Q.   Simple question, Detective, was the failure to strike --

5        **MAGISTRATE JUDGE MCCARTHY:** Wait, there's an

6  objection pending so --

7        **MR. TORRE:** Oh, sorry.

8        **MAGISTRATE JUDGE MCCARTHY:** -- I'm going to overrule

9  the objection at this point on the assumption that we're

10  quickly going to get to the end of this line of questioning

11  so...

12  **BY MR. TORRE:**

13  Q.   It's a simple question, Detective, was the warrant

14  application that you submitted to Judge Bargnesi as amended,

15  was the failure to change the designation of the house you

16  wanted to search on the first page of the warrant, was that by

17  simple oversight or was there a reason why there's two

18  different descriptions in your warrant application?

19  A.   I wouldn't strike anything.  It's not my warrant.  It's up

20  to the judge.  If anything was done it's probably just an

21  oversight.

22  Q.   So what you're telling us is the judge changed your

23  warrant application?

24  A.   Correct.

25  Q.   All right.  Based upon what you told him at the search

1  warrant hearing?

2  A.   Yes, I mean, all the information was provided to him that

3  we would like to search Apartment No. 4, which is described

4  vehemently to us as the upper right, as well as the 911

5  complaints being in apartments, one, two, three, four, upper,

6  lower, we were being as thorough as possible.

7  Q.   Were there mailboxes on the outside of this building, sir?

8  A.   I don't recall.

9  Q.   Now, I think you touched on this earlier, but the place

10  where the pistol was found was outside the confines of the

11  apartment that the police searched on the night of March 21,

12  2017, correct?

13         **MS. HIGGINS:** Objection, this is beyond the scope of

14  direct.  No questions were asked about the firearm on direct.

15         **MR. TORRE:** Judge, there was a bunch of questions

16  about the doorway to the apartment, the exterior lock, nobody

17  went in that door according to the U.S. Attorney, everybody

18  went out the door, the door wasn't breached, there's a landing

19  outside the door, Detective Imiolo searched outside there with

20  Chief D.J. Granville so I respectfully --

21         **MS. HIGGINS:** But the question is about the firearm.

22         **MAGISTRATE JUDGE MCCARTHY:** Wait, wait, wait --

23         **MR. TORRE:** -- disagree with my learned counsel.

24         **MAGISTRATE JUDGE MCCARTHY:** One at a time, please.

25  Okay, Mr. Torre, there was testimony during direct that

1  something was taken from the hallway.  That's my recollection.

2          **MS. HIGGINS:** That's right, but Mr. Torre has now

3  changed that -- I mean, has put a finer point on it and is now

4  asking questions about the firearm that was recovered and

5  there's no testimony that a firearm was recovered.

6          **MAGISTRATE JUDGE MCCARTHY:** Well, isn't part of the

7  basis of this motion that at least something was -- at least

8  according to the defendants -- that at least one item of

9  contraband was not taken from within the apartment?

10         I mean, they put that in issue, haven't they?

11         **MS. HIGGINS:** They've put that in issue.

12         **MAGISTRATE JUDGE MCCARTHY:** So why shouldn't they be

13  allowed to testify about it?

14         **MS. HIGGINS:** Your Honor, it's the Government's

15  position that it's not properly put to this witness.  This

16  witness wasn't asked about it on direct.

17         The next witness will be and I think the question

18  is more properly posed to that person, which is why I'm

19  objecting now.

20         **MR. TORRE:** Judge, if I could be heard briefly?

21         **MAGISTRATE JUDGE MCCARTHY:** Yeah.

22         **MR. TORRE:** I didn't ask about the recovery of the

23  firearm.  I asked a simple question that the hallway outside

24  the back kitchen door that we've heard so much about this

25  morning is outside of the confines of the apartment.

1          He was there, he can answer the question.

2          **MAGISTRATE JUDGE MCCARTHY:** That's not the question

3    you asked, but if you want to ask that question, you can.

4          **MR. TORRE:** That's what I thought I asked.  I'll

5    withdraw the previous question.

6    **BY MR. TORRE:**

7    Q.    Sir, the hallway that you've testified about today and

8    described as a landing or storage area shown in 32 with what

9    you described as the vantage point of the photographer, I'm

10   putting Exhibit 32 before you, do you see and recognize it

11   again, correct?

12   A.    Correct.

13   Q.    All right.  So that's the back door of the apartment shown

14   in this photograph, correct?

15   A.    Correct.

16   Q.    And my question for you is outside of that deadbolt back

17   door of the apartment that one would enter or leave through

18   the kitchen to the apartment, is outside of the apartment,

19   correct?

20   A.    Yes, it's on the outside of the apartment.

21   Q.    All right.  And you told us that there's, according to the

22   information you were given by your fellow officers who were

23   there, there's a stairwell out there, right?

24   A.    Yes.

25   Q.    And you said as far as whether that stairwell leads to the

1  exterior door you attempted to show us on Exhibit 36, you

2  don't -- you don't know?  You don't have that information?

3  A.   I don't.

4  Q.   All right.  Now did -- according to what you do know from

5  the search that night, did Detective Imiolo investigate the

6  stairwell?

7  A.   I don't know.

8  Q.   And neither he nor Granville told you anything more than

9  there's a landing outside the apartment and a rear stairwell?

10 A.   And that there was some items recovered, but that was it.

11 Q.   All right.  And they delivered an item they told you they

12 recovered from out there?

13 A.   Yes.

14 Q.   Beyond the fact that they told you they recovered it

15 outside the apartment in that rear landing/storage/stairwell

16 area, did they tell you any more specifically where they

17 recovered the item?

18 A.   Yes.

19 Q.   Was it Detective Imiolo that told you where he recovered

20 the Glock pistol he told you he found?

21 A.   Yes.

22          **MS. HIGGINS:** Objection.  Judge, this line of

23 questioning is like -- is an effort to confront this witness

24 with information from another future witness before that

25 witness has testified.

1              It's -- I guess -- I guess my basis is relevance.

2  Why does it matter whether -- whether Detective Imiolo told

3  this witness whatever it was he told him about the recovery of

4  the firearm?

5              **MR. TORRE:** Judge, as the U.S. Attorney pointed out

6  earlier, hearsay is permissible at these hearings and I

7  think --

8              **MAGISTRATE JUDGE MCCARTHY:** She's not arguing

9  hearsay.  She's arguing relevance from this witness.

10             **MR. TORRE:** I think it's --

11             **MAGISTRATE JUDGE MCCARTHY:** I guess the basic issue

12 here, and correct me if I'm wrong, is was there entitlement

13 under the warrant to take something from outside the

14 apartment, right?  Isn't that the basic issue?

15             **MR. TORRE:** That is a big issue raised in my papers,

16 among some other issues.

17             **MAGISTRATE JUDGE MCCARTHY:** Understood.  I

18 understand there were other issues, but with respect to the

19 firearm and where it was taken from that, that would be the

20 issue, correct?

21             **MR. TORRE:** Yes, Judge.  I am trying to hone in on

22 one of the main issues before the Court.  That's exactly what

23 I'm doing.

24             **MAGISTRATE JUDGE MCCARTHY:** Exactly, but this

25 witness didn't testify to the -- any firearm being taken from

1  outside the apartment.

2          Counsel, Ms. Higgins has indicated that the next

3  witness will and I guess we'll explore that with that witness.

4          **MR. TORRE:** Well, I'm sure we will, Judge.  However,

5  I am fully entitled to ask this police detective what the

6  police detective told him who delivered him the gun the other

7  detective supposedly found.

8          **MS. HIGGINS:** That's my basis for my relevance

9  objection.  Why does it matter?  Why does it matter what he

10 told this witness about the recovery of the firearm?

11         We're going to hear from him about the recovery of

12 the firearm.  It's like -- it's like a future impeachment.

13 It's like trying to elicit an inconsistent statement before

14 even getting a statement itself.

15         **MR. TORRE:** Well, I don't anticipate counsel's

16 arguments and I don't think she should anticipate mine, Judge.

17 I just want to know what Detective Imiolo told this detective

18 when he handed him a gun about where he supposedly found it.

19         **MAGISTRATE JUDGE MCCARTHY:** Why is that relevant?

20         **MR. TORRE:** It's the central issue before Your

21 Honor, as the Court has just pointed out.  Where it was found

22 is key.

23         **MS. HIGGINS:** That's not the question.  The question

24 is what he said about it.

25         **MAGISTRATE JUDGE MCCARTHY:** Okay, look, if push came

1  to shove, depending on what Detective Imiolo would say,

2  conceivably we could bring Officer McMahon back and I suspect

3  he doesn't want to be brought back.

4          So let's just get through it right now and your

5  objection is noted, Ms. Higgins.  So go ahead.

6  **BY MR. TORRE:**

7  Q.   You can tell us, what did Detective Imiolo tell you about

8  where he found the gun that he told you he found?

9  A.   That he recovered it from the outside on the landing

10 inside a cooler.  Whatever else, other details were

11 memorialized on the property receipt.

12         **MAGISTRATE JUDGE MCCARTHY:** Counsel, can I just

13 interject for a second here?  In terms of logistics here, we

14 have another witness.

15         Mr. O'Rourke, are you going to be crossing this

16 witness?

17         **MR. O'ROURKE:** I had a few questions.  Some of it's

18 getting --

19         **MAGISTRATE JUDGE MCCARTHY:** And then I suppose

20 you're going to have some redirect, Ms. Higgins?

21         **MR. O'ROURKE:** -- clarified, but --

22         **MAGISTRATE JUDGE MCCARTHY:** Ms. Higgins, are you

23 going to have redirect?

24         **MS. HIGGINS:** Very briefly.

25         **MAGISTRATE JUDGE MCCARTHY:** Well, I don't know.  It

1   just seems to me maybe we ought to break at this point.  I'm

2   sorry, sir, but bring you back, finish up because I don't see

3   us finishing up quickly here.

4           **MR. TORRE:** That part is true -- I was gonna say I

5   could probably be done by 12:30 without any problem.

6           **MAGISTRATE JUDGE MCCARTHY:** But then by the time

7   Mr. O'Rourke's done, Ms. Higgins is done, so let's break now

8   and reconvene -- reconvene at 1:15?

9           **MS. HIGGINS:** Judge, I have an arraignment at

10  2 o'clock and then I have a plea at 3 o'clock that I need to

11  attend to.

12          I can either arrange for coverage if the Court

13  prefers it or we could work -- we could work through the

14  12 o'clock hour and take a later break, if that would be

15  convenient to the Court?

16          **MR. O'ROURKE:** I am also scheduled for a plea at

17  3:00, the same plea that AUSA Higgins is referring to, Your

18  Honor, but I could work if you wanted to, I could work at

19  having that covered, although it is a plea.

20          **MAGISTRATE JUDGE MCCARTHY:** Are we even going to get

21  to this other witness today then?

22          **MS. HIGGINS:** Judge, my expectation was that we

23  would have gotten to him an hour ago.  Really, I don't have

24  that -- that much redirect here.  I think we could get him on

25  and off the stand hopefully before 2 o'clock.

1          **MAGISTRATE JUDGE MCCARTHY:** All right. Let me -- I

2  need to take a five minute break because I need to make a call

3  and then we'll continue and see where we go.

4          **MS. HIGGINS:** Thank you.

5          **MAGISTRATE JUDGE MCCARTHY:** All right.

6          **MR. TORRE:** We'll reconvene in five minutes, Judge?

7          **MAGISTRATE JUDGE MCCARTHY:** Yes.

8          (**WHEREUPON**, there was a pause in the proceeding.)

9          **THE CLERK:** We're back on the record, United States

10  vs. Williams, et al., all parties are present, witness is

11  still under oath.

12  **BY MR. TORRE:**

13  Q.   Detective, earlier in your testimony today you said that

14  you had information and I think you might have alluded to it

15  when you said whatever Detective Imiolo told me about where he

16  recovered the gun would be on your property receipt.

17          But I think you mentioned a Metro PCS bag?

18  A.   If it's documented on the property receipt.

19  Q.   So you must have been looking at it when the U.S. Attorney

20  was asking you about that.  I'm going to put it on the screen

21  so you can see that again.  Exhibit 4, I'll turn to item 6, is

22  it close enough?  Can you see that?

23  A.   Yeah, I can read it.

24  Q.   All right.  So quantity one Metro PCS plastic bag

25  containing a Glock 43 and it carries on from there in a cooler

1  in the back hallway by Adam Imiolo.

2          Do you see that?

3  A.   Yes.

4  Q.   Was the Metro PCS plastic bag that originally had the

5  pistol in it, according to what Detective Imiolo told you, was

6  that secured and we used to refer to it as vouchered for

7  evidence?

8  A.   Yes, if it was documented on the property receipt it

9  should have.

10  Q.   So it's still in your custody?

11  A.   Yes.

12  Q.   Do you remember what it looked like?

13  A.   I do not.

14  Q.   Do you see any pictures today that look like what the gun

15  was originally in according to what the Detective Imiolo told

16  you?

17  A.   Yes, I think I glanced over one.

18  Q.   What's the bag look like?

19  A.   I'd have to look at it again.  I can't remember if it was

20  black or blue, but it was a plastic bag that was -- that the

21  handgun was recovered in.

22  Q.   It's an opaque, a black plastic bag that says Metro PCS,

23  right?

24  A.   If that's what the picture depicts, yes.

25  Q.   Well, you just told us you saw it.

1  A.   I glanced over a picture of it today, yes, quickly.

2  Q.   Well, the operative term was opaque.  It's a plastic bag,

3  it's not a clear plastic bag.  You can't see through it,

4  right?

5  A.   If that's what the picture is, yes.

6           **MR. TORRE:** Do you have a hard copy of that?

7           **MS. HIGGINS:** It's not in evidence.  I do.  And it's

8  in your packet.

9           **MR. TORRE:** Oh, you mean the ones that are marked?

10          **MS. HIGGINS:** Yup.  It's not in evidence yet.  This

11 is the one with the gun in it.

12 **BY MR. TORRE:**

13 Q.   First I'm going to show you Exhibit 23 --

14          **MS. HIGGINS:** Again, Judge, this is not in evidence.

15 **BY MR. TORRE:**

16 Q.   Do you recognize it?

17 A.   I recognize the picture, yes.

18 Q.   All right.  Did the police make this during the search at

19 that building that night?

20 A.   It was recovered, yes.

21 Q.   All right.  Is this the blue or the black plastic Metro

22 bag you were talking about?

23          **MS. HIGGINS:** Objection, Judge.

24 **BY MR. TORRE:**

25 Q.   If you know?

1          **MAGISTRATE JUDGE MCCARTHY:** Just a second.  Okay,

2     just a second.  Ms. Higgins, what's the objection?

3          **MS. HIGGINS:** Mr. Torre keeps referring to a Metro

4     PCS bag as black or blue.  That description is not born out on

5     the description on Government Exhibit 4.

6          It's not described as black or blue and I am afraid

7     that Mr. Torre is trying to trick the witness into agreeing

8     that this is such a bag, which it is not.

9          **MR. TORRE:** I assure you, Judge, I'm not, but I wish

10    the U.S. Attorney would prep her witness before the middle of

11    cross-examination.

12         So he testified it was a blue or a black Metro PCS

13    bag.

14         **MAGISTRATE JUDGE MCCARTHY:** Understood, that was

15    some pretty good coaching there, but in any event, Exhibit 4,

16    page 2, item 6 --

17         **MS. HIGGINS:** It's not described as black or blue.

18         **MAGISTRATE JUDGE MCCARTHY:** That is correct.  So --

19         **MR. TORRE:** The detective just said it was a blue or

20    black plastic bag, he reviewed the photographs earlier today,

21    I'm going to ask him, Judge.

22         **MAGISTRATE JUDGE MCCARTHY:** I don't think he said --

23    you know, at this point I don't recall.  The transcript will

24    bear out whether he said it was a blue or black plastic bag.

25         You can proceed on that basis.  Just ask him a

1   question and see what he says.

2   **BY MR. TORRE:**

3   Q.   When you told us less than five minutes ago that you

4   glanced through the pictures earlier and saw the Metro PCS bag

5   and it was opaque and either black or blue, I'm asking you now

6   if you recognize item 23 on the screen as one in the same bag

7   you just referred to from the crime scene?

8   A.   I don't believe so.  I believe that's a separate item that

9   was recovered.

10   Q.   All right.  Where was this item depicted in 23 recovered?

11   A.   I think it was on an intermediate landing in the rear

12   hallway.

13   Q.   When you say "intermediate," you mean outside the back

14   door of the apartment off the kitchen or you mean halfway down

15   the stairwell where it turns to the last flight down?

16   A.   Off the kitchen down the stairwell.

17   Q.   So just so the Court understands the point that you're

18   making, there's a landing halfway up similar to what you told

19   us about on the front stairwell where the first flight of

20   stairs hits a landing, it turns and the second flight of

21   stairs takes you to the second floor?

22   A.   Right, that's where the item was recovered.

23   Q.   And what you're telling me is that based upon information

24   given to you by other officers, this black bag and what

25   appears to be clear bags of some type of green vegetative

1  matter were found on an intermediate stairway in the back

2  stairwell at the top of which a cooler with a plastic bag with

3  a gun in it was found; is that true?

4  A.    Correct.

5  Q.    Anything else the officers told you they found in this

6  back stairwell/landing/storage area outside the apartment you

7  were supposed to search that night?

8  A.    Whatever they told me was documented on the property

9  receipt.

10  Q.    All right.  Do you know from what -- well, first of all,

11  you told us all the items of evidence were delivered to you,

12  Detective McMahon, right?

13  A.    Correct.

14  Q.    All right.  So you handled them?

15  A.    Yes.

16  Q.    Including the Metro PCS -- is it PCS?

17  A.    Yes, I believe.

18  Q.    Metro PCS plastic bag containing the Glock.  When the gun

19  came to your possession, your personal physical possession,

20  was it in a plastic bag, sir?

21  A.    The whole thing was given to me, yes, whatever is

22  documented on the property receipt.

23  Q.    All right.  Just tell the judge if you could see the gun

24  through the bag or if the bag that contained the gun was

25  opaque as Imiolo told you he found it in the cooler in the

1  back hall?

2  A.   I don't recall if the -- you could see it directly through

3  the bag.

4  Q.   I'm going to show you 25 for identification.  Do you see

5  that?

6  A.   I do.

7  Q.   Do you recognize any part of what's depicted in

8  Exhibit 25?

9  A.   It appears to be a blue cooler with a plastic bag inside

10 it.

11 Q.   Is this what you're referring to as a plastic bag on the

12 right side of the inside of the cooler?

13 A.   Yes.

14 Q.   Did that come into your possession with a pistol inside of

15 it on the night in question, sir?

16 A.   Plastic bag with a pistol inside of it, yes.

17 Q.   But I'm asking you about the plastic bag shown at the

18 bottom of this cooler on the right side of the floor of the

19 cooler in Exhibit 25, is that the plastic bag that you were

20 given after Detective Imiolo came to you and told you what he

21 said?

22 A.   If that's the plastic bag that contains the handgun, then

23 yes.

24 Q.   But did you just say if?

25 A.   If that is, in fact, the plastic bag, yes.

1  Q.   No, no, no.  I want you to tell the judge if the plastic

2  bag in this photograph is one that you personally recognize as

3  the evidence control officer having been given to you with a

4  9 millimeter semi-automatic Glock pistol on the night in

5  question?

6        **MS. HIGGINS:** Objection.

7  **BY MR. TORRE:**

8  Q.   If you can?

9        **MS. HIGGINS:** Objection.

10       **MAGISTRATE JUDGE MCCARTHY:** Don't answer yet.

11       **MS. HIGGINS:** On two bases.  First, Mr. Torre is

12 again eliciting testimony specifically referring to a

13 photograph that's not in evidence.

14       Second, Mr. Torre is asking the witness to identify

15 an innocuous white plastic bag in Government Exhibit 25 and

16 telling the Court in a very combative manner --

17       **MAGISTRATE JUDGE MCCARTHY:** Okay, okay, okay,

18 enough.  The fact that the exhibit is not in evidence doesn't

19 preclude the witness from testifying about it.  He's

20 recognized it.

21       Now, in terms of what's in the bag or whether he

22 knows what's in the bag, he can be asked that and we'll see

23 what he says.

24       **MS. HIGGINS:** But, Judge, that's not the question.

25 The question is identifying the bag itself.  He's not -- the

1   witness was asked is this the plastic bag?  It's an innocuous

2   looking plastic bag in this photograph.

3          **MAGISTRATE JUDGE MCCARTHY:** He said is this the

4   plastic bag that had the gun in it?  That's the question.  He

5   can say yes, no or I don't know.

6   **BY MR. TORRE:**

7   Q.   I'm going to ask you again, Detective.  Can you recognize

8   the white plastic bag shown in Exhibit 25 on the right-hand

9   side of the cooler as the white or as the plastic bag that

10  Detective Imiolo handed you with a gun in it that night?

11  A.   Specifically if that's the bag, I can't recall, but I'm

12  assuming it is, yes.

13  Q.   All right.  Now did you tell us earlier you looked at

14  pictures and it was a blue or a black MCS plastic bag?  PCS

15  plastic bag?

16  A.   The picture you showed me before was a black plastic bag.

17  I'm assuming that I mistook it for that.

18  Q.   No, I showed you the photograph after you testified to

19  blue or black plastic bag.  That's why I'm asking you the

20  question.

21  A.   I understand that, but that's one of the pictures I saw

22  earlier when I was looking at the pictures.

23  Q.   When you say that, you mean you were looking at pictures

24  in the U.S. Attorney's Office before testifying today, right?

25  A.   No, I was handed a bunch of pictures by the other

1    counselor and I looked at all those pictures just now.

2    Q.    Okay. But that's why you're in court.  Did you look at

3    pictures before you came to court today or not?

4    A.    Yes, I did.

5    Q.    Okay. So when you looked through the pictures that have

6    these Government exhibit stamps on them at the U.S. Attorney's

7    Office to prepare for testimony today, you saw the picture of

8    the cooler with the white plastic bag, right?

9    A.    I don't recall.  I'm assuming so, but I don't recall.

10    Q.    You saw the picture with the black plastic bag with the

11    marijuana next to it on the intermediate landing, right?

12    A.    Yeah.

13            **MS. HIGGINS:** Objection, relevance.

14            **MAGISTRATE JUDGE MCCARTHY:** I'll allow it.

15    **BY MR. TORRE:**

16    Q.    My question is were you simply mistaken when you earlier

17    told us it was a black or a blue PCS Metro plastic bag that

18    the gun came to you in as the evidence control officer from

19    Detective Imiolo?

20    A.    Yes, simple mistake.

21    Q.    All right.  Now, what is this other object in 25 that you

22    say you recognize to the left?  Do you know?

23    A.    I didn't say I recognized that.  I never looked directly

24    in there and observed it for myself.

25    Q.    Did you put the cooler into evidence --

1    **MAGISTRATE JUDGE MCCARTHY:** You're not near a mic,

2  Mr. Torre.

3  **BY MR. TORRE:**

4  Q.    Sorry, Judge.  Did you put the cooler into evidence, sir?

5  A.    I did not, no.

6  Q.    Which officer did you designate to put the cooler into

7  evidence if you did?

8  A.    I didn't designate anybody to put the cooler into

9  evidence.

10  Q.    Did Detective Imiolo tell you what caused him to open the

11  cooler in the back hallway storage area of this building, sir?

12  A.    He did not.

13  Q.    You went to the premises with the search warrant in your

14  hands, correct?

15  A.    Correct.

16  Q.    And you knew the terms by the first paragraph authorized

17  the search of the upper right apartment at 198 Potomac Avenue,

18  nothing more, nothing less, correct?

19  A.    That's what it states, yes.

20  Q.    All right.  Sir, that stairwell you've been talking about

21  out the back of the apartment, some of the various officers

22  that were there they went up the stairwell as well as down,

23  correct?

24  A.    I don't know.

25  Q.    With regard to that, sir, there is a attic above this

1  premises listed as a two and a half story building, right?

2  A.    There could be.  I don't know.

3  Q.    Were you brought any evidence that was said to have been

4  recovered from the attic of the four unit building?

5  A.    Not that I recall.

6  Q.    According to what you were told by the officers searching

7  with you that night, did they encounter any persons in the

8  back stairwell, back hallway of the building when they went

9  there and searched it?

10  A.    I don't think so, but I don't know for sure.

11  Q.    Now, I just have to ask you about one other area with

12  regard to the pre-warrant application investigation you did.

13  You mentioned the 911 call records from the Central Police

14  Services.

15              And when you reviewed those you indicated that

16  apartments at the address of 198 Potomac came back with

17  various descriptions; is that true?

18  A.    Yes.

19  Q.    All right.  Sometimes those apartments you said were

20  listed as numbered apartments and sometimes they were not; is

21  that accurate?

22  A.    Yes.

23  Q.    With regard to the 911 call log from CPS, did you keep it?

24  A.    No, it was just reviewed.

25  Q.    Did you give information from it to the issuing judge,

1  meaning Judge James Bargnesi?

2  A.    I think at some point, yes, I did.

3  Q.    And that's because he asked you about it?

4  A.    Yes.

5  Q.    All right.  And with regard to this other door you saw on

6  the second floor before you broke open the apartment door,

7  meaning you in the sense of you and the other officers

8  watching, do you say there was a number on it?

9  A.    Yes.

10  Q.    What was it?

11  A.    4.

12            **MAGISTRATE JUDGE MCCARTHY:** Wait a second.  The door

13  that you broke into was 4?

14            **THE WITNESS:** Yes, the door that we breached had a

15  number 4 next to it.

16            **MAGISTRATE JUDGE MCCARTHY:** Okay.

17  **BY MR. TORRE:**

18  Q.    How about the one across the hallway towards the other

19  side of the building?  Was there a number on it according to

20  you?

21  A.    I don't recall.

22  Q.    You don't know?

23  A.    I don't recall.

24  Q.    All right.  With the 911 call log you reviewed and told

25  the issuing judge about at least in part, my client's name

1  didn't pop up on that, did it?

2  A.    Your client being?

3  Q.    Ms. Centeno.

4  A.    I don't recall.

5  Q.    And with regard to that are you saying that on that call

6  log there were calls or a call from 198 Potomac for 911

7  assistance specifically to Apartment 4?

8  A.    In the past there were, yes.

9  Q.    And were there also calls to other apartments by I guess

10 geographic location in the building, like lower front, lower

11 left, lower right?

12 A.    I recall upper, lower.  As far as specifically upper lower

13 right, I don't recall.  But upper, lower for sure.

14 Q.    Was it only Apartment 4 that was ever designated by number

15 according to your investigation of the 911 call log?

16 A.    No, there were other apartments one, two, three and four

17 were listed.

18         **MR. TORRE:**  I don't have any other questions for you

19 right now.

20         **MAGISTRATE JUDGE MCCARTHY:**  Mr. O'Rourke.

21                 <u>**CROSS-EXAMINATION**</u>

22 **BY MR. O'ROURKE:**

23 Q.    Good afternoon, Officer McMahon.

24 A.    How you doing?

25 Q.    Just have a few questions for you.  When you -- when the

1   confidential informant was taken to that location on Potomac,

2   you did not do that?

3   A.   No.

4   Q.   And do you know who was -- who took him there?

5   A.   I don't recall.  Two other officers at least, but I don't

6   recall who.

7   Q.   And do you know -- do you know when that was done?

8   A.   Prior to us getting the search warrant reviewed.

9           **MAGISTRATE JUDGE MCCARTHY:** I'm sorry, you were not

10   there when he -- when the confidential informant was taken to

11   the premises; is that what you were saying?

12          **THE WITNESS:** Correct.

13          **MAGISTRATE JUDGE MCCARTHY:** Okay.

14   **BY MR. O'ROURKE:**

15   Q.   But it -- it appears in your affidavit, does it not, that

16   you put before the Court that you had basically received that

17   information, but that was secondhand information through other

18   officers?

19   A.   Yes, I received that information.

20   Q.   Okay.  I understand you received that information, but

21   that is not clarified at all in your application, is it?  It

22   just says, you know, I'm deputy sheriff with Erie County

23   Sheriff's Office assigned to your intelligence unit, et cetera

24   and you received information from a confidential source, et

25   cetera.

1          You're indicating -- you were indicating, were you

2    not, in that affidavit that that was your information?

3          **MS. HIGGINS:** Objection, this is improper

4    impeachment.  Paragraph 4 very clearly denotes that the -- it

5    says the aforesaid cooperating source was shown a booking

6    photograph and on that same date the cooperating source was

7    driven.

8          That phraseology does not claim that --

9          **MR. O'ROURKE:** Your Honor, I would have to object to

10   the AUSA attempting to --

11         **MAGISTRATE JUDGE MCCARTHY:** Does seem like --

12         **MR. O'ROURKE:** -- prep her witness here and give him

13   the answer.

14         **MAGISTRATE JUDGE MCCARTHY:** I agree.  You can ask

15   the witness, he can say what he wants to say, but I'm going

16   to --

17         **MS. HIGGINS:** Judge, what about my objection on --

18         **MAGISTRATE JUDGE MCCARTHY:** I'm going to strike that

19   objection.  That is coaching the witness.

20         **MS. HIGGINS:** Okay, Judge, I won't give a speaking

21   objection, but I have made an objection on this is grounds of

22   improper impeachment.

23         **MAGISTRATE JUDGE MCCARTHY:** This is

24   cross-examination.  I'll allow it.

25   **BY MR. O'ROURKE:**

1    Q.    You indicated in your application, did you not, that it

2    was you who had been -- had received that information.

3    There's no other --

4              **MAGISTRATE JUDGE MCCARTHY:** Wait, in fairness, if

5    he's going to be asked about his application, he should have

6    it in front of him.  So at a minimum I would ask that that be

7    done.

8    **BY MR. O'ROURKE:**

9    Q.    Do you want to take a look at that?

10   A.    Sure.

11   Q.    Do you want to look at it on --

12   A.    Whatever's easiest for you.

13   Q.    Okay. Can you make that out?

14   A.    Yes.

15   Q.    All right. You see where it indicates you're a deputy

16   sheriff and you're assigned to the intelligence unit under one

17   there?

18   A.    Yes.

19   Q.    Ten years experience?

20   A.    Yes.

21   Q.    You received information --

22             **THE CLERK:** Mr. O'Rourke, if you're gonna -- just

23   move the mic -- there you go.

24   **BY MR. O'ROURKE:**

25   Q.    -- that you received information from a confidential

1  source that Mr. Williams was selling cocaine in that

2  particular area.

3            There's no clarification that you received that

4  information second or thirdhand or anything of that nature, is

5  it?  Is there?

6  A.   I received that information personally.

7  Q.   From the informant?

8  A.   Yes.

9  Q.   Okay. And it goes on -- goes on to say that -- that

10 address was reviewed by the informant also?

11 A.   Yes, that he positively identified the residence.

12 Q.   Do you put that information in your application?

13 A.   I did, yes.

14           **MAGISTRATE JUDGE MCCARTHY:** Where are you in the

15 application right now?

16           **THE WITNESS:** Number 4.

17 **BY MR. O'ROURKE:**

18 Q.   It is at number -- it's under number 3, I believe, there.

19           **MAGISTRATE JUDGE MCCARTHY:** Okay, page 2, paragraph

20 3?

21           **MR. O'ROURKE:** Yes.

22           **MS. HIGGINS:** Objection.  That's not what that

23 paragraph says.

24           **MAGISTRATE JUDGE MCCARTHY:** What's the pending

25 question?

1      **MR. O'ROURKE:** Whether he put into --

2  BY MR. O'ROURKE:

3  Q.    -- Detective, did you put into your application that the

4  informant had indicated to you that he was selling out of 198

5  Potomac?

6  A.    Yes, which the confidential source, in fact, did.

7  Q.    Did you indicate that he had been taken to that -- that he

8  had been taken to that location?

9  A.    Yes.

10  Q.    And where is that -- where is that in your affidavit?

11  A.    Number 4, on 3/21/2017 the aforesaid cooperating source

12  was shown a booking photograph of Lamel Williams, date of

13  birth 4/23/78, and did positively identify the subject; and

14  that same date the cooperating source was driven to the area

15  of Potomac Avenue, Buffalo, New York, and did point out 198

16  Potomac Avenue, Buffalo, New York as the residence being

17  utilized by Lamel Williams to distribute cocaine.

18  Q.    Okay. From what you would read there, would it not be safe

19  to assume that you were indicating that you were the one that

20  drove him to that location?

21  A.    No, it doesn't indicate that at all.

22  Q.    Is there any clarification that there is someone else that

23  drove him to that location?

24  A.    Yes, being the fact that he was taken to that area and

25  they were positively identified.

1   Q.    My question is is there any clarification that it was two

2   other officers who took the cooperating witness to Potomac

3   Avenue to view the house?  Is that in your affidavit at all?

4   A.    No.

5              **MS. HIGGINS:** Objection.

6              **MAGISTRATE JUDGE MCCARTHY:** You know, I'm going to

7   overrule the objection, but I'm going to say I'm capable of

8   looking at the application, looking at what was said, looking

9   at what the confidential informant said and drawing my own

10  conclusions as to whether there was probable cause.

11             So let's move along.

12  **BY MR. O'ROURKE:**

13  Q.    The information -- could you tell us what the information

14  that the informant gave the officers when they took him to

15  that location?  Do you recall?  And this information being

16  relayed to you what that was?

17  A.    The confidential source stated that Lamel Williams

18  utilized, while looking at Potomac Avenue, 198 the upper right

19  apartment, to store and distribute narcotics.

20  Q.    Okay. Did you -- did you know whether or not he knew that

21  of his own personal knowledge?

22  A.    Yes, based on conversations that I had with the

23  confidential informant.

24  Q.    And those conversations were that he had been in that

25  location and purchased drugs at that location?

1          **MS. HIGGINS:** Objection.

2          **THE WITNESS:** Yes, he or she was there.

3          **MAGISTRATE JUDGE MCCARTHY:** What's the objection?

4          **MS. HIGGINS:** Eliciting information about what the

5    confidential informant specifically told the detective, which

6    could be identifiable information, which also -- and it's also

7    outside the scope of this evidentiary hearing.

8          **MR. O'ROURKE:** Your Honor, I'm looking for -- I'm

9    asking questions from a document that the AUSA has introduced

10   herself here into evidence.  She put No. 1 into evidence and I

11   had some questions.

12         Yes, it is a document, but it contains all of this

13   information that I was asking about.

14         **MS. HIGGINS:** Mr. O'Rourke is asking questions with

15   more detail and asking for more information than what is in

16   this document.  This document is very carefully limited to the

17   kind of information it portrays.

18         And Mr. O'Rourke is asking for more and, again, it

19   is not pertinent to the question before the Court during this

20   evidentiary hearing.

21         **MR. O'ROURKE:** I don't know whether, you know, what

22   that has to do with it.  It's the Government who introduced

23   this evidence.  You know, that door has been opened.  I can

24   clarify it.

25         **MAGISTRATE JUDGE MCCARTHY:** Look, one of the issues

1    is whether the warrant is supported by probable cause.  I have

2    reviewed the video statement of the confidential informant and

3    I will make that determination based on a combination of the

4    review of the affidavit, plus Detective McMahon's affidavit --

5    excuse me, Deputy McMahon's affidavit, Exhibit 1, plus the

6    statements by the confidential informant.

7              As I've indicated several times now, I am going to

8    direct the Government to produce a redacted transcript of the

9    confidential informant's testimony before Judge Bargnesi in a

10   manner that does not identify the confidential informant, but

11   does shed some light on the location of the apartment.

12             But beyond that I don't see the purpose of this

13   hearing being to get into whether the warrant was otherwise

14   supported by probable cause.  I think we're focusing now on

15   scope of the search, whether the search was consistent with

16   the warrant.  I suppose another issue down the road is whether

17   there was an expectation of privacy in anything taken from

18   outside the apartment and we'll address those issues as they

19   come up.

20             So let's move forward on that basis.

21             **MR. O'ROURKE:** Thank you, Your Honor.

22             **MAGISTRATE JUDGE MCCARTHY:** Okay.

23   **BY MR. O'ROURKE:**

24   Q.   Officer McMahon, the -- could you tell me what the

25   procedure was when you executed the search warrants?  Am I

1    correct in understanding that nobody had a specific assignment

2    in that other than yourself who was the officer who was going

3    to be responsible for the evidence?

4    A.    Well, during execution somebody is assigned to use the

5    ram; somebody is assigned to use the pry; somebody is assigned

6    to use the long gun.   Once we get inside, everything is

7    cleared, sometimes we just make the decision then who is going

8    to do what.

9    Q.    Okay. So those -- so once you got inside, it was --

10   someone would say I'll take this particular room and I'll

11   search it or I'll take that room and I'll search it?

12   A.    Yeah.

13   Q.    And you -- you personally did not go into and search every

14   room and every closet and every nook and cranny in the entire

15   apartment; is that correct?

16   A.    No.

17   Q.    All right.   And am I correct then in the items that were

18   brought to you and you noted them down on the evidence -- on

19   the property and evidence receipt, you set up somewhere in the

20   apartment to do that?

21   A.    Yes.

22   Q.    And where was that?

23   A.    I don't recall.   Some space that we could find that was

24   open and clear enough to handle all the evidence.

25   Q.    Okay.

1  A.    And be comfortable enough.

2  Q.    You set up somewhere, you put the form down and as

3  evidence was brought to you you put it on the form?

4  A.    Yup.

5  Q.    Okay. Some of those items in that -- in that particular

6  property receipt, specifically I see here 2, 3, 7, 13, some of

7  those items were taken into your possession directly, correct?

8  A.    Correct.

9  Q.    And the other items that were brought to you as they were

10  brought by an officer to where you were centrally located and

11  they're the ones that told you where that was; is that

12  correct?

13  A.    Yes, when I was able to set up and be prepared to document

14  everything, that's what happened.

15  Q.    And obviously that was not of your own personal knowledge?

16  You relied upon what they told you, correct?

17  A.    Correct.

18  Q.    And some of these photographs that were taken -- and let

19  me refer to Government Exhibit No. 18, you can see that white

20  baggie with a powdered -- tied up with the powder substance

21  inside.  That is an item that you know had been moved prior to

22  that photograph being taken, correct?

23  A.    I believe so.

24  Q.    That originally was in some other location in the

25  apartment, I believe it was on the floor, they moved it and

1  photographed it at that location?

2  A.   Yeah, in some other location or on the person of somebody.

3  Q.   Okay. And do you -- do you know how many of these items

4  were moved within the apartment before they were photographed?

5  Do you know that of your own personal knowledge?

6  A.   I do not.

7  Q.   Okay.  Isn't it standard operating procedure to photograph

8  an item of evidence in the condition that it is found?

9  A.   When possible, yes.

10  Q.   Okay.  And that just -- that procedure was just not

11  followed under this particular search?

12  A.   If there's a situation that arose that it wasn't able to,

13  then yes.

14  Q.   Okay. When you went in the apartment how many individuals

15  did you find in there?

16  A.   I believe four.

17         **MS. HIGGINS:** Objection, Judge.  This has well been

18  gone over by co-defendants' counsel.

19         **MAGISTRATE JUDGE MCCARTHY:** Are we plowing any new

20  ground here?

21         **MR. O'ROURKE:** Yes.

22         **MAGISTRATE JUDGE MCCARTHY:** Okay, we already know

23  that there were four people, but get to the new stuff.

24  **BY MR. O'ROURKE:**

25  Q.   Were all four individuals arrested?

1  A.    No.

2  Q.    One of the individuals then was not arrested along with

3  the other three and for what reason was that?

4  A.    Above my pay grade.  I did not make that decision.

5  Q.    All right.  Who made that decision?

6  A.    Probably Chief D.J. Granville or Alan Rozanski, he was

7  still employed at the time with us, which I believe he was.

8  Q.    And just so I'm completely clear about that, the

9  individual was interviewed by one of your superiors?

10  A.    He was interviewed by somebody.  By who I don't know.

11  Q.    You don't know who he was interviewed for.  And that

12  decision and then a decision based upon that interview was to

13  just cut that individual loose and not arrest him at all?

14  A.    Ultimately, yes.

15  Q.    Okay. Did you have any further involvement in that

16  particular -- did you have any involvement in that particular

17  decision at all?

18  A.    No.

19  Q.    Okay. Did I understand you correctly to say that you did

20  not know that there was a back door to that -- to that

21  apartment house when you -- before you executed the search

22  warrant?

23  A.    I did not know that, no.

24  Q.    And would it have been standard operating procedure to

25  find out about that information so that back door could be

1  covered by officers on the outside?

2  A.    Yeah, it's typical that we send people to the rear or

3  sides of the residence, typically uniformed personnel, which I

4  believe we did that night.

5  Q.    Okay.  And am I to take it that you weren't in charge of

6  setting up that detail then?

7  A.    No, I'm not.

8  Q.    Okay. You were -- basically you were just here as the

9  evidence guy?

10 A.    Correct.

11 Q.    Okay.  And last but not least, I guess, on Exhibit 2 and I

12 think we have covered this, but I would just like to make it

13 crystal clear that you can see Government's Exhibit 2 is the

14 search warrant, correct?

15 A.    Correct.

16 Q.    And nowhere in that search warrant under any circumstances

17 is the back hallway of that apartment set forth to -- for a

18 location to be searched, correct?

19 A.    Specifically, no.

20 Q.    Okay.

21        **MR. O'ROURKE:** That's all I have.  Thank you, Your

22 Honor.

23        **MAGISTRATE JUDGE MCCARTHY:** Thank you.

24        **MS. HIGGINS:** No redirect, thank you, Judge.  The

25 Government's prepared to call our next witness, Adam Imiolo.

1    **MAGISTRATE JUDGE MCCARTHY:** All right. I have one

2  question of the witness, maybe one or two before I release

3  him.

4    I'm a little confused.  You came in through the

5  front door of 198 Potomac?

6    **THE WITNESS:** Correct.

7    **MAGISTRATE JUDGE MCCARTHY:** You then went up a

8  stairway?

9    **THE WITNESS:** Correct.

10    **MAGISTRATE JUDGE MCCARTHY:** And did the stairway

11  have a landing and then --

12    **THE WITNESS:** If I recall correctly, it had a little

13  landing and then it comes up.

14    **MAGISTRATE JUDGE MCCARTHY:** So the stairway would go

15  in one direction and then turn and go in the other direction?

16    **THE WITNESS:** I believe so.

17    **MAGISTRATE JUDGE MCCARTHY:** So when you came to the

18  second floor you were facing the front of Potomac?  Or you

19  were facing Potomac then?

20    **THE WITNESS:** I don't recall.  I do recall that when

21  we did come upstairs -- when we came up to the end of the

22  stairs, the apartment was on the right-hand side.

23    **MAGISTRATE JUDGE MCCARTHY:** Okay.  So -- all right.

24  So when you arrived at the second floor off the stairway, then

25  the apartment that you entered was on the right-hand side?

1                **THE WITNESS:** Correct.

2                **MAGISTRATE JUDGE MCCARTHY:** Okay, thank you.

3                **MS. HIGGINS:** Sorry, Judge, just for my clarity,

4      based on those questions, that would have been as you faced

5      the front of the building from the outside the right-hand side

6      of the building?

7                **THE WITNESS:** Correct.

8                **MS. HIGGINS:** So that hallway that you were standing

9      on on the second floor faced the rear of the building just as

10     you would face the rear of the building from the front of the

11     building, correct?

12               **THE WITNESS:** Yeah, if you're standing at the top of

13     the stairs the apartment was on the right-hand side, I

14     believe.

15               **MS. HIGGINS:** Okay.

16               **THE WITNESS:** It was the upper right apartment from

17     the outside of the building.

18               **MS. HIGGINS:** Right.  As you stand at the top of the

19     stairs you're also facing the rear of the building directly?

20               **THE WITNESS:** Yes.

21               **MS. HIGGINS:** The hallway runs from the front of the

22     house to the back of the house?

23               **THE WITNESS:** You can be looking through the back of

24     the house or towards the front of the house.

25               **MS. HIGGINS:** Thank you.

1          **MAGISTRATE JUDGE MCCARTHY:** Okay.  Thank you, sir.

2          **THE WITNESS:** Thank you.

3          (**WHEREUPON**, the witness was excused).

4          **MAGISTRATE JUDGE MCCARTHY:** I recognize nobody can

5 predict for certain, but are we going to get through this

6 witness?  You've got a 2 o'clock?

7          **MS. HIGGINS:** I do.

8          **MAGISTRATE JUDGE MCCARTHY:** And Mr. O'Rourke -- what

9 do you have, a plea at 2:00?

10          **MS. HIGGINS:** Arraignment at 2:00, then a plea at

11 3:00.

12          **MAGISTRATE JUDGE MCCARTHY:** If we don't get things

13 done by 2:00, we're not getting them done today, right?

14          **MS. HIGGINS:** I'm motivated, Judge.

15          **MAGISTRATE JUDGE MCCARTHY:** I understand you are,

16 but I'm trying to be realistic here in terms of whether we're

17 going to get done with this witness today because if we're

18 not, then I suggest we break now.

19          So, counsel, I've got to rely on your good faith in

20 telling me whether you think we can be done by 2:00 with your

21 cross-examination, bearing in mind that there are three of

22 you.

23          **MR. GRIEBEL:** Judge, on behalf of Mr. Williams, Dan

24 Griebel, I don't think so because as I understand things

25 correctly, this is Adam Imiolo?

1             **MAGISTRATE JUDGE MCCARTHY:** I don't know.  Is it?

2             **MS. HIGGINS:** That's what I just -- yes.

3             **MR. GRIEBEL:** Yeah.

4             **MAGISTRATE JUDGE MCCARTHY:** Okay.

5             **MR. GRIEBEL:** And my read of the sequence of events

6    here is that given the opaqueness of this first officer's

7    testimony, I do have a lot of questions for Mr. Imiolo.

8    Hopefully he'll be able to resolve some of them.

9             **MAGISTRATE JUDGE MCCARTHY:** Before the objection

10   comes, I will strike the reference to opaqueness and that's

11   for argument later, whether he was straightforward and

12   credible or not is something I will decide down the road.

13            But as a practical matter, Ms. Higgins, I

14   understand that you would like to finish the hearing today, as

15   would I, but I just don't realistically think it's possible.

16            **MS. HIGGINS:** Judge, I could also get a colleague to

17   cover my 2 o'clock arraignment.  We could go beyond 2:00.

18            **MAGISTRATE JUDGE MCCARTHY:** Mr. O'Rourke has a

19   3 o'clock plea and I --

20            **MS. HIGGINS:** That gives us to 3 o'clock.  Two hours

21   I think, is sufficient.

22            **MAGISTRATE JUDGE MCCARTHY:** We've been at this

23   for -- with minor breaks, we've been at this for three and a

24   half hours right now.

25            **MS. HIGGINS:** Okay.

1          **MAGISTRATE JUDGE MCCARTHY:** Over your strenuous

2    objection, Ms. Higgins, I'm going to -- we're just going to

3    have to reschedule.

4          **MS. HIGGINS:** I'm satisfied that I can tell

5    Detective Imiolo that I tried.

6          **MAGISTRATE JUDGE MCCARTHY:** You can tell him you

7    tried and you can say -- you can say, if you like, say the

8    damned judge just wouldn't let me go forward.

9          **MS. HIGGINS:** I would never, Judge.

10         **MAGISTRATE JUDGE MCCARTHY:** Well, you can think

11   that.  So let's talk about -- should I set another date right

12   now?  Counsel have your calendars or -- because what I'd like

13   to do also hopefully between now and then is --

14         **MS. HIGGINS:** Judge, recognizing this is specific to

15   Detective Imiolo, I don't -- I have my calendar.  I don't have

16   his.

17         **MAGISTRATE JUDGE MCCARTHY:** All right, good point.

18         **MS. HIGGINS:** Would you mind if I just brought him

19   in for this?

20         **MAGISTRATE JUDGE MCCARTHY:** Yeah, yeah, that's fine.

21   Nobody has an objection to that, right?  We're just talking

22   about scheduling.  Yeah, go ahead.

23         **MR. TORRE:** No, Judge, I would ask before the

24   prosecutor brings him in since we are breaking at this point

25   it looks like, I would just ask that -- that the next witness

1 | be instructed not to discuss the testimony of Detective

2 | McMahon before he testifies.

3 | I thought we were going to go in sequence here, but

4 | apparently I think we're going to need some time so --

5 | **MS. HIGGINS:** Judge --

6 | **MR. TORRE:** I just notice they're talking out in the

7 | hallway between testimony, Judge, and I'd rather not have to

8 | deal with that later.

9 | **MAGISTRATE JUDGE McCARTHY:** Yeah, I --

10 | **MR. TORRE:** It's pretty standard.

11 | **MAGISTRATE JUDGE McCARTHY:** Go ahead, Ms. Higgins.

12 | **MS. HIGGINS:** Because that implicates my ethics, I

13 | do feel compelled to respond.

14 | **MAGISTRATE JUDGE McCARTHY:** It's not your ethics.

15 | I'm not even suggesting it's implicating anybody's, certainly

16 | not yours, but I do think it's appropriate to instruct the

17 | witness not to discuss the subject matter of Deputy McMahon's

18 | testimony because that's one of the reasons I excluded him.

19 | So I'm not suggesting any -- any shadiness on anybody's part.

20 | I just think that's the appropriate way to go forward.

21 | Good afternoon, sir.  Detective Imiolo?

22 | **DETECTIVE IMIOLO:** Yes, sir.

23 | **MAGISTRATE JUDGE McCARTHY:** All right, sir, I don't

24 | know if Ms. Higgins has had the opportunity to advise you, but

25 | given various time constraints today, we're not going to be

1    proceeding with your testimony today.  So I need to reschedule

2    and I was going to -- I was about to ask counsel what date

3    would work for them, but Ms. Higgins quite properly pointed

4    out that we need to consider your schedule as well.

5              **DETECTIVE IMIOLO:** I'm pretty sure my schedule

6    (inaudible) I can make time, so whatever is convenient.

7              **MAGISTRATE JUDGE MCCARTHY:** Okay, I appreciate that.

8    So, counsel, are we all in a position to set a date right now?

9              **MS. HIGGINS:** Yes.

10             **MAGISTRATE JUDGE MCCARTHY:** All right. You tell me.

11   I mean, obviously we'll shoot for a date in March, hopefully

12   sooner rather than later.

13             **MS. HIGGINS:** Judge, most any day next week would

14   be -- would be convenient for us.

15             **MR. TORRE:** Tuesday I have a quick matter at 9:30 in

16   City Court, which is usually a very quick calendar call,

17   Judge, so Tuesday is pretty much good.  I'm not trying to take

18   the reins, but I'm just saying that's okay.  But I see

19   Wednesday I have a federal thing in Rochester and so that's

20   gonna be tricky.  And then -- so Tuesday or Friday looking at

21   this.

22             **MAGISTRATE JUDGE MCCARTHY:** All right, Tuesday,

23   let's see, Tuesday is March 6th.  I've got -- I got a

24   couple -- Tuesday is pretty tight for me, so can we shoot for

25   Friday the 9th?

1          **MR. GRIEBEL:** Friday is not good for me, Judge.  I'm

2   supposed to be in Cleveland.

3          **MR. TORRE:** And, Judge, Thursday I could do it, I

4   just noticed this matter here is in Bronx County and I know I

5   have an old colleague that's going to cover that.  So Thursday

6   is also a possibility by my schedule.

7          **MAGISTRATE JUDGE MCCARTHY:** All right, I could do --

8   I have a couple matters on for Thursday afternoon, but I'm

9   available Thursday morning.  Is everyone available Thursday

10  morning?

11         **MR. O'ROURKE:** I have a matter Thursday morning,

12  Your Honor.

13         **MAGISTRATE JUDGE MCCARTHY:** What time?

14         **MR. O'ROURKE:** 9:30.

15         **MR. GRIEBEL:** I could do tomorrow or Friday.

16         **MS. HIGGINS:** We can't do Friday.

17         **THE CLERK:**  Nobody's available Monday?

18         **MS. HIGGINS:** We can't do either --

19         **THE CLERK:** Can't do Monday?

20         **MAGISTRATE JUDGE MCCARTHY:** That's what I was going

21  to ask.

22         **MS. HIGGINS:** I can do Monday.

23         **MR. GRIEBEL:** I could do Monday afternoon.

24         **MAGISTRATE JUDGE MCCARTHY:** I've got a meeting at

25  3:30 on Monday afternoon.  I'm otherwise available the entire

1    day.

2              **MR. O'ROURKE:** Monday would be -- Monday would be

3    good for me, Your Honor.

4              **MR. GRIEBEL:** I can't do Monday morning.

5              **MAGISTRATE JUDGE MCCARTHY:** You can't do Monday

6    morning at all?

7              **MR. GRIEBEL:** No.

8              **MS. HIGGINS:** What about Monday at noon?

9              **MAGISTRATE JUDGE MCCARTHY:** Yeah, I mean, if we

10   start at 12:30 that gives us three hours.

11             **MR. GRIEBEL:** Yeah, I mean, that might work.  I

12   could be down here I would imagine about 12:30 or so.

13             **MR. TORRE:** I just see a County Court sentence at

14   2 o'clock with Judge DiTullio but, again, that's not, you

15   know, if I get over there at quarter to 2:00 I could, I mean,

16   I could almost -- not in custody, Judge, I don't know.  But

17   that's all I have on my calendar, 2 o'clock County Court

18   sentencing.  If we broke for a half an hour I could probably

19   be there and be back or --

20             **MAGISTRATE JUDGE MCCARTHY:** See, I got a 3:30

21   meeting that I need to attend.

22             Mr. Griebel, are you out of commission the entire

23   morning or could we start in the latter part of the morning?

24             **MR. GRIEBEL:** The problem is with the morning is

25   it's actually -- it's -- I have to make some court appearances

1  and the dockets are just wildly out of control sometimes and

2  so I just can't --

3              **MAGISTRATE JUDGE MCCARTHY:** Right, so Monday --

4              **MR. GRIEBEL:** Monday morning just doesn't work.

5              **MS. HIGGINS:** What if we did something like late

6  morning, like 11:30 and --

7              **MAGISTRATE JUDGE MCCARTHY:** Well, Mr. Griebel's

8  telling me he doesn't know because of the unpredictability of

9  the dockets whether he would be free any time Monday morning.

10             **MS. HIGGINS:** Okay.

11             **MR. O'ROURKE:** Is the 6th out of --

12             **MAGISTRATE JUDGE MCCARTHY:** I've got -- I've got an

13  oral argument at 10:00, I've got something at 11:00, I've got

14  something at 2:00 and 3:00 so --

15             **MR. O'ROURKE:** That's out.

16             **MAGISTRATE JUDGE MCCARTHY:** Actually, wait a second.

17  I could -- I could work my way around the afternoon

18  commitments, could we do Tuesday afternoon?

19             **MS. HIGGINS:** Yes.

20             **MR. GRIEBEL:** That's fine by me.

21             **MR. TORRE:** Fine by me.

22             **MR. O'ROURKE:** It was my idea.

23             **MAGISTRATE JUDGE MCCARTHY:** Oh, well then -- I'm

24  going to second Mr. O'Rourke's excellent idea to reconvene on

25  Tuesday afternoon -- wait a second, wait a second.  Just a

1   second.  Just bear with me a second.

2           Matt, do you know what the status conference is

3   Tuesday afternoon at -- Matthew's at 2 o'clock?  The 3 o'clock

4   is just a scheduling conference.  All right. Okay, okay, okay,

5   good, thanks.

6           All right, let's plan on Tuesday afternoon.  So do

7   you want to start at -- I can start at 1:00 or 1:30, whatever

8   counsel wants to do.

9           **MS. HIGGINS:** Let's start at 1:00.

10          **MAGISTRATE JUDGE MCCARTHY:** Okay?

11          **MR. TORRE:** I'm available.

12          **MR. GRIEBEL:** Thank you, Judge.

13          **MS. HIGGINS:** Thank you.

14          **MAGISTRATE JUDGE MCCARTHY:** All right, we'll see you

15  all at 1:00.  As far as that transcript -- well, I don't know

16  if that's realistic to try to get that between now and then,

17  but I would like you to get that, at least get it over to me

18  so I can --

19          **MS. HIGGINS:** Before Tuesday?

20          **MAGISTRATE JUDGE MCCARTHY:** If you can.  If you

21  can't, we'll do it some other --

22          **MS. HIGGINS:** Judge, just because I -- I've

23  inherited the case from Mr. Cullinane, I may not be exactly

24  with it on the procedural posture of it, but it was my

25  understanding this evidentiary hearing was limited to the

1  scope question of the execution of the warrant and the

2  probable cause question and the *in camera* contents was

3  separated from this evidentiary hearing.

4          **MAGISTRATE JUDGE MCCARTHY:** Yeah.

5          **MS. HIGGINS:** I'm happy to make my efforts.

6          **MAGISTRATE JUDGE MCCARTHY:** Well, but there was --

7  there was a question of whether the --

8          **MS. HIGGINS:** Right, so my --

9          **MAGISTRATE JUDGE MCCARTHY:** -- whether the warrant

10 properly identified the -- and there was a question of why the

11 number 4 was taken out and I think the transcript addresses

12 that.

13         **MS. HIGGINS:** Right.  So is the Court requesting the

14 transcript be prepared and given to the defense counsel in

15 advance of Tuesday because --

16         **MAGISTRATE JUDGE MCCARTHY:** No, no, no, I was going

17 to suggest you get it to me.  But that can wait, that can

18 wait, we'll just finish with Detective Imiolo and then we'll

19 see where we go from there.

20         **MR. TORRE:** Judge, could I be heard just briefly on

21 that?

22         **MAGISTRATE JUDGE MCCARTHY:** Yeah.

23         **MR. TORRE:** Because I think you have zeroed in on

24 this sort of important issue relative to whether this was a

25 lawful seizure of the gun outside the apartment or not and

1   potentially whether there was confusion over which apartment

2   in the building.

3           So the request is first that this redacted

4   transcript be prepared like now to reduce any reference to who

5   this person is.  We're not interested, but the information

6   relative to the actual -- the reason I say that -- one of the

7   reasons is we've already touched on the paperwork that

8   references and points one thing and then another points

9   another and even in the final form, you know, of the

10  application itself it's -- it's got both 4 and upper right.

11  It wasn't struck in the first paragraph.

12          **MAGISTRATE JUDGE MCCARTHY:** Yeah, but, Mr. Torre, I

13  understand what you're saying.  I guess the only question is

14  whether we need to have that before us at the time that

15  Detective Imiolo is questioned on Tuesday, and I don't think

16  we do.

17          **MR. TORRE:** The one thing --

18          **MAGISTRATE JUDGE MCCARTHY:** If it turns out we need

19  to bring somebody back because of that, we can consider that,

20  but, you know, it's a relatively short timeframe between then

21  and now and, quite frankly, we had all anticipated that

22  Detective Imiolo would be testifying today without that.

23          So I'm not foreclosing anybody from making the

24  argument s they want to make and if they need a further

25  continuance based on that, we can take it up, but --

1          **MR. TORRE:** Judge, one thing the Court may not have

2   yet considered, it may be that it was Imiolo that drove the CI

3   by the premises and in the application that Mr. O'Rourke was

4   last questioning about --

5          **MS. HIGGINS:** Sorry, before Mr. Torre goes on, I can

6   tell you that it wasn't.

7          **MR. TORRE:** Even if it wasn't, Judge, whoever drove

8   the informant by, it's referenced in paragraph 4 of the

9   application at the top on the second page it says, and I

10   quote, the cooperating source was driven to the area of

11   Potomac Avenue, Buffalo, New York and did point out 198

12   Potomac Avenue, Buffalo, New York as the residence being

13   utilized by Lamel Williams to distribute cocaine.

14          And then at other points in his testimony this

15   first witness said that the CI ID'd the premises as the upper

16   right apartment at that address.

17          **MAGISTRATE JUDGE MCCARTHY:** Right.

18          **MR. TORRE:** And then we all know that he referenced

19   the CPS logs as to potentially where this Apartment No. 4 that

20   ultimately was struck -- at least mostly struck from the

21   application.

22          So what I'm saying is what this CI said or what the

23   police said about which apartment it is they really wanted to

24   search or which apartment the CI implicated, it's kind of

25   critical at this hearing and so, therefore, I mean, unless

1 | this is a really voluminous search warrant application

2 | transcript which, quite frankly, it would be a surprise,

3 | but --

4 |          **MAGISTRATE JUDGE MCCARTHY:** I think without

5 | breaching any confidences, I can tell you it's not, okay?

6 |          **MR. TORRE:** In that sense it probably could be

7 | redacted with very little effort by either one of the

8 | assistants handling the file.

9 |          **MS. HIGGINS:** That assumes that the transcript has

10 | even been created and it hasn't.

11 |          And the other thing I just want to mention is that

12 | if the scope of this hearing was designed to include that

13 | issue, then I wish the Government had been on notice of it

14 | because we would have prepared and offered additional

15 | testimony from Detective McMahon.

16 |          This could be my error because I've inherited the

17 | case at sort of a mid stage, but my understanding was that it

18 | was about the scope of the execution of the warrant, and I

19 | grant that that may or may not be connected with the way that

20 | the search warrant describes it and the fact that there could

21 | be certain testimony from the confidential informant which

22 | gives meaning to the way that it's described inside the

23 | warrant that that may effect it, but it's separate and apart

24 | from the execution scope --

25 |          **MR. TORRE:** Judge, it's all in the papers --

1      **MS. HIGGINS:** -- so what I'm --

2      **MAGISTRATE JUDGE MCCARTHY:** -- all right, counsel,

3  counsel, I'm going to leave it this way, I'm going to leave it

4  this way: I'm not foreclosing anybody from asking for

5  continuances or to have certain witnesses brought back, but

6  for now we're going to go with Detective Imiolo on Tuesday.

7      If he or Deputy McMahon or anybody else has to be

8  brought back at a later date, I'll consider that application.

9  I think in fairness the transcript will be prepared and it

10  will be delivered to counsel.  I just don't know whether it

11  will be done by Tuesday, but we're gonna go ahead and see what

12  we see -- what we see, all right?

13      Thank you all.

14      **MR. GRIEBEL:** Thank you, Judge.

15      (**WHEREUPON**, proceedings adjourned at 1:24 p.m.)

16                  *    *    *

17              **CERTIFICATE OF TRANSCRIBER**

18      In accordance with 28, U.S.C., 753(b), I certify that

19  this is a true and correct record of proceedings from the

20  official electronic sound recording of the proceedings in the

21  United States District Court for the Western District of New

22  York before the Honorable Jeremiah J. McCarthy on February

23  28th, 2018.

24  S/ Christi A. Macri

25  Christi A. Macri, FAPR-CRR
    Official Court Reporter