1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5
- - - - - - - - - - - - - X
6   UNITED STATES OF AMERICA              17-CR-78(G)

7   vs.
                                         Buffalo, New York
8   LAMEL WILLIAMS, LATISHA              March 6, 2018
    WILLIAMS AND IRIS CENTENO,           1:08 p.m.
9            Defendants.
- - - - - - - - - - - - - X
10

11                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE JEREMIAH J. MCCARTHY
12                UNITED STATES MAGISTRATE JUDGE

13

14

15

16
    AUDIO RECORDER:    Debbie Zamito
17

18
    TRANSCRIBER:       Christi A. Macri, FAPR-CRR
19                     Kenneth B. Keating Federal Building
                       100 State Street, Room 2120
20                     Rochester, New York 14614

21
    (Proceedings recorded by electronic sound recording,
22   transcript produced by computer).

23

24

25

1                    A P P E A R A N C E S

2
     JAMES P. KENNEDY, ESQ.
3    United States Attorney
     BY: LAURA HIGGINS, ESQ.
4    Assistant United States Attorney
     138 Delaware Avenue
5    Buffalo, New York 14202

6
     DANIEL M. GRIEBEL, ESQ.
7    106 Grayton Road
     Tonawanda, New York 14150
8    Appearing on behalf of Lamel Williams

9

10   MICHAEL G. O'ROURKE, ESQ.
     112 Franklin Street
11   Buffalo, New York 14202
     Appearing on behalf of Latisha Williams
12

13
     NELSON S. TORRE, ESQ.
14   438 Main Street
     Suite 910
15   Buffalo, New York 14202
     Appearing on behalf of Iris Centeno
16

17

18

19

20

21

22

23

24

25

1                                **I N D E X**

2    **WITNESS FOR THE GOVERNMENT**

3    Adam Imiolo
          Direct examination by Ms. Higgins          Page  5
4         Cross-examination by Mr. Griebel            Page 21
          Cross-examination by Mr. Torre              Page 36
5         Cross-examination by Mr. O'Rourke           Page 56

6

7

8

9

      **EXHIBIT**              **RECEIVED**
10
      Government 22-24    10
11    Government 25-27    18

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **P R O C E E D I N G S**

2                           *   *   *

3              (**WHEREUPON**, all defendants are present).

4              **THE CLERK:** All rise.

5              **MAGISTRATE JUDGE MCCARTHY:** Please be seated.

6              **THE CLERK:** On the record, this is United States

7    vs. Lamel Williams, Latisha Williams and Iris Centeno, case

8    No. 17-CR-78.

9              For the Government, Laura Higgins.

10             Daniel Griebel with defendant Lamel Williams.

11             Michael O'Rourke with defendant Latisha Williams.

12             Nelson Torre with defendant Iris Centeno.

13             All the defendants are present, we are here for

14   continuation of the evidentiary hearing, the Honorable

15   Jeremiah J. McCarthy presiding.

16             **MAGISTRATE JUDGE MCCARTHY:** Good afternoon,

17   everyone.

18             **MS. HIGGINS:** Good afternoon.

19             **MAGISTRATE JUDGE MCCARTHY:** Mary Eldridge is a third

20   year law student at UB Law School, who is interning with me

21   this semester, so I know you'll all be on your best behavior.

22             All right, are we ready to proceed?

23             **MS. HIGGINS:** Yes, Your Honor.  Government calls

24   Detective Adam Imiolo.

25             **GOVERNMENT'S WITNESS, ADAM IMIOLO, SWORN**

1                    **DIRECT EXAMINATION**

2            **THE CLERK:** Would you state your name for the

3 record?

4            **THE WITNESS:** Adam Imiolo, I-M-I-O-L-O.

5            **THE CLERK:** Thank you.

6            **MS. HIGGINS:** May I proceed?

7            **MAGISTRATE JUDGE MCCARTHY:**  You may.

8 **BY MS. HIGGINS:**

9 Q.   Are you employed?

10 A.   I am.

11 Q.   Where?

12 A.   I'm a detective with the Erie County Sheriff's Office,

13 Narcotics and Intelligence Division.

14 Q.   How long have you been employed that way?

15 A.   Roughly 12 years.

16 Q.   And is that -- does that comprise your full experience in

17 law enforcement?

18 A.   Yes, it does.

19 Q.   Have you also served previously as a task force officer

20 liaisoning with the federal agents?

21 A.   Yeah, I was a task force officer with the FBI Safe Streets

22 Task Force for approximately five years.

23 Q.   And when was that?

24 A.   I've been with straight narcotics for two years, so

25 roughly about -- started about seven years ago, 2011.

1  Q.    How long did that last?

2  A.    About five years.

3  Q.    Thank you.

4  A.    Mm-hmm.

5  Q.    I want to direct your attention to March of 2017,

6  specifically March 21st, 2017.  Did you participate in the

7  execution of a search warrant at 198 Potomac Avenue, Apartment

8  No. 4?

9  A.    I did.

10 Q.    And did you play any role whatsoever in the efforts to

11 obtain that search warrant?

12 A.    I did not.

13 Q.    Did you participate in any debriefing, however, in advance

14 of the execution of that search warrant?

15 A.    We were given a quick brief before the warrant was

16 executed, yes.

17 Q.    Can you describe the premise and how you got inside the

18 premise on March 21st?

19 A.    It was a multi-family premises.  It was -- the apartment

20 was located on the upper floor of the right-hand side of the

21 building.  I was kind of back in the stack of what we call it,

22 the stack is the number of guys entering the premises.

23          I was kind of near the rear, so I just followed the

24 stack up the stairs, entry was made.  By the time I got in

25 there the occupants were secure and the premises was secure.

1  Q.   And did you then participate in the search for contraband

2  inside the apartment?

3  A.   I did.

4  Q.   At some point did you enter a hallway off the kitchen in

5  the apartment?

6  A.   I did.

7  Q.   And was that hallway towards the back side of the

8  building?

9  A.   It was.

10 Q.   So with respect to Potomac Avenue, can you describe its

11 orientation inside the building?

12 A.   The front of the building was directly on Potomac Avenue,

13 so it was -- I think it was south -- I'm sorry, north -- north

14 of Potomac to the rear of the building.

15 Q.   And specifically was there a stairwell in that hallway?

16 A.   There was.

17 Q.   How did you enter the hallway?

18 A.   The kitchen door into the hallway was open and ajar and

19 that's the way I made entry into the hallway.

20 Q.   Okay.  And do you know how that jar became -- or that door

21 became ajar?

22 A.   I do not.

23 Q.   Do you know whether it was locked when agents first

24 entered?

25 A.   I do not know.

1  Q.   Were any items of contraband recovered in that stairwell?

2  A.   There was.

3  Q.   Specifically I want to show you Government Exhibits 22, 23

4  and 24.  Do you recognize these items?

5  A.   I do.

6  Q.   What do you recognize them to be?

7  A.   Exhibit 24 is the overall view of the stairwell looking

8  down toward the intermediate landing.

9         22 is an overview of the plastic bag that was found

10  on that intermediate landing.

11         And 23, the plastic bag was opened up and some of

12  the items were spread out for photographic purposes.

13  Q.   So are these photographs fair and accurate depictions of

14  the way the items in them and the area represented in them

15  appeared when you were there on March 21st, 2017?

16  A.   Yes.

17  Q.   To be clear, were these photographs taken by you?

18  A.   No, they weren't.

19  Q.   Were they specifically taken in your presence?

20  A.   No, they weren't.

21  Q.   And were the items that were seized in these photographs

22  personally seized by you?

23  A.   They were not.

24  Q.   Who were they seized by?

25  A.   Chief Daniel Granville.

1  Q.   And did he inform you of the seizure of these items?

2  A.   He did.

3  Q.   And have you separately had an opportunity to observe

4  these items in person?

5  A.   Yes.

6          **MS. HIGGINS:** I want to offer into evidence

7  Government's Exhibits 22, 23 and 24.

8          **MAGISTRATE JUDGE MCCARTHY:** Any objection?

9          **MR. O'ROURKE:** Not for the purpose of this hearing,

10  Your Honor.

11          **MR. GRIEBEL:** Judge, if I can just do a brief

12  *voir dire* on these?

13          **MAGISTRATE JUDGE MCCARTHY:** Yes.

14          **MR. GRIEBEL:** Thank you.  Detective Imiolo, do you

15  know who took the photographs?

16          **THE WITNESS:** I do not.

17          **MR. GRIEBEL:** And you didn't actually see these

18  items sitting in the various locations at the time of these

19  photographs?

20          **THE WITNESS:** I did not.

21          **MR. GRIEBEL:** Do you know whose footprints in the

22  base of Exhibit 22 ?

23          **THE WITNESS:** I do not know.

24          **MR. GRIEBEL:** Or the jeans in No. 23 ?

25          **THE WITNESS:** I do not know.

1          **MR. GRIEBEL:** Thank you, Judge.

2          **MAGISTRATE JUDGE MCCARTHY:** Any objection?

3          **MR. GRIEBEL:** I guess the only objection I have is I

4    just don't know if he's competent to testify as to them other

5    than being photographs.  Doesn't know anything about them.

6          **MS. HIGGINS:** Judge, the witness testified about

7    having been informed by a fellow agent about these items and

8    then thereafter personally observing the items, so I think

9    that's competent testimony.  The Court is well aware of those

10   circumstances and can consider the weight of that evidence for

11   what it is.

12         **MAGISTRATE JUDGE MCCARTHY:** I'll allow it.

13         (**WHEREUPON**, Government Exhibits 22, 23 and 24 were

14   received into evidence).

15   BY MS. HIGGINS:

16   Q.   When you described these items as being recovered from the

17   intermediate landing on the stairwell, can you just describe

18   what you mean by that?

19   A.   When you exit the kitchen door there's a landing.  The

20   landing right off the kitchen door, then there's a set of

21   stairs which is in Exhibit 24 going down to this other landing

22   which I described as the intermediate landing.

23   Q.   So using Government Exhibit 24, I'll publish it on our

24   screen -- in Government Exhibit 24 can we actually see both

25   the top and the intermediate landing?

A.    The top, yes, is where the kitchen door and the entry to
the apartment is and the intermediate landing is at the
bottom -- or the top of the photograph, but yes.

Q.    Okay. So for the record the witness is indicating in the
foreground that landing is the one at the top of the stairs
and the landing towards the center of the photograph is the
lower or intermediate landing, correct?

A.    Correct.

Q.    And based on the way the stairwell appears, the
intermediate landing seems to lead to additional stairs going
the opposite direction, correct?

A.    Yes.

Q.    The perspective of Government Exhibit 24 appears to be
obviously taken from the top of the stairwell.  What proximity
is this view to the apartment itself?

A.    From the view the apartment is directly to the left.

Q.    So in the very bottom left-hand corner of the photograph
we appear to see some white trim?

A.    Correct.

Q.    Is that -- what is that?

A.    That's the kitchen -- entry door to the kitchen.

Q.    Then again just so we understand, I'm going to refer back
to Government Exhibit 32, which is in evidence.  Comparing
what we were just looking at in Government Exhibit 24, what do
we see here in Government Exhibit 32?

1  A.    That's the door going into the kitchen and the kitchen

2  floor.

3  Q.    Okay. So the trim that we see down the center of the

4  photograph is the same trim that we saw at the bottom left

5  corner in Exhibit 24?

6  A.    Correct.

7  Q.    I'm going to show you the property receipt, which is in

8  evidence as Government Exhibit 4.  Would you identify for us

9  which item number reflects the item that we see here in

10 Government Exhibit 22?

11 A.    Yeah, that's item number 8 on the property receipt.

12 Q.    And what does the property receipt describe that as?

13 A.    It describes it as a black plastic bag containing two

14 large plastic bags containing marijuana and three bags of

15 marijuana; one plastic bag containing numerous plastic --

16 excuse me, numerous black plastic baggies; one black CR

17 digital scale with white residue; one plastic spoon with white

18 residue; one plastic ziplock bag which contained numerous bags

19 with packaging material; one box of bright red checkered bags;

20 one plastic bottle containing cut; and one plastic bag

21 containing a plastic bag with numerous white pills in the back

22 hallway.

23 Q.    Thank you.  Have you specifically had a discussion with

24 Chief D.J. Granville about the recovery of this item?

25 A.    I have.

1  Q.   And did he describe to you how this item appeared when he

2  first observed it?

3  A.   Yes, he said it appeared as it is in the photographs.

4  Q.   Okay.  And did he indicate that he -- whether he could see

5  this item from the top of the stairs?

6  A.   He said it was on the lower intermediate landing.

7           MR. GRIEBEL: Judge, I object because it's hearsay.

8  I mean, if we want to -- I know it's admissible in -- in

9  suppression hearings, but if we want to hear from Detective

10 Granville, it seems to me that we should hear from Detective

11 Granville because my client has a right of confrontation and

12 for him to sit and relay what Detective Granville is telling

13 him, why not just call Detective Granville and he can talk to

14 us directly about this?

15          So my objection is that it's hearsay and it's

16 unreliable.

17          MS. HIGGINS: Judge, I think the purpose of my

18 question's a little bit more simple.  If I could rephrase the

19 question, I think it may be less objectionable for

20 Mr. Griebel?

21          MAGISTRATE JUDGE MCCARTHY: Okay.

22          MS. HIGGINS: If I could?

23          MAGISTRATE JUDGE MCCARTHY: Sure.

24 BY MS. HIGGINS:

25 Q.   I want to show you Government Exhibit 24, which you

1  mentioned -- you testified was sort of the perspective

2  essentially from the doorway leading from the kitchen,

3  correct?

4  A.   Yes, ma'am.

5  Q.   Was the contraband that we see in Government Exhibit 22

6  visible to Chief Granville from this perspective in Government

7  Exhibit 24?

8         **MR. GRIEBEL:** Judge, I object.  That calls for

9  speculation.

10        **MAGISTRATE JUDGE MCCARTHY:** Do you know?

11        **THE WITNESS:** Chief Granville stated it was on the

12  intermediate landing.

13        **MAGISTRATE JUDGE MCCARTHY:** Hearsay is admissible.

14  I'll allow the statement for what it's worth, but it is

15  hearsay so I'll allow it.

16  **BY MS. HIGGINS:**

17  Q.   In other words, was the contraband beyond the view from

18  this perspective?

19        **MR. TORRE:** Objection to leading the witness, Judge.

20        **MAGISTRATE JUDGE MCCARTHY:** No, I'll overrule that.

21  I'll allow it.

22        **THE WITNESS:** No.  He said it was right on the

23  intermediate landing where the picture was taken.

24  **BY MS. HIGGINS:**

25  Q.   Thank you.  I'm going to direct your attention now to

1 Government Exhibits 25, 26 and 27.  Do you recognize these?

2 A.    I do.

3 Q.    What are they?

4 A.    They are pictures of a cooler and a firearm found during

5 the execution of the search warrant.

6 Q.    And do you know who found them?

7 A.    I did.

8 Q.    And do you know who took these pictures?

9 A.    I'm not aware who took the pictures.  I don't recall.

10 Q.    Okay.  I want to direct your attention specifically to

11 Government Exhibit 27.  Do you recognize whose hands appear in

12 that photograph?

13 A.    Yes, those are mine.

14 Q.    Okay.  So it's your belief that it's you holding the

15 firearm in that photograph?

16 A.    Correct.

17 Q.    So are these photographs, all three of them, 25, 26 and

18 27, fair and accurate depictions of the way those items

19 appeared on March 21st, 2017?

20 A.    Yes, ma'am.

21 Q.    Did you personally recover this firearm?

22 A.    I did.

23 Q.    Where did you recover it from?

24 A.    It was in the hallway landing directly next to the kitchen

25 entry door on that same landing that we were just talking

1 | about previous.

2 | Q.   Okay. And we see in Government Exhibit 25 a cooler?

3 | A.   Yes.

4 | Q.   Can you describe where specifically the firearm was found

5 | with respect to that cooler?

6 | A.   It was inside the cooler.  The cooler was -- there was a

7 | lot of material there.  I removed some of the material, I came

8 | to the cooler, I opened the cooler and found a firearm inside

9 | of this bag.

10 | Q.   Okay.

11 |         **MS. HIGGINS:** I'll offer Government's Exhibits 25,

12 | 26 and 27 into evidence.

13 |         **MAGISTRATE JUDGE MCCARTHY:** Any objection?

14 |         **MR. TORRE:** 25 through 27?

15 |         **MAGISTRATE JUDGE MCCARTHY:** 25, 26 and 27.

16 |         **MS. HIGGINS:** Yeah.

17 |         **MR. TORRE:** Judge, I'd like to ask a couple

18 | questions, Judge, in *voir dire*.

19 |         **THE CLERK:** I'm not picking you up on the mic, I'm

20 | sorry.

21 |         **MR. TORRE:** Sorry.  I'd like to ask a couple of

22 | questions on *voir dire*, Judge, about the three exhibits.

23 |         **MAGISTRATE JUDGE MCCARTHY:** Okay.

24 |         **MR. TORRE:** Detective, did you just look at those --

25 | oh, you have hard copies in your hand.  Okay, I was confused.

1    You have them before you.

2            25 you said after you opened up the cooler, this is

3    the inside of the cooler after you removed the gun or while it

4    was still in there?

5            THE WITNESS: The gun's still in there.

6            MR. TORRE: All right. And so then moving to 26, you

7    say that's your gloved hand in 26?

8            THE WITNESS: Yes.

9            MR. TORRE: All right. This is after you took the

10   pistol out of a plastic bag that was in the cooler you opened

11   up on the landing outside the apartment, right ?

12           THE WITNESS: Correct.

13           MR. TORRE: And lastly this is a picture after you

14   made the pistol safe by taking the clip out of it, sir?

15           THE WITNESS: Yes, sir.

16           MR. TORRE: Did that all happen in fairly short time

17   in terms of the sequencing of those three things, sir?

18           THE WITNESS: Yes.

19           MR. TORRE: All right. From what you saw, nobody had

20   opened and gone through this cooler before you did so, right?

21           THE WITNESS: No.

22           MR. TORRE: All right. And 25 -- do you have that

23   before you?

24           THE WITNESS: Yes.

25           MR. TORRE: Do you know what the other yellow-ish

1  white object to the left of this apparently closed plastic bag

2  is?

3           **THE WITNESS:** I do not.

4           **MR. TORRE:** Do you know what that small material

5  above the two whitish and yellow-ish looking objects is?

6           **THE WITNESS:** I do not.

7           **MR. TORRE:** All right. And lastly you're telling us

8  that the pistol you later removed from the white plastic bag

9  is in there in 25, correct?

10          **THE WITNESS:** Correct.

11          **MR. TORRE:** You can't actually see it, but it's in

12  there, is that it?

13          **THE WITNESS:** Correct.

14          **MR. TORRE:** No objection for purposes of this

15  hearing to the three photographs marked 25, 26 and 27 from my

16  part.

17          **MR. O'ROURKE:** None, Your Honor.

18          **MR. GRIEBEL:** None on behalf of Mr. Williams.

19          **MAGISTRATE JUDGE MCCARTHY:** All right, Government

20  Exhibits 25, 26 and 27 are in evidence.

21          (**WHEREUPON**, Government Exhibits 25, 26 and 27 were

22  received into evidence).

23  **BY MS. HIGGINS:**

24  Q.   So you mentioned that the cooler that we see in 25, 26 and

25  27 was recovered from one of the landings in the stairwell?

1  A.    Yes.

2  Q.    Can you describe specifically which one?

3  A.    It was the landing directly adjacent to the entry door to

4  the kitchen.

5  Q.    Okay. So I'm going to show you Government Exhibit 32

6  again.  Can you describe for us where in this photograph that

7  area is?

8  A.    It would be to the left of the view of the photograph

9  along the wall.

10  Q.    Okay. So to the left of the door leading to the kitchen?

11  A.    Yes, ma'am.

12  Q.    Okay. At the point you entered the stairwell were you

13  aware that a holster and rounds of ammunition had been found

14  inside the apartment?

15  A.    I was.

16  Q.    Did you at any point go all the way down to the bottom of

17  the stairwell?

18  A.    I did not.

19  Q.    Did you at any point learn whether the stairwell was

20  accessible from any other apartment?

21  A.    I do not know.

22  Q.    Did you learn whether the stairwell ultimately led to the

23  back door to exit the building?

24  A.    I did not.

25  Q.    Did you see anyone enter the back stairwell from below?

1  A.   No, ma'am.

2  Q.   Did you see anyone enter the back door of the building at

3  all?

4  A.   No, ma'am.

5  Q.   I want to show you one more photograph, this is Government

6  Exhibit 13, which is in evidence.   What do we see here?

7  A.   That is the kitchen to the apartment.

8  Q.   And in this photograph can we see the doorway that you've

9  described that leads to the stairwell?

10  A.   No, the doorway that I described is directly to the right

11  of the photograph where this unknown person is, I believe.

12  Q.   Okay. So the person on the very right edge of the

13  photograph?

14  A.   Yes, ma'am.

15  Q.   And are there any rooms -- what other rooms lead off of

16  the kitchen?

17  A.   I believe there's a bathroom directly -- almost from where

18  this picture is taken, and the hallway where this other

19  gentleman's at.

20  Q.   And so you've indicated that the perspective of the

21  photograph is almost standing in front of where the bathroom

22  is off the kitchen?

23  A.   Yes, ma'am.

24  Q.   And then you mentioned the hallway.   Are you referring to

25  the area -- and I'm pointing to it -- the doorway in the

1  middle of the photograph?

2  A.   Yes, ma'am.

3  Q.   Do you know where this hallway leads?

4  A.   The hallway leads to the right, I believe, is the front

5  entry door and to the left is bedrooms, living rooms and so

6  forth.

7          **MS. HIGGINS:** I have no further questions.  Thank

8  you.

9          **MAGISTRATE JUDGE MCCARTHY:** Thank you.  Anybody?

10                    <u>**CROSS-EXAMINATION**</u>

11  **BY MR. GRIEBEL:**

12  Q.   Good afternoon, Detective.

13  A.   Good afternoon.

14  Q.   Dan Griebel for Mr. Williams.  Before you testified today,

15  Detective, did you review any notes?

16  A.   Yes.

17  Q.   What notes did you review?

18  A.   The property receipt, police report, other notes in the

19  file, pictures.  That's about it.

20  Q.   Okay. And when you say a police report, what police

21  report?

22  A.   A police report that's for the Erie County Sheriff's

23  Office.

24  Q.   Okay. Would you happen to -- would you recognize that if

25  you saw it?

1  A.   I assume so, yes.

2  Q.   Okay. And then you said there were some other notes you

3  reviewed as well?

4  A.   Property receipt and photographs.

5  Q.   And you said some other notes, too?

6  A.   No, that was about it.

7  Q.   That was it?

8  A.   Yes, sir.

9  Q.   Okay.  And did you make any statements to anybody relative

10 to this, like Detective Granville or Officer McMahon?

11 A.   Did I make statements to them?

12 Q.   Yeah.

13 A.   No.

14 Q.   So did you testify -- have you ever testified relative to

15 this before a grand jury?  Before --

16 A.   No.

17 Q.   -- an Erie County grand jury, before anyone like that?

18 A.   No.

19 Q.   Okay. So I guess since I don't know what police report you

20 reviewed, if I could perhaps ask the prosecutor -- did the

21 prosecutor review it with you?

22 A.   Negative.

23 Q.   Okay. Where is that report?

24 A.   It's in our system.

25 Q.   Okay. And so could you produce that report?

1  A.   Not right now.

2  Q.   But later on you could?   Okay.

3         I'd ask that that report be produced.

4         **MS. HIGGINS:** Your Honor, that report has been

5  produced and is marked as Government's Exhibit 3.

6         **MR. GRIEBEL:** Can I show the witness Government's

7  Exhibit 3 and make sure it's the same report?

8         **MAGISTRATE JUDGE MCCARTHY:** Sure.

9  **BY MR. GRIEBEL:**

10 Q.   After you've had a chance to review Government's

11 Exhibit 3, if I could ask you a question?

12 A.   Yes.

13 Q.   Is that the report you reviewed?

14 A.   Yes, sir.

15 Q.   Okay, thank you.  Now, Officer, you testified that you

16 were present at the debriefing, correct?

17 A.   Correct.

18 Q.   And could you describe for us what that debriefing

19 consisted of?

20 A.   It was basically just describing the address, who the

21 target of the warrant was, what we were looking for and so

22 forth.

23 Q.   Okay. Have you ever seen a copy of the search warrant?

24 A.   I have.

25 Q.   When did you first see it?

1  A.    I can't recall.  I didn't see it that day.

2  Q.    Okay. So when you entered the premises you hadn't seen the

3  search warrant, correct?

4  A.    Not a physical copy, no.

5  Q.    So you would have not had any idea as to what the search

6  warrant authorized or didn't authorize according to the terms

7  of the search warrant, correct?

8  A.    I was authorized -- I was told it was a search of the

9  apartment named in the warrant, yes.

10  Q.    But you yourself hadn't reviewed the terms of the search

11  warrant?

12  A.    That is correct.

13  Q.    Okay. And just so we're clear what we're talking about

14  with the search warrant, do you have a camera?

15  A.    I'm sorry?

16  Q.    Do you have a screen there?

17  A.    Yes.

18  Q.    So if I put this on this table you can see it?

19  A.    Yeah, it's a little blurry, but yes, I can see it.

20  Q.    Okay, let's see how this works here.  Got to reduce this a

21  little bit.

22            **MAGISTRATE JUDGE MCCARTHY:** Excuse me, is this an

23  exhibit?

24            **MR. GRIEBEL:** This is Exhibit 2.

25  **BY MR. GRIEBEL:**

1  Q.    It's a little large on this screen --

2  A.    I think I can make out most of it.

3  Q.    I think it's probably got to focus in here.  Let's see

4  what happens.  Nope.  There we go.  And zoom.  Beautiful

5  thing.  Okay.  For whatever reason, they got something called

6  (inaudible) let's see what happens here.  Okay, super.

7            Can you see that?

8  A.    Yeah, my eyes aren't the best so --

9  Q.    Okay. Well, I can show it to you in person?

10 A.    You want me to read it, I can.

11 Q.    Yeah, okay.  Showing you what's been marked as

12 Government's Exhibit 2 and I think that's in evidence, is that

13 the search warrant that you eventually saw?

14 A.    Yes, sir.

15 Q.    Okay. And you testified that you weren't present during

16 the actual application for the search warrant, correct?

17 A.    Correct.

18 Q.    Now, as far as the premises to be searched, you testified

19 I believe it was 198 Potomac?

20 A.    Correct.

21 Q.    Had you ever seen 198 Potomac before that day?

22 A.    No.

23 Q.    Okay. Would you be able to describe 198 Potomac if you saw

24 it?

25 A.    No.

1    Q.    And it would be fair to say that since you couldn't

2    recognize 198 Potomac, you wouldn't be able to recognize what

3    the upper right of 198 Potomac looked like; is that correct?

4    A.    Reviewing the pictures I recognize the picture, yes.

5    Q.    But my question was is you earlier testified that you

6    couldn't recognize 198 Potomac if you saw it, correct?

7    A.    Correct.

8    Q.    So would it be fair to say you wouldn't know what the

9    upper right of 198 Potomac looked like?

10   A.    No, I remember what the upper apartment looks like.

11   Q.    From the outside?

12   A.    Not from the outside, no, sir.

13   Q.    Okay, very good.  You were -- you testified you were in

14   the stack when you entered the apartment, correct?

15   A.    Yes, sir.

16   Q.    Okay. And at the time you entered, everyone -- the

17   occupants of the apartment had been secured as I believe you

18   testified, correct?

19   A.    Correct.

20   Q.    So in terms of sequence -- in terms of time, how long did

21   the entire search take?

22   A.    It was a long time ago.  An hour, maybe two.  I don't

23   really recall.

24   Q.    And in terms of that sequence, when did your -- when did

25   you find the firearm?

1  A.   It was somewhere in the middle.  It wasn't initial by any

2  means.  It was -- I'd say about halfway through.

3  Q.   So at the 45 minute, the hour mark?

4  A.   Again, it's been a long time.  It's best guess, yeah.

5  Q.   Okay.  Do you keep time logs of these things?

6  A.   No.

7  Q.   Were there any videotapes made of them?

8  A.   No.

9  Q.   Okay. Can you tell me about the photographer?

10 A.   I don't know who was taking photographs that day.

11 Q.   Was someone -- do you recall -- and so is someone assigned

12 to take photographs?

13 A.   It's whoever is available basically.  Whoever, yeah,

14 whoever jumps at the chance basically.

15 Q.   So walk me through the process.  Is it you sit in the

16 debriefing room and someone says I'll take the pictures?

17 A.   Sometimes.  It's not always like that, no.  Sometimes it's

18 when we're at the scene some gentleman, one of our detectives

19 picks up the camera and he's the photographer of the day.

20 Q.   And he's just a photographer of the day?

21 A.   Correct.

22 Q.   Stays with whoever that person is, correct?

23 A.   The camera, yes.

24 Q.   Yeah.  And that wouldn't change hands?

25 A.   Not that I'm aware of, no.

1   Q.   Okay.  But you don't know who the photographer of the day

2   was?

3   A.   I do not.  I don't remember.

4   Q.   Is there any record as to who the photographer of the day

5   would be?

6   A.   I don't think so, sir, no.

7   Q.   So who sends the -- is it a digital photograph?  What kind

8   of camera is it?

9   A.   It's a digital photograph.

10  Q.   So there would be some sort of record I would imagine

11  regarding who processes the -- who downloads the photos onto a

12  printer and so on and so forth, correct?

13  A.   I would not know.

14  Q.   You wouldn't know?

15  A.   No, I wouldn't know.

16  Q.   Do you know whether anyone -- strike that.

17           Who was in charge of the execution of the search

18  warrant?

19  A.   Chief D.J. Granville.

20  Q.   And what are the duties of the person who is in charge?

21  A.   Supervise basically.

22  Q.   When you say "supervise," he assigns the search teams to

23  go to particular places and so on and so forth?

24  A.   We know where we're going.  The general search is the

25  whole apartment, so he didn't have to assign rooms if that's

1  what you're asking.

2  Q.   That's what I'm asking.

3  A.   No, no one was assigned.

4  Q.   How do you guys divide up the labor?

5  A.   You just do the work.

6  Q.   Just wander from room to room?

7  A.   We take our time and go through each room and make sure

8  each room is clear.

9  Q.   And then how do you determine when a room is clear?

10  A.   When we deem there's no more evidence or contraband or

11  anything that needs to be found for the investigation.

12  Q.   Okay. Do you shut a door so that the other agents know

13  that the room is clear?

14  A.   No.

15  Q.   How do you determine?

16  A.   Well, it's usually they're small apartments and everyone's

17  in the same area and if the room is clear people know.

18  Q.   People know?

19  A.   Yes, sir.

20  Q.   So you communicate it verbally?

21  A.   Yes, sir.

22  Q.   Is that how it happens?

23  A.   If people are asked, yes, they tell if they were in that

24  room or so forth.

25  Q.   Okay. And during the search do you recall where Detective

1   McMahon was?

2   A.   I do not.

3   Q.   And how about Detective Carney?

4   A.   I do not.

5   Q.   In what rooms did you search?

6   A.   I assisted with the bedroom and the hallway.

7   Q.   And are those the only two rooms?

8   A.   That I recall, yes.

9   Q.   Now, Officer, did you prepare a property receipt?

10  A.   I did not.

11  Q.   Do you know who would have prepared the property receipt?

12  A.   I believe it was Pat McMahon.

13  Q.   And what's the basis of the knowledge that he would have

14  prepared the property receipt on?

15  A.   He stated he prepared the property receipt.

16  Q.   Okay. And when he puts information in to the property

17  receipt, who does he get that from?

18          **MS. HIGGINS:** Objection, basis of knowledge, asking

19  about what another person knows and why another person does

20  it.

21          **MR. GRIEBEL:** Judge, let's assume it's hearsay.

22  It's been coming in --

23          **MAGISTRATE JUDGE MCCARTHY:** I'll allow it.

24          **MR. GRIEBEL:** Thank you.

25          **THE WITNESS:** Every detective does a property

1    receipt a different way.  Some detectives ask somebody what

2    did you find?  They document it down.  As to the detail,

3    though, it's every detective is different as to color, make,

4    model, and so forth.  I don't want to speak exactly what he

5    did.

6    **BY MR. GRIEBEL:**

7    Q.    Okay.  So it's your testimony that you were just in what?

8    A bedroom and a back hallway?

9    A.    Correct.

10   Q.    And no other place, correct?

11   A.    Searching, no.

12   Q.    Okay. I'm going to show you what's been marked as

13   Government's Exhibit No. 4 and I'd like you to take a look at

14   it.  Let me know when you're finished looking at it.  It

15   consists of four pages.

16   A.    Oh, I'm sorry, the whole thing, yes, it's the property

17   receipt.

18   Q.    And I'd like to refer you -- are you finished reviewing

19   it?

20   A.    Yes, sir.

21   Q.    Okay. I'd like to refer you to item 14.

22   A.    Yes, sir.

23   Q.    Okay. Could you read item 14 for me?

24   A.    A metal pipe with rubber and containing white residue on

25   the couch in living room by Adam Imiolo.

1  Q.    Okay. Now that's not consistent with what you testified

2  with before, so is it fair to say Detective McMahon would have

3  made a mistake in terms of who delivered that property to him?

4  A.    It could have been I forgot I searched the couch.

5  Q.    Okay. But somehow there's a discrepancy from what you

6  testified to and what's on that property receipt?

7  A.    Correct.

8  Q.    Okay. Did you ask any questions of Mr. Williams?

9  A.    No.

10 Q.    Do you know if anyone asked any questions of Mr. Williams?

11 A.    I'm not aware.

12 Q.    Have you applied for search warrants before?

13 A.    I have.

14 Q.    And could you tell us have you applied to any judges that

15 are in special term?

16        MS. HIGGINS: Objection, beyond the scope of direct,

17 and relevance.

18        MR. GRIEBEL: Judge, if I can make an offer of

19 proof?

20        MAGISTRATE JUDGE MCCARTHY: Yeah.

21        MR. GRIEBEL: Okay.  Could I have the witness

22 excused during this sequence?

23        MAGISTRATE JUDGE MCCARTHY: Would you step down,

24 sir?  All right, the witness has now left the courtroom.

25        MR. GRIEBEL: Thank you, Judge.  Judge, Detective

1    McMahon testified that there was a special term judge sitting

2    that was not Judge Bargnesi.  And I realized between the last

3    hearing date, excuse me, and this hearing date that there's

4    nothing in the record regarding what a special term judge

5    does.

6            And I've just been trying to elicit that testimony

7    so that the record's clear that a special term judge has a

8    certain function within the state court system.

9            I'm happy to stipulate to the special term judge is

10   the judge that's assigned to take cases that come through at a

11   particular time, according to a calendar, but I again realized

12   that that part had not been developed in the record last time.

13           **MS. HIGGINS:** Judge, of what consequence is -- are

14   those facts to the evidentiary hearing today?

15           **MR. GRIEBEL:** Judge, it goes to the search warrant

16   issue that there might have been some judge shopping going on.

17           **MS. HIGGINS:** That's a different question beyond the

18   scope of this evidentiary hearing and that sort of

19   accusation -- this is the first I'm hearing it and the

20   Government would hope that an accusation like that would have

21   been brought to our attention.

22           It's an inappropriate question to be brought at

23   this stage in cross-examination of this witness.

24           **MAGISTRATE JUDGE MCCARTHY:** I'm not going to allow

25   that.

1          **MR. GRIEBEL:** Judge, just for the record, I don't

2    personally think it's an inappropriate question.  I think it

3    does go to the fair and impartial magistrate --

4          **MS. HIGGINS:** But this witness testified that he

5    wasn't part of the application process.

6          **MR. GRIEBEL:** That's fine, Judge.  I just -- I

7    appreciate Your Honor letting me --

8          **MAGISTRATE JUDGE MCCARTHY:** You made your offer of

9    proof and I at this point don't -- don't see the relevance,

10   but the offer of proof's in the record.

11         **MR. GRIEBEL:** Okay, thank you, Judge.

12         **MAGISTRATE JUDGE MCCARTHY:** Okay.

13         **MR. GRIEBEL:** Okay.

14   **BY MR. GRIEBEL:**

15   Q.   Okay.  Now -- bear with me, Judge, I'm sorry, I'm just

16   trying to get a photograph here.

17         **MAGISTRATE JUDGE MCCARTHY:** Okay.

18   **BY MR. GRIEBEL:**

19   Q.   Okay.  Detective, I'm going to show you what's been marked

20   as Government Exhibit 13.

21         **MAGISTRATE JUDGE MCCARTHY:** 30?

22         **MR. GRIEBEL:** 13.

23         **MAGISTRATE JUDGE MCCARTHY:** Oh, 13, okay.

24   **BY MR. GRIEBEL:**

25   Q.   Now, you testified before that that perspective of that

1    picture is taken from the bathroom that's off the kitchen I

2    believe?

3    A.    That view, yes.

4    Q.    Okay. And now at some point was there a holster and a live

5    round of ammunition found?

6    A.    Yes.

7    Q.    In terms of your sequence for the firearm, when was that?

8    A.    The holster was and the firearm -- or the ammunition was

9    found before I found the firearm.

10   Q.    Do you know where the holster and the -- were you

11   present -- did you actually see where the holster and the live

12   round of ammunition were found?

13   A.    No, sir.

14   Q.    So you don't know in that picture where they would have

15   been found?

16   A.    No, sir.

17   Q.    Okay. And showing you again on top of -- on Government

18   Exhibit 13 -- do you see on top of Government Exhibit 13

19   there's cereal boxes and stuff like that on the refrigerator?

20   A.    I do.

21   Q.    Were those cereal boxes ever searched?

22   A.    I don't know.

23   Q.    You didn't search them?

24   A.    I did not.

25            **MR. GRIEBEL:** Judge, if I could talk with my client

1  for just one second?  Judge, I don't have any further

2  questions.  Thank you.

3             **MAGISTRATE JUDGE MCCARTHY:** Thank you.

4             **MR. TORRE:** Same order?

5             **MR. O'ROURKE:** That's fine with me.

6                        **CROSS-EXAMINATION**

7  BY MR. TORRE:

8  Q.   Detective Imiolo, good afternoon.

9  A.   Good afternoon.

10 Q.   A couple of questions.  When the U.S. Attorney was asking

11 you questions earlier it sounded like you said the face of the

12 home, the front of the building, do you remember going through

13 the front door?

14 A.   Yes.

15 Q.   You said you were last in the stack?

16 A.   I was one of the last people, yes.

17 Q.   The front of the building fronts on Potomac, right?

18 A.   I believe so, yes.

19 Q.   All right. You said that's the -- which side of the

20 building did you say that is?

21 A.   I'm sorry?

22 Q.   The back was the south, the front was the north?

23 A.   I was trying to do a compass in my head.  I said the back,

24 I thought, was going north from Potomac.

25 Q.   In other words, Potomac runs east and west?

1   A.   East and west, correct.

2   Q.   We would agree on that?

3   A.   Yes, sir.

4   Q.   So the back of the structure is on the north side?

5   A.   Yes, best guess.  I was never back there.

6   Q.   All right.  The first Government witness, Detective

7   McMahon, he told us that there was probably more than a dozen

8   Buffalo Police and Sheriff's Department officers that executed

9   the warrant.  Does that sound right?

10  A.   There was a lot, yes, sir.

11  Q.   All right.  And in any event, with regard to what took

12  place, you went through the front door, you went upstairs with

13  a line of officers that were on the entry team, correct?

14  A.   Yes, sir.

15  Q.   All right.  And I wanted to ask you, had other officers

16  preceded you into that rear stairwell hallway where you talked

17  about the ice chest and --

18  A.   I believe so, yes.

19  Q.   All right.  And how long were you back in that rear

20  hallway off the kitchen towards the north side of the

21  structure?

22  A.   I don't even recall.  Ten minutes maybe.

23  Q.   All right.  And I wanted to ask you, did you see your

24  Chief D.J. Granville in the stairwell at that time?

25  A.   Not at that time.  He was there prior to me, I believe.

1  Q.   All right.  So at least during the time you were there you

2  didn't see Chief Granville go down the stairs to an

3  intermediate landing and recover anything of an evidentiary

4  nature?

5  A.   Not that I recall.

6  Q.   All right.  And when the U.S. Attorney asked you earlier

7  about the items you identified as having been recovered from

8  the intermediary landing, you told us that they could be seen

9  from the upper landing where you found an ice chest; is that

10  accurate?

11  A.   Correct.

12  Q.   All right.  That's based upon what your chief told you?

13  A.   Correct.

14  Q.   All right.  You said at some point you did lay eyes upon

15  the black plastic bag and the -- quite possibly some marijuana

16  and some other red little baggies, right?

17  A.   Yes, sir.

18  Q.   Do you happen to know if the photographer came before you

19  or after you or at the same time as you?

20  A.   I do not know.

21  Q.   The pictures of you holding the pistol you removed from

22  the inside of a closed plastic bag that was inside of a closed

23  plastic ice chest, was that the photographer or a different

24  photographer that was working to document the scene that

25  night?

1  A.    I don't recall who was taking pictures that day.

2  Q.    My question for you is is that the same member of the team

3  that was doing the photography that night?

4  A.    Again, I don't know who was taking pictures.  I can't say

5  one way or the other.

6  Q.    Now, you've done a few warrant executions, you told us

7  that?

8  A.    Yes, sir.

9  Q.    So question: Proper procedure, is it one officer that

10  photographs the scene and the evidence or is it anybody who

11  just happens to take out a cell phone camera or something?

12  A.    No, usually one officer does take the pictures for the

13  entire scene, yes.

14  Q.    So that's what I'm trying to hone in on.  In other words,

15  the police photographer that night that took a photograph of

16  the ice chest after you opened it and then later the gun after

17  you took it out of the chest and the bag, that would

18  presumably be the officer that was making photographs that

19  night?

20  A.    Presumably, yes.

21  Q.    All right.  Now, the one picture of the stairwell we've

22  been talking about looking down towards that intermediary

23  landing, that's a photograph that was made, to your knowledge,

24  before or after the items were recovered from that landing?

25  A.    I don't know when the pictures were taken.

1    Q.   Well, some of them you do because your hands are pictured

2    on a gun you say you found in an ice chest.

3    A.   As to sequence I don't know when the pictures were taken.

4    Q.   As far as the landing near where you were positioned with

5    the ice chest you're not 100% sure when this police

6    photographer took that picture?

7    A.   I do not know.

8            **MS. HIGGINS:** Objection.

9    **BY MR. TORRE:**

10   Q.   Is that true?

11           **MAGISTRATE JUDGE MCCARTHY:** I'm sorry?

12           **MS. HIGGINS:** The witness has answered repeatedly

13   that he doesn't know when the sequence of photographs were

14   taken in comparison to his recovery.

15           **MAGISTRATE JUDGE MCCARTHY:** Right.  I think we've

16   covered this, but if there's some new territory I'll listen.

17   **BY MR. TORRE:**

18   Q.   You identified this -- in fact, it's been admitted into

19   evidence this afternoon, Exhibit 24, of the stairs from the

20   landing where you say you found the blue and white ice chest

21   heading down, correct?

22   A.   Yes, sir.

23   Q.   By the way, just outside of that kitchen door you referred

24   to in connection with this landing where you found the ice

25   chest, did you see the door going up to the attic on the

1  landing you were standing on?

2  A.   I don't recall if there was a door or not.  I don't

3  remember.

4  Q.   Did you see the officers go up to the attic?

5  A.   I didn't see anybody go up to the attic.  I don't remember

6  if there's a door.

7  Q.   So we know officers went down the stairs, but if there's

8  stairs going up to the attic in this center stairwell you

9  don't know?

10  A.   I don't know -- I don't recall, no, I don't recall, no.

11  Q.   Now, this particular Exhibit 24, do you know what the

12  object to the left of the photograph is, sir?  It looks like a

13  whitish rectangle.

14  A.   In the corner down there?

15  Q.   On the intermediary landing where you say the items that

16  Chief Granville found.

17  A.   I don't know what that is, no.

18  Q.   You don't.  It doesn't look like the black plastic bag and

19  the other items shown on that landing, does it?

20  A.   No, sir.

21  Q.   You were asked about this picture, that's 23 in evidence.

22  You see it?

23  A.   Yes, sir.

24  Q.   You recognize it again, correct?

25  A.   Yes, sir.

1  Q.   All right.   Now, you know exactly where on the landing

2  these items were located?

3  A.   I do not.

4  Q.   I'm going to show you 22 and ask you if you can tell us if

5  Exhibit 22 helps you in any way place the items that you say

6  were found on the intermediary landing by your chief?

7  A.   As to what?

8  Q.   The location on the intermediary landing.

9          **MS. HIGGINS:** Objection.   The witness has already

10  testified he does not know exactly where on the landing they

11  were recovered from.   He also testified that his basis for

12  knowing what he knows about the photograph is hearsay from

13  D.J. Granville.

14          Counselor is asking him to make inferences that the

15  Court can just as easily make as this witness.

16          **MAGISTRATE JUDGE MCCARTHY:** Mr. Torre, it seems

17  well-founded, but what do you have to say?

18          **MR. TORRE:** Judge, it was a pretty simple question,

19  if he can tell us whereabouts on this intermediary landing

20  these items were recovered shown in 22.

21          **MAGISTRATE JUDGE MCCARTHY:** He said he doesn't know.

22  **BY MR. TORRE:**

23  Q.   Well, sir, by looking at the exhibit you already told us

24  the police photographer took pictures of the items of evidence

25  *in situ*, right?   Where they were found?

1    A.    I did not take the picture, sir. I can't say where the

2    pictures were taken.

3    Q.    With regard to what's properly done as far as police

4    procedure, you don't move the evidence and then take pictures

5    of it, do you?

6    A.    No.

7    Q.    Okay. Do you think most likely that the photographer found

8    and photographed these items or at least photographed them

9    where they were found?

10   A.    I'm not going to speak for what I don't know.

11   Q.    It would be contrary to proper procedure to first move

12   items, put them somewhere else and then take pictures of them,

13   right?

14   A.    Depends on safety, sir, yes.

15   Q.    All right.  Do you see this inside corner on the landing

16   on the right side of 22, sir?

17   A.    I do.

18   Q.    All right.  There's only two of those on the landing

19   you've been telling us about at the intermediary landing,

20   right?

21           **MAGISTRATE JUDGE MCCARTHY:** Mr. Torre, I'm sorry, I

22   didn't hear, what were you referring to?  You said something

23   on the right side of Exhibit 22?  What?

24   **BY MR. TORRE:**

25   Q.    Yeah, let me do that again.  I'm indicating on the

1  right-hand side of Exhibit 22, an inside corner of the

2  landing.  Do you see it?

3  A.    Yes.

4  Q.    Do you see the baseboard in the exhibit, correct?

5  A.    Yes.

6  Q.    All right.  There's only two inside corners on that

7  landing; am I correct?

8  A.    Yes.

9  Q.    All right.  And you can tell that by looking at the other

10 exhibits that I already showed to you, right?

11 A.    Yes.

12 Q.    I'm going to revert back to 24 just so we're 100% clear.

13 This is the left inside corner on the left side where the wall

14 meets the other wall, correct?

15         **MS. HIGGINS:** Objection.  Judge, it appears that

16 Mr. Torre is attempting to ask through testimony of this

17 witness, the witness to draw inferences that he can factually

18 argue based on the evidence that is in evidence.

19         **MR. TORRE:** Judge, we've been through this before, I

20 just have to object to the speeches because it's improper.  If

21 there's going to be standing objections, I just don't think

22 it's right.

23         **MS. HIGGINS:** Judge, nothing about what I've --

24         **MAGISTRATE JUDGE MCCARTHY:** All right, just a second

25 counsel, both of you.  It does seem to me that -- I mean, the

1   witness has testified he did not see the contraband when it

2   was discovered.  The photos say what they say.

3        So I don't know what we gain by having him make

4   suppositions that I can make or you can argue.

5        MR. TORRE: Judge, since this witness was in this

6   stairwell I thought I'd establish the physical layout of it

7   for Your Honor so that Your Honor can make those

8   determinations later.

9        MAGISTRATE JUDGE MCCARTHY: All right.  Well, you

10  can describe the -- you can ask him to describe the layout,

11  physical layout of the stairwell.  That's -- if he was there,

12  that's fair enough.

13  BY MR. TORRE:

14  Q.   Detective, let me ask you again.  I'm indicating on the

15  left side here opposite the bannister rail at the bottom of

16  the stairs shown in Exhibit 24, do you see where I'm

17  indicating with my pen?

18  A.   Yes.

19  Q.   That's the inside corner of the intermediary landing on

20  the left side, right?

21  A.   Yes.

22  Q.   All right.  Now, by the way, when you were there did you

23  happen to notice that the stairwell is 36 inches wide, sir?  A

24  standard width for building code?

25  A.   No.

1  Q.   All right.  Did you notice that the floor tiles in the
2  kitchen are 12 by 12 floor tiles?
3  A.   No.
4  Q.   All right.  Did you notice that the door frame on the
5  landing where you did your search is about 36 inches wide?
6  A.   No.
7  Q.   All right.  Do you quarrel with those estimates having
8  been there and seen it?
9  A.   Not at all.
10  Q.   All right.
11  A.   I just don't recall the tiles or anything.
12  Q.   And it's your belief based upon what D.J. Granville told
13  you that one could see the black bag in the opposite corner on
14  the right-hand side from what's shown in 24 from the top
15  landing; is that what you're telling us?
16  A.   I stated he was able to see the black bag from the
17  landing, yes.
18  Q.   He was able to see the black bag on the intermediary
19  landing from the top landing where you found the blue and
20  white ice chest.  That's what you're telling us according to
21  Granville, right?
22  A.   Correct.
23  Q.   All right.  Now, I wanted to ask you about the kitchen
24  door that leads out to that landing.  To the best of your
25  knowledge, you were not the first one to go out there, right?

1   A.    Correct.

2   Q.    All right.  Now, you told us earlier it was your

3   understanding that the search warrant that you went there to

4   help execute designated a search of I think the upper right

5   apartment?

6   A.    Correct.

7   Q.    All right.  Now, you do not know if there's a door leading

8   to the outside at the bottom of the stairwell shown in 24,

9   right?

10  A.    Correct.

11  Q.    Because you never went down there personally?

12  A.    Correct.

13  Q.    Nobody ever told you that from the officers that did go

14  down the stairs?

15  A.    No, sir.

16  Q.    All right.  What about the ones that covered the back of

17  the building, did they tell you there's a center door on the

18  back of the building similar to the door on the front?

19  A.    I didn't talk to any of those officers.

20  Q.    All right.  Now with regard to what happened, did anyone

21  give you personally permission or consent to search anywhere

22  outside of what the search warrant said that night?

23  A.    No.

24  Q.    All right.  Did anyone direct you to search outside of the

25  area that the search warrant authorized a search of on the

1  night in question?

2  A.    No.

3  Q.    Now, you're a detective with let's say over a dozen years

4  of experience, correct?

5  A.    Yes, sir.

6  Q.    All right. So it's fair to say you're aware that your

7  authority to search is defined by the search warrant that

8  brings you into somebody's house, correct?

9  A.    Correct.

10  Q.    You know that it's against police procedure to search

11  areas that are not covered in a search warrant that you're

12  acting under too; isn't that a fact, sir?

13  A.    Correct.

14  Q.    Now, at the time you got to the kitchen door that leaves

15  the apartment and goes into this back landing stairwell area,

16  nobody on the police team told you that they saw somebody flee

17  out that back door, correct?

18  A.    Correct.

19  Q.    And you yourself personally didn't see anyone who you were

20  pursuing at that time when you left the apartment and began to

21  search outside of it, correct?

22  A.    Correct.

23  Q.    Now, likewise, no police member of the team told you that

24  they saw anybody try to discard, conceal or destroy evidence

25  by removing it from the apartment before you left the

1  apartment to search outside of it, right?

2  A.   Correct.

3          **MS. HIGGINS:** Objection to the form of the question

4  in that Mr. Torre's trying to make legal argument through his

5  questioning.  The latter -- the latter part of his question

6  goes to a legal conclusion that the -- that is at issue at

7  this evidentiary hearing and it shouldn't be disguised inside

8  of the question making this witness commit to it.

9          **MR. TORRE:** Judge, I think I asked a very simple

10 factual question of the witness.  Whether any other member of

11 the police team told him that night that he saw someone leave

12 the apartment to conceal, destroy or otherwise discard

13 evidence.

14         **MS. HIGGINS:** Respectfully that was not --

15         **MR. TORRE:** He's told us he was -- he was not told

16 that.  It's a simple fact.

17         **MAGISTRATE JUDGE MCCARTHY:** Okay, so that's

18 established.  So --

19         **MR. TORRE:** Yeah, I'd like the objection overruled,

20 I suppose.  I may have a few more questions.

21         **MAGISTRATE JUDGE MCCARTHY:** Well, I mean, he's

22 testified that nobody told him that.  So okay, we're there.

23 Now I don't know what the next question's going to be, we'll

24 see.

25 **BY MR. TORRE:**

1  Q.    After you left the apartment and went on to the upper

2  landing you've described for us today, the blue and white ice

3  chest was not the only thing you saw out there; is that true?

4  A.    Correct.

5  Q.    All right.  And with regard to what you saw out there, was

6  there some grocery bags or items, household items stacked on

7  top of the blue and white chest, sir?

8  A.    There was a lot of boxes and so forth.  I don't remember

9  exactly what was out there in particular, but yes, a lot of

10 items were there.

11 Q.    All right.  And in order to get down to the chest you had

12 to unbury it so to speak?

13 A.    I moved a few items, yes, sir.

14 Q.    All right.  And then during that -- I hate to use the word

15 rummaging, but during that activity you uncovered the lid of

16 this blue and white plastic ice chest, right?

17 A.    Yes, sir.

18 Q.    And that's when it dawned on you to open the chest?

19 A.    Yes, sir.

20 Q.    All right.  But you had no specific information from

21 either the warrant or any officer of what you might find

22 inside, correct?

23 A.    Correct.

24 Q.    And then from there after doing so you already advised us

25 when I asked a couple of questions about the pictures earlier

1  that you picked up and removed the closed plastic bag in order

2  to look inside, correct?

3  A.    Correct.

4  Q.    At the moment you reached in and pulled the bag out you

5  didn't know what you were going to find, right?

6  A.    When I opened the bag I saw it was a firearm, yes, sir.

7  Q.    My question was when you first laid eyes on the junk in

8  the bottom of the chest you didn't know there was a gun in

9  there, right?

10  A.    No.

11  Q.    Okay. Did you check the other boxes and bags on the

12  landing/storage area as it was described by Detective McMahon?

13  A.    I looked through a few things.  I don't remember exactly.

14  I didn't find any other contraband, it wasn't documented.

15  Q.    No other items of evidentiary value that you located

16  inside of the containers on the landing; is that accurate?

17  A.    Not that I recall, no.

18  Q.    Now, I just wanted to ask you a question or two about

19  dimensions.  Is the landing you were on roughly the same size

20  and square footage as the intermediary one?

21  A.    I was never down at the intermediary one.  From the

22  pictures it looks a little bigger, but it's tough to tell.

23  Q.    Which one seems like it might be a little bigger?  The top

24  or the intermediary?

25  A.    The intermediary looks a little bigger.

1  Q.   I just wanted to ask you about this, let's go back to 24,

2  you see that exhibit before you?

3  A.   Yes.

4  Q.   All right.  You have some training in estimating distance,

5  right?

6  A.   Sure.

7  Q.   All right.  Is it fair to say this intermediary landing is

8  perhaps 5 or 6 feet by roughly 3 feet as a rectangle?

9  A.   Sure.

10 Q.   You say the top landing that you were on when you went

11 through the items outside the apartment was perhaps a little

12 bit smaller?

13 A.   From my recollection, yes.

14 Q.   All right.  And is it fair to say that when you walked out

15 that apartment door it looked like a type of storage area in

16 close proximity to the apartment door with the deadbolt on it?

17 A.   Correct.

18 Q.   Do you know if the deadbolt on the back door of the

19 apartment matched the deadbolt on the front door that was

20 broken on this apartment?

21 A.   I do not know.

22 Q.   Do you remember when you went in with the team through the

23 front door of the apartment closer to the south side of the

24 building that there was another apartment door on the floor

25 when you got up to the second floor?

1  A.    I don't recall.

2  Q.    All right.  Just have a couple of last questions for you

3  on another one of these exhibits.  I'm going to show you

4  what's been marked 35. (Inaudible).

5          **MAGISTRATE JUDGE MCCARTHY:** Yeah.

6  **BY MR. TORRE:**

7  Q.    Can you make that out?

8  A.    Looks like a picture, yes.

9  Q.    Take my word for it, that's 35, the sticker's a little off

10 screen.  Can you see the part on the building of the apartment

11 you went in and started searching or passing through in order

12 to search?

13         **MS. HIGGINS:** Objection, the witness has already

14 testified that he wouldn't be able to recognize this from the

15 exterior of the building.

16         **MAGISTRATE JUDGE MCCARTHY:** I'll allow it.

17         **THE WITNESS:** The question again, sir?

18 **BY MR. TORRE:**

19 Q.    Can you tell the Court where in this building pictured in

20 Exhibit 35 is the apartment you passed through in order to get

21 to the landing/storage area you searched?

22 A.    No, sir.

23 Q.    Now, when the word upper right apartment was mentioned

24 earlier during your direct testimony, would you agree with me

25 that depending on whether one enters from the north side or

1   the south side of that building that could mean two different

2   geographic locations in the building?

3   A.   Upper right means, yeah, upper right but north and south,

4   yes.

5   Q.   Well, show you another picture that's in evidence, this

6   one's got some markings on it that aren't in evidence, but it

7   might make my question a little bit more plain.

8           I'm going to ask you to understand that there's

9   been some testimony in this case by your partner, Detective

10  McMahon, that this over here near this corner store --

11          **MS. HIGGINS:** Objection to -- there was a reason to

12  sequester witnesses and it was not so that the counselor could

13  repeat testimony of other witnesses to this witness in order

14  to -- I don't know, impeach him, I don't know the purpose of

15  the question.  But recounting another witness's testimony to

16  this witness is improper.

17          **MAGISTRATE JUDGE MCCARTHY:** Well, if he's accurately

18  recounting it, I don't see a problem to it, but I don't know

19  what he's going to recount or whether it's accurate so...

20  **BY MR. TORRE:**

21  Q.   Detective --

22          **MAGISTRATE JUDGE MCCARTHY:** Let me --

23          **MR. TORRE:** Sorry, go ahead, Judge.

24          **MAGISTRATE JUDGE MCCARTHY:** -- I mean, well, you can

25  ask your question and I'll -- we can all consider whether it's

1  accurate.

2  **BY MR. TORRE:**

3  Q.   Detective, you've been working in and around Buffalo for

4  12 years as a officer and a detective, right?

5  A.   Yes, sir.

6  Q.   All right.  And you were on the task force with pretty

7  wide jurisdiction for five of those years, right?

8  A.   Yes, sir.

9  Q.   All right.  So do you completely not recognize the

10 intersection of Potomac and Herkimer from Exhibit 35?

11 A.   No.   That appears to be Potomac.

12 Q.   Okay. So can you tell from this exhibit, is this street

13 here that crosses Potomac with the blue mark on it, would that

14 be Herkimer in this picture?

15 A.   Sir, I don't know.

16 Q.   All right.

17 A.   I don't know.

18 Q.   So as far as -- as far as the door that you made entry

19 through, as you sit here today can you tell us anything in

20 particular about it so that we know you knew it was the front

21 door and not the back door of the building you went in?

22 A.   Yes, I followed the stack of the rest of the officers who

23 made entry through the front door.

24 Q.   All right.  But as far as your own personal knowledge, do

25 you see any mailboxes?  Any names?  Anything like that to

1  designate the building or the door?

2  A.   I wasn't looking, but no, I didn't recollect any -- seeing

3  any.

4       **MR. TORRE:** No other questions, Judge.

5       **MAGISTRATE JUDGE MCCARTHY:** Thank you.

6                    <u>**CROSS-EXAMINATION**</u>

7  **BY MR. O'ROURKE:**

8  Q.   Good afternoon, Detective.

9  A.   Good afternoon.

10 Q.   How you doing today?

11 A.   Doing okay.  Thank you.

12 Q.   I'm a little confused so just bear with me if you would

13 from some of this testimony.  You -- when did you first find

14 out there was going to be a raid to execute a search at this

15 address on Potomac?

16 A.   It was that evening.

17 Q.   That evening?

18 A.   Yes, sir.

19 Q.   Do you know -- remember the approximate time?

20 A.   It was later in the evening.  I don't remember approximate

21 time, no, sir.

22 Q.   Did you ever -- did you have anything to do with working

23 with the informant in this case?

24 A.   I don't believe so, no.

25 Q.   Do you know who that informant was?  Not that you have to

1 tell me the name, I understand you would have an objection to

2 that.

3 A.   Yes.

4 Q.   Do you know who that informant was?

5 A.   I don't remember his name off the top of my head, but I am

6 aware of who he is.

7 Q.   So you would certainly remember that had you worked with

8 him, taking him into the house or doing something else of that

9 nature to do some kind of identification of the premises or

10 any of that stuff?  You didn't do any of that?

11 A.   It was a long time ago.  I'm trying to think.  I don't

12 recall.  I don't want to say yes or no, I might have been

13 involved in -- I don't recall, sir.

14 Q.   Well, it would have been in the grand scheme of things in

15 regards to obtaining a search warrant and then executing it at

16 this residence, that would have been a significant factor that

17 whether or not you might have worked for him -- worked with

18 him in regards to this?

19 A.   I don't recall.  I could have been in the vehicle driving

20 him around, but I don't recall.

21 Q.   Do you ever recall taking him to the residence?

22 A.   I don't recall.

23 Q.   Well, do you recall possibly being in a vehicle with him

24 and driving him around?

25 A.   It was a busy day, sir.  I don't know.

1    Q.    Okay. How about when you learned about this -- that there

2    was going to be a search at this particular location, you

3    indicated there was some kind of debriefing?

4    A.    Very quick and informally, yes.

5    Q.    Okay. Well, let's take a little bit of a look at that.

6    Where was the debriefing held?

7    A.    It was a small brief, one at our office and there was

8    another one which I was not part of, but around the location

9    before the search warrant was to the other officers who joined

10   us after-the-fact.

11   Q.    Okay. When the small one that took place at your office,

12   you were present at that one?

13   A.    Yes, sir.

14   Q.    And who were the other participants that were present at

15   that particular debriefing?

16   A.    Other detectives, uniformed personnel.  That's basically

17   it.

18   Q.    Who was -- who was there?  Who?

19   A.    It was Chief Granville, Detective McMahon, a couple of our

20   undercover gentlemen, I believe.  A couple of our uniformed

21   guys or (indiscernible) guys.  There were a couple general

22   detectives.  I believe Sergeant Neal Held, Detective John

23   Hannah, I can't remember everyone off the top of my head.

24   Q.    So say at that particular one there were seven or eight

25   people?

```
 1  A.   If not more, yes.
 2  Q.   And Chief Granville was in charge of the operation?
 3  A.   Yes, sir.
 4  Q.   And what did -- what did Chief Granville tell you?
 5  A.   I don't remember him saying much.  It was just the general
 6  scheme.  We decided -- or Detective McMahon briefed us on the
 7  warrant of who the warrant was for, what we're looking for,
 8  where the residence was and I believe we just went in tandem
 9  from there to a separate staging spot and from that staging
10  spot we went to the house.
11  Q.   Okay. So in -- although the in charge -- in charge of the
12  detail, Chief Granville was that individual, but it was
13  McMahon who was doing the briefing?
14  A.   He did the brief about the warrant and so forth, yes.
15  Q.   Okay. Did he show you the warrant?  I believe your
16  testimony was that --
17  A.   Not that day.  I don't remember it now.
18  Q.   You don't remember seeing it.  Did he specifically tell
19  you where you were going?
20  A.   He told us the address, yes.
21  Q.   All right.  And when he -- and when he told you the
22  address, did he also told you what was to be searched at the
23  address?
24  A.   He said the search warrant was for 198 Potomac,
25  Apartment 4, upper right and the search was for cocaine and
```

1  other drug paraphernalia and so forth listed in the warrant.

2  Q.    Okay.  Never -- did not -- did not on that occasion take

3  the search warrant around and show it to the -- any of the

4  other individuals other than yourself?

5  A.    He did not show it to me.  I can't speak if he showed

6  it -- I don't believe he showed it to anybody, no.

7  Q.    You didn't see him do that while you were there?

8  A.    No, sir.

9  Q.    What were the -- at that particular time what were the

10  specific assignments?

11  A.    There was no specific -- well, excuse me, there was.

12  There was -- I don't know who was breaching the door.  Again,

13  I was in the back, I just said I'll fall in the stack, I was

14  working on something else at the time.  I'll fall in the stack

15  at the end.  I think Sergeant Held made entry but, again, I

16  don't know who actually had the ram, had the pry, had the

17  shotgun and long gun and so forth.  I don't know who had those

18  assignments.

19  Q.    Do you remember -- do you remember that being discussed at

20  all?

21  A.    Yes.

22  Q.    And you were the only one in the group that -- or you were

23  one of the ones in the group that didn't get any specific

24  assignment?

25  A.    Again, not to get into detail, usually there's a ram, a

61

1  pry, a long gun, maybe a long rifle and guys cover the

2  perimeter and other guys just fall in the stack at the end.

3  Q.    All right.  But you're not clear as to --

4  A.    No.

5  Q.    -- how any of that went?

6  A.    I don't know who was in the stack, no, sir.

7  Q.    Okay.

8  A.    No.

9  Q.    Okay. And when you got to the -- when you went to the

10  house, there was -- there was another debriefing or another

11  quick meeting at the house?

12  A.    Not at the house.  In a secondary location.

13  Q.    Okay. Well, at a secondary location?

14  A.    Yes, sir.

15  Q.    And you were not -- you were not part of that?

16  A.    I was in the car.  I was not out (indiscernible) for that,

17  yes.

18  Q.    Do you know how many officers?

19  A.    Handful of Buffalo uniformed officers, I believe.  I

20  believe some detectives were there too, a handful.

21  Q.    You don't know -- not being there you don't know what or

22  if any assignments were made at that location?

23  A.    I am not aware.

24  Q.    Did you ever hear anybody talking about that there was a

25  back door to this house?

1  A.   I believe the perimeter was discussed, but as specifics on

2  the back door, no.

3  Q.   Okay. So I mean, you're indicating that because you did

4  not walk down that stairway in the back hallway and -- that

5  you cannot testify personally as to whether or not there was

6  a -- that led to a back door?

7  A.   Yes, sir.

8  Q.   But in your experience in being in houses in this world,

9  you would probably assume that it led to a back door I take

10 it?

11 A.   If I was a betting man, but yes.

12 Q.   Okay. So when you got -- when you -- when you got to the

13 house, you just fell in the line with everybody that was

14 heading up the stairs to go up to apartment number 4 and

15 entered through the doorway at the top of the stairs?

16 A.   Yes, sir.

17 Q.   Okay. When you got -- when -- in fact, that happened?

18 A.   Yes.

19 Q.   The door was breached?

20 A.   I believe it was breached, yes.

21 Q.   How many people went up the stairway do you think?

22 A.   Again, sir, I don't want to be specific.  There was a

23 whole line of us.  Ten, maybe more.

24 Q.   Okay. When -- and when you got inside it was your

25 indication that there was no specific -- there was no specific

1   assignment as to who would take any room or who would take the

2   kitchen, who would take the back hall or whatever, correct?

3   A.   That is correct, sir.

4   Q.   Okay.  So at that point everybody just basically kind of

5   walked or ran in to whatever room they were gonna start

6   searching in?

7   A.   Yes.

8   Q.   First and foremost when you entered that apartment you

9   wanted to secure the individuals that were in there?

10  A.   Yes, sir.

11  Q.   That was done?

12  A.   Yes, sir.

13  Q.   And who secured the -- did you secure any of the

14  individuals?

15  A.   I did not.

16  Q.   Do you know who did that?

17  A.   I do not.

18  Q.   Do you know where -- once they were secure, where they

19  were kept?

20  A.   I believe it was in the hallway.  I don't remember off the

21  top of my head.  I believe it was in the hallway right near

22  the -- no, because that's where the evidence may have been.

23  I'm not sure if it was the kitchen or the hallway or the

24  living room for that matter.  I don't remember.

25  Q.   And about how long would you take?  About how long do you

64

1   think it took between the time that you breached the front

2   door and everybody was secure and no further problem?

3   A.   30 seconds maybe.

4   Q.   Okay. So within 30 seconds that whole -- the whole

5   apartment was pretty much everybody was in hand and no --

6   didn't anticipate any further problems from any of the people

7   that were being arrested?

8   A.   To my knowledge, yes, sir.

9   Q.   There was -- there are three individuals who are named in

10  this particular indictment, but there was a fourth individual

11  that was there that evening; is that correct?

12  A.   I do remember another male, I believe.

13  Q.   And that particular individual was never arrested?

14  A.   No, sir.

15  Q.   Was that individual, was he secured at the time the detail

16  entered the apartment?

17  A.   He was secured when we got there, yes.

18  Q.   And he was one of the people that was taken out into this

19  area in the upstairs outer hallway in the front?

20  A.   He was secured in the apartment.  Again, I don't want to

21  be specific of where these people were.  I don't remember.  I

22  know yes, some people might have been talking to other people,

23  so we keep them separate at points.

24  Q.   All right. And that individual was subsequently released?

25  A.   That's correct.

1  Q.   Did you -- did you have -- did you have anything to do

2  with participating in the reasons why he was released?

3           MS. HIGGINS: Objection.  This is well beyond the

4  scope of direct and the relevance is unclear to me.

5           MAGISTRATE JUDGE MCCARTHY: How is it within the

6  scope of direct and why is it relevant?

7           MR. O'ROURKE: Well, I think it's certainly

8  relevant, Your Honor, that there are four individuals who are

9  found in that apartment and only three of them ended up being

10  arrested and one was outright released from the scene.

11           MAGISTRATE JUDGE MCCARTHY: Well, I mean, it may be

12  relevant to the case in general, but I don't see how it's

13  relevant to the subject of this hearing.

14           MR. O'ROURKE: Well, I was wondering what that

15  individual did in relation to items that might have been found

16  in the -- found in the apartment.  I'm wondering what that --

17  if that individual had any access beyond the point when he was

18  initially confronted by the police upon their entrance to the

19  apartment.  Could have a lot to do with things that were or

20  were not found in the apartment.

21           MS. HIGGINS: But, Judge, all of those things go to

22  the possession element and the proof given to a trial jury,

23  not to how the execution of the warrant was conducted.

24           MAGISTRATE JUDGE MCCARTHY: Yeah, I'm not gonna

25  allow it.

1    BY MR. O'ROURKE:

2    Q.    And, Officer, when you got to the top of the stairs, you

3    breached the door, all ten officers went inside?

4    A.    Everyone went inside, yes.

5    Q.    So within 30 seconds everybody is secure?

6    A.    I believe so, yes.

7    Q.    And at that point everybody starts to scatter to look and

8    see what they can find if there's anything to find?

9    A.    We slow it down quite a bit, yes.

10   Q.    Okay.  The adrenalin was not pumping quite as fast as when

11   you got inside --

12   A.    We slow everything down, yes, sir.

13   Q.    -- right before the front door?

14   A.    Yes, sir.

15   Q.    All right. So once you got inside officers from your

16   apartment -- department?  There were officers from your

17   department?

18   A.    Yes, correct.

19   Q.    Officers from the BPD?

20   A.    Yes.

21   Q.    Any other departments that were involved in --

22   A.    I don't recall, no, I don't think so.

23   Q.    Okay. So once you got inside and they started moving

24   around and so forth, was everybody went somewhere to search,

25   was -- I don't want to use this comparison, but somewhat like

1  a Chinese fire drill in there?

2  A.    It gets hectic.

3            **MS. HIGGINS:** Objection.   The reference is a little

4  unclear and perhaps a better term could be used.

5            **MAGISTRATE JUDGE MCCARTHY:** Well, I think I

6  understand what is --

7            **MS. HIGGINS:** Well, maybe I don't is the truth.

8            **MAGISTRATE JUDGE MCCARTHY:** Okay, okay.

9            **MR. O'ROURKE:** I can rephrase it, I can rephrase it.

10 **BY MR. O'ROURKE:**

11 Q.   Was it somewhat like a Korean fire drill?

12           **MAGISTRATE JUDGE MCCARTHY:** Same rulings.   If you

13 can, move on.   It was -- it was -- it was hectic; is that

14 basically what you are driving at?

15           **THE WITNESS:** Yeah, we slow things down, but it's

16 not move one box and put a box here.   We go through things to

17 make sure we don't miss anything.

18           **MAGISTRATE JUDGE MCCARTHY:** Okay.

19 **BY MR. O'ROURKE:**

20 Q.   All right. Detective, you personally, you indicated that

21 you searched the bedroom?

22 A.    I assisted.   There was multiple people searching the

23 bedroom.   I remember being in the bedroom, yes, sir.

24 Q.   And obviously you didn't find anything in the bedroom?

25 A.    Correct.

1  Q.   The property receipts indicate that you signed out for

2  finding something in the living room?

3  A.   That is correct.

4  Q.   Okay. Eventually you made your way to the back hallway?

5  A.   Yes, sir.

6  Q.   You proceeded through the kitchen to do that?

7  A.   Yes, sir.

8  Q.   You had no -- you went out of the doorway into the common

9  area, which was a back hallway onto this landing that we've

10  been talking about?

11  A.   Yes, sir.

12  Q.   All right.  Let me take a look around out there.  When

13  you're standing at that doorway and we saw a lot of the

14  pictures, if you're looking right outside the doorway, there's

15  an indication there's a stairway there, is there not?

16  A.   Correct.

17  Q.   And it went down to that landing?

18  A.   Correct.

19  Q.   Okay. That landing from your observation from the top of

20  the stairway then that bears around to your right?

21  A.   It appeared to, yes.

22  Q.   When you went out there you didn't see any kind of

23  contraband or drugs or a package of anything laying around?

24  A.   I did not.

25  Q.   Okay. You subsequently found out about that from Chief

1  Granville?

2  A.   Yes, sir.

3  Q.   And did -- when was that that you talked to Chief

4  Granville about that?

5  A.   Well, that night.  I mean, during the search warrant and

6  so forth.   Is that your question?

7  Q.   Yeah.  When did you find out that he had found something

8  down in that landing?

9  A.   Oh, that night.

10 Q.   And how did that conversation go?  What did you say to him

11 and what did he say to you?

12 A.   It wasn't a direct conversation.  It might have been we

13 found something down here and I just overheard it.  It wasn't

14 a direct me to him conversation.

15 Q.   Okay. So when the testimony came out that Chief Granville

16 had told you that he had found something down there --

17 A.   Mm-hmm.

18 Q.   -- he never told you -- he never told you that?  That's

19 something you kind of had overheard in the grand mix of

20 things?

21 A.   That night he was telling a group of people.  I was among

22 the group.  It wasn't a direct conversation that night.

23 Q.   Was he like, I mean, I don't want to use the term like

24 kind of bragging, he was saying man, I went down in that

25 stairwell and I found this black plastic bag?

1    A.    Not at all.

2    Q.    No?

3    A.    No.

4    Q.    So, I mean, how did -- there was no direct conversation

5    with you, though, right, correct?

6    A.    Correct.

7    Q.    Okay. And let me look around a little bit out there.  You

8    get out and you -- you know that there's a doorway back in to

9    the kitchen; is that correct?

10   A.    Correct.

11   Q.    All right.  And you know there's a stairway that goes down

12   from that location right outside the door of the kitchen,

13   correct?

14   A.    Correct.

15   Q.    And when -- if you go straight across the landing, is

16   there another apartment on the other side?

17   A.    I tried to rack my brain, I couldn't see from the pictures

18   and I do not recall.

19   Q.    Do you recall any windows out there?

20   A.    I don't recall.

21   Q.    Okay. You just don't recall anything other than what was

22   refreshed -- refreshed your recollection in the pictures that

23   we can all see?

24   A.    Yes, it was a long time ago.

25   Q.    All right.  Now, it kind of from the testimony, it's kind

1    of appeared as if the people who were searching the apartment

2    would find something and then they would walk it over to

3    Detective McMahon, I believe.  He said this and he was set up

4    somewhere and they would tell him where they found it?

5    A.    Correct.

6    Q.    All right.  There's a little confusion in my mind anyway

7    about the photographer.  Was the photographer from the

8    Sheriff's Department?

9    A.    Yes.

10   Q.    How many photographers do you have that go on raids?

11   A.    We don't have any official photographers.

12   Q.    Oh, okay.  That's -- that might be where some of the

13   confusion is for me --

14          **MS. HIGGINS:** Objection.  There's a number of

15   extraneous comments between questions.  I just ask that it be

16   question and answers.

17          **MAGISTRATE JUDGE MCCARTHY:** All right. I know you'll

18   try to behave in the future.

19          **MR. O'ROURKE:** I will, Your Honor.  I will.

20   **BY MR. O'ROURKE:**

21   Q.    So the only thing that you can remember is the doorway to

22   the kitchen?

23   A.    Yes.

24   Q.    All right.  And then that there is a landing there?

25   A.    Yes.

1   Q.   Okay. On -- when you went out there you indicated from

2   your testimony it was about halfway through the search?

3   A.   Again, give or take.

4   Q.   I understand.  And that you felt that maybe it was

5   about -- the search lasted about two hours.  It was about an

6   hour into the search when you found your way out there?

7   A.   Correct.

8   Q.   Okay. Seeing the entire apartment's only about 8 by 10,

9   what were you doing for the other hour?

10  A.   Assisting with other officers, walking around, just

11  assisting basically.

12  Q.   Okay. After the initial --

13          MS. HIGGINS: I'm sorry, I just have -- I have a

14  clarification objection.  The entire apartment being 8 by 10?

15  The photographs belie that.  It's not 8 by 10 feet I'm sure.

16  BY MR. O'ROURKE:

17  Q.   Okay.  After you were walking around this 9 by 11

18  apartment --

19          MAGISTRATE JUDGE MCCARTHY: All right.

20          MS. HIGGINS: Judge, the Government takes this

21  proceeding very seriously and we hope that the Court and the

22  other counsel do as well.

23          MAGISTRATE JUDGE MCCARTHY: Yes, I take it seriously

24  and the photographs will indicate the dimensions of the -- of

25  the apartment.  This is cross-examination, so Mr. O'Rourke is

1  allowed some leeway, but it's neither 8 by 10 nor 9 by 11 nor

2  anything close to that.  So we'll proceed on that basis.

3  **BY MR. O'ROURKE:**

4  Q.   Detective, after -- before you went out on the landing you

5  spent some time in the apartment?

6  A.   Mm-hmm.

7  Q.   Were there other officers that came in and out after the

8  initial -- after the initial crew breached the door and went

9  in and then were more individuals coming in?

10 A.   I believe maybe a uniformed officer was in after that,

11 yes.

12 Q.   Okay. Which is probably how many -- how many people -- how

13 many officers or people associated with the execution of the

14 search warrant came in?  How many people were up there all

15 together would you say?

16 A.   Again, sir, the initial investigation was ten and then

17 there was uniformed officers.  I don't know if they hung

18 around outside, if they were in the hallway, if they left or

19 came in.  I can't speak to that, but the -- our department was

20 around ten to 12 people.

21 Q.   Okay. When you found your way -- when you made your way to

22 the back door there and went out into the outer area, the area

23 outside the apartment on to that back landing --

24 A.   Yes.

25 Q.   -- all right, you were aware of the fact that that

1  particular area was not covered by the search warrant?

2  A.    It was a common area.

3  Q.    Right.

4  A.    It was not named in the search warrant, no.

5  Q.    Okay. And you were aware of that fact?

6  A.    I was aware that the search warrant was for 198 Potomac,

7  Apartment 4.

8  Q.    Okay. When you went out there how many people were out on

9  that landing when you made your way out there?

10  A.    I don't recall seeing anybody.

11  Q.    Okay. When -- when you went out there do you know how many

12  individuals had proceeded you out there?

13  A.    No.

14  Q.    Okay. You -- but had there been some individuals that

15  preceded you out there?

16  A.    The door was ajar.  I don't know how many went up there or

17  went in there.

18  Q.    Okay. I thought at one point you indicated that Chief

19  Granville had been out there prior to the time that you went

20  out on the landing?

21  A.    He was.

22  Q.    And who else went out there other than Chief Granville?

23  A.    I don't know.

24  Q.    So the only individual that you know that went outside

25  onto that landing was -- prior to you going out there was

1  Chief Granville?

2  A.    Yeah, I don't know.

3  Q.    Well, that's the only individual --

4  A.    Yes, that I know of personally went out there, yes.

5  Q.    All right.  Then what you looked around out there and you

6  saw a cooler?

7  A.    Correct.

8  Q.    Plastic picnic cooler out there?

9  A.    Correct.

10  Q.    A blue and white one I believe it was, was it not?

11  A.    I believe so, yes, sir.

12  Q.    We could look at the pictures, but -- and on top of

13  that -- there was a number of things piled on top of that?

14  A.    Again, I remember moving a few things, not specifically

15  what they were, but I remember the cooler was not on top.

16  Q.    All right.  And you took the opportunity to search those

17  things, too, I believe your testimony --

18  A.    I would have, yes.

19  Q.    -- your testimony was?

20  A.    Yes.

21  Q.    Did not find anything else in -- did not find anything

22  else in any of that other material that you were searching?

23  A.    No, sir.

24  Q.    Okay.  Then you opened up the top of the cooler to look

25  inside?

1  A.    Correct.

2          **MS. HIGGINS:** Objection, Your Honor, this line of

3  questioning has been gone over twice before and I recognize

4  that Mr. O'Rourke has the disadvantage of having to go third

5  in the order, but there's just no new headway being made here.

6          **MR. O'ROURKE:** I didn't go over it before, Your

7  Honor.  I heard some --

8          **MAGISTRATE JUDGE MCCARTHY:** I understand you didn't,

9  but it has been covered, but if there's new material we'll

10 certainly get to that.

11 **BY MR. O'ROURKE:**

12 Q.    Okay.  Went into that cooler?

13 A.    Yes.

14 Q.    You saw a package in there that you examined?

15 A.    I believe it was a bag, but yes.

16 Q.    Or a bag in there that you examined?

17 A.    Yes.

18 Q.    Subsequently you found out that there was a Glock in

19 there?

20 A.    A firearm, yes, sir.

21 Q.    That was a Glock, wasn't it?

22 A.    I would have to refer to the property sheet to be exact,

23 but yes, I believe it was a Glock.

24 Q.    There was a -- you saw there was a firearm in there?

25 A.    Yes, sir.

1    Q.    Okay. And do you know who placed that firearm in there?

2    A.    I do not.

3    Q.    Do you know whether it was Chief Granville or not?

4    A.    It was not.

5    Q.    As far as you know it was not?

6    A.    As far as I know.

7    Q.    But certainly it could have been, correct?

8              **MS. HIGGINS:** Your Honor, this is -- objection.

9              **THE WITNESS:** I take offense to that.

10             **MS. HIGGINS:** Essentially this is asking the witness

11   whether Chief Granville planted evidence.

12             **MR. O'ROURKE:** I didn't say that.  I said --

13             **MS. HIGGINS:** By implication that --

14             **MAGISTRATE JUDGE MCCARTHY:** Wait, wait, wait, one at

15   a time.  Ms. Higgins.

16             **MS. HIGGINS:** By implication the question is asking

17   the witness whether the chief of the Erie County Sheriff's

18   Office planted evidence during the execution of this search

19   warrant.

20             **MAGISTRATE JUDGE MCCARTHY:** Mr. O'Rourke, I

21   recognize that this is cross-examination, but it's a pretty

22   serious direction you're heading in and as any attorney to ask

23   a question, you have to have a good faith basis for asking it.

24             So I would just -- I don't know, maybe you do,

25   maybe you don't, but I would advise you to proceed with

1  caution.

2          **MR. O'ROURKE:** Well, Your Honor, I'm making the

3  point that he doesn't know how that firearm got in that ice

4  cooler.

5          **MAGISTRATE JUDGE MCCARTHY:** That's a valid point.

6  Then your next question was did Chief Granville place it there

7  and unless you had a good faith basis for asking that and

8  maybe you do, I'm just suggesting that you proceed with

9  caution.  That's --

10          **MS. HIGGINS:** Judge, if that's the case I'd ask for

11  a proffer outside the presence of the witness.

12          **MAGISTRATE JUDGE MCCARTHY:** Well, are you going

13  to -- if you're going to pursue that line of questioning, then

14  I will ask the witness to step out for a moment.  So you tell

15  me.

16          **MR. O'ROURKE:** Pursue the line of questioning that

17  he doesn't know who put that in there?

18          **MAGISTRATE JUDGE MCCARTHY:** No, no, no.  The line of

19  questioning suggesting or raising the possibility that Chief

20  Granville placed the firearm in there.  If you want to pursue

21  that, I'm going to ask him to step out and we can have a

22  proffer.

23          **MR. O'ROURKE:** I don't think we have to have him

24  step out.

25          **MAGISTRATE JUDGE MCCARTHY:** Okay.

1  BY MR. O'ROURKE:

2  Q.   Detective, the individual that was released that was not

3  arrested, do you recall what his name was?

4  A.   I do not.

5  Q.   Would the name of Phillip Esskuchen ring any bell to you?

6  A.   It does not.

7  Q.   Okay. Do you know whether or not it might have been Mr.

8  Phillip Esskuchen who placed that firearm in that cooler?

9  A.   I have no knowledge to how the firearm got in the cooler.

10 Q.   Okay. So you don't have any idea whatsoever how it got in

11 there?

12 A.   I have no knowledge how the firearm got in the cooler as I

13 already said the first time.

14 Q.   Okay. Other than -- other than that -- the firearm and the

15 evidence that you found in the living room, did you recover

16 any other evidence?

17 A.   No, sir, I don't believe so.

18 Q.   Those are the only two things that you can recall

19 recovering?

20 A.   Yes, sir.

21 Q.   Okay.

22         MR. O'ROURKE: I think that's all I have, Your

23 Honor.  Thank you.

24         MAGISTRATE JUDGE MCCARTHY: Ms. Higgins, any

25 redirect?

1          **MS. HIGGINS:** No, Your Honor.

2          **MAGISTRATE JUDGE MCCARTHY:** Okay.  Thank you, sir,

3    you may step down.

4          **THE WITNESS:** Thank you.

5          (**WHEREUPON**, the witness was excused).

6          **MAGISTRATE JUDGE MCCARTHY:** Do you have another

7    witness?

8          **MS. HIGGINS:** No, that's it.  The Government rests.

9    Thank you.

10          **MAGISTRATE JUDGE MCCARTHY:** Okay, all right. Any --

11    do the defendants rest?  Any witness?

12          **MR. GRIEBEL:** Judge, if I could just have a recess

13    for one second so I can talk with co-counsel --

14          **MAGISTRATE JUDGE MCCARTHY:** Yeah.

15          **MR. GRIEBEL:** -- before we rest?

16          **MAGISTRATE JUDGE MCCARTHY:** Let's break for ten

17    minutes, okay?  It's quarter to 3:00, so ten to -- excuse me,

18    five to 3:00.

19          (**WHEREUPON**, there was a pause in the proceeding.)

20          **THE CLERK:** Everybody's here, okay, we're back on

21    the record, United States vs. Williams, et al., all parties

22    are present.

23          **MAGISTRATE JUDGE MCCARTHY:** Okay, the Government has

24    rested.  Defense counsel, what is your position?

25          **MR. GRIEBEL:** Judge, I believe Mr. Torre has a

1   proposed stipulation and depending on what the Government's

2   position is with that proposed stipulation, that will inform

3   us as to our position.

4           **MAGISTRATE JUDGE MCCARTHY:** Okay.

5           **MS. HIGGINS:** This is the first I'm hearing of it.

6           **MAGISTRATE JUDGE MCCARTHY:** Me too.

7           **MR. TORRE:** That makes three of us.

8           **MAGISTRATE JUDGE MCCARTHY:** Mr. Torre.

9           **MR. TORRE:** Judge, actually, I on behalf of Iris

10  Centeno am going to rest.  I'm not calling any witnesses.

11          **MAGISTRATE JUDGE MCCARTHY:** Okay.

12          **MR. GRIEBEL:** Well, I guess the -- the -- on behalf

13  of Mr. Williams, I just needed to know whether the Government

14  was going to stipulate as that -- that back stairwell had

15  access to Apartments 1, 2, 3 or 4, however they're denominated

16  because I don't believe there was any testimony to that effect

17  and I just wanted to make sure the record would be complete as

18  to that.

19          **MAGISTRATE JUDGE MCCARTHY:** Okay.

20          **MS. HIGGINS:** Stipulate that -- I mean, Judge, I

21  would rather before agreeing to stipulate consult with my

22  co-counsel who is handling the case.  Consult with the

23  witnesses because there is no testimony about that.

24          The two Government witnesses were not sure about

25  whether or not that stairwell was accessible by other

1  apartments and if it was accessible to the back door.

2          **MAGISTRATE JUDGE MCCARTHY:** Okay.  Well, it seems

3  that that's an issue that there is an answer to, so I would

4  think the parties ought to be able to get together and figure

5  out how we're going to resolve that.

6          So you want to hold the hearing open --

7          **MR. GRIEBEL:** If we could just to see if we can come

8  to some sort of accommodation as to that potential thing.  And

9  I didn't want to get into the specifics because if we can work

10 out agreeable language, that's fine, but as it stands right

11 now if that could just be kind of a hypothetical stipulation

12 as opposed to a concrete one just so we can hold it open so we

13 can maybe arrive at suitable language.

14         **MAGISTRATE JUDGE MCCARTHY:** Okay.  All right, I

15 don't want to keep things open indefinitely, so why don't

16 we -- let me come back to that in a minute, okay?  Because I

17 want to just recite so we're all in agreement as to which

18 exhibits are in evidence.

19         I'm going by my notes right now, Government

20 Exhibits 1, 2, 3, 4, 5 through 21 -- well, okay, I'm going to

21 get a little out of sequence here because they came in at

22 different times -- 1, 2, 3, 4, 5 through 21, 22 through 24, 25

23 through 27, 28 through 32 and 35 and 36.

24         So I can recast that, I guess it's 1, 2, 3, 4, 5

25 through 32, and then 35 and 36.  Is that correct?

1          **MS. HIGGINS:** No, Judge, Government Exhibit 3 was

2    marked but not offered and entered.

3          **MAGISTRATE JUDGE MCCARTHY:** I'm sorry, you're

4    correct.  Yeah, I do note that.

5          Am I otherwise correct?

6          **MS. HIGGINS:** Yes.

7          **MAGISTRATE JUDGE MCCARTHY:** Everybody agree?

8          **MR. GRIEBEL:** Judge, I missed the tail end of 5

9    through --

10          **MAGISTRATE JUDGE MCCARTHY:** 5 through 32 and then 35

11    and 36.

12          **MR. GRIEBEL:** So 33, 34, are not in.

13          **MAGISTRATE JUDGE MCCARTHY:** They're not in.

14          **THE CLERK:** So 30 and 31 are in?

15          **MS. HIGGINS:** Yes.

16          **MAGISTRATE JUDGE MCCARTHY:** Yes, they're in.

17          **MR. TORRE:** It's really 1 through 32 are in.

18          **MS. HIGGINS:** No, 3 is not in.

19          **MAGISTRATE JUDGE MCCARTHY:** 3 is not in.

20          **MR. TORRE:** Number 3 is out.

21          **MR. GRIEBEL:** The other ones that aren't in are the

22    photographs are 33 and 34?  And then number 3?  And the

23    balance are in.

24          **MS. HIGGINS:** Yes.

25          **MAGISTRATE JUDGE MCCARTHY:** Yeah.

1          **MR. GRIEBEL:** That's what I have, Judge.

2          **MAGISTRATE JUDGE MCCARTHY:** Okay.  All right. And

3   then the only other issue that I recall was we had discussion

4   last week about the transcript of the confidential informant's

5   interview that I was going to -- or I did suggest that the

6   Government prepare a transcript and I would provide a redacted

7   portion of that just dealing with the description of how the

8   person got to the apartment as bearing on the upper right and

9   Apartment 4 and that issue, but not identifying the person.

10  So that's still an open item.

11          So why don't we for now just set a further status

12  conference at which point hopefully we will have resolved the

13  issue of the stairwell and access or at least have a plan for

14  resolving that, and hopefully by that point the transcript

15  will be produced as well.

16          And if I -- let's see, today is the 6th.  Two weeks

17  give everybody enough time for all that?

18          **MS. HIGGINS:** Yes, Judge.

19          **MR. TORRE:** Will we be coming back, Judge?

20          **MS. HIGGINS:** I expect we should because if we're

21  gonna enter a stipulation, it should be done formally here in

22  court.

23          **MAGISTRATE JUDGE MCCARTHY:** Yeah, and beyond that

24  then we need to just agree on a briefing schedule for

25  post-hearing briefs and so forth.

1          **MR. TORRE:** The 20th I'm in a different county,

2    Judge.  That's the only reason I ask if we're going to

3    physically return.

4          **MAGISTRATE JUDGE MCCARTHY:** Okay, how about Monday

5    the 19th?

6          **MR. GRIEBEL:** I could do the afternoon on the 19th.

7          **MR. TORRE:** My schedule looks the same.

8          **MS. HIGGINS:** That's fine.

9          **MAGISTRATE JUDGE MCCARTHY:** Mr. O'Rourke?

10         **MR. O'ROURKE:** I'm just -- March 19th?

11         **MAGISTRATE JUDGE MCCARTHY:** Yeah.

12         **MR. O'ROURKE:** That would be fine for me in the

13   morning, Your Honor.

14         **MAGISTRATE JUDGE MCCARTHY:** How about the afternoon?

15   Wait, did somebody say the morning is not good?

16         **MR. GRIEBEL:** Morning is not good for me, Judge, on

17   the 19th.

18         **MR. O'ROURKE:** I can move something and make that

19   happen.

20         **MAGISTRATE JUDGE MCCARTHY:** Okay.  I could either do

21   1:30 or 2:30 that afternoon.

22         **MR. GRIEBEL:** It's up to Mr. O'Rourke.

23         **MR. O'ROURKE:** 1:30 would be better for me, Your

24   Honor.

25         **MAGISTRATE JUDGE MCCARTHY:** All right. So 1:30, the

1  motions remain pending, and on that basis please confirm that

2  time remains excluded through at least March 19th --

3          **MS. HIGGINS:** Yes.

4          **MAGISTRATE JUDGE MCCARTHY:** -- from the Speedy Trial

5  Act calendar.  Defense counsel, you agree?

6          **MR. TORRE:** Yes, Judge.

7          **MR. O'ROURKE:** Yes.

8          **MAGISTRATE JUDGE MCCARTHY:** Okay.  All right,

9  anything else today?

10         Oh, let's see, Ms. Higgins, you'll submit the

11  originals of the exhibits?

12         **MS. HIGGINS:** Would you like them now, Judge?

13         **MAGISTRATE JUDGE MCCARTHY:** You can give them to

14  Deb, yeah, that's fine.

15         **MS. HIGGINS:** I will, thank you.

16         **MAGISTRATE JUDGE MCCARTHY:** Thank you.  All right,

17  defendants are remanded.

18         **MS. HIGGINS:** Thank you.

19         **MR. O'ROURKE:** Your Honor --

20         **MAGISTRATE JUDGE MCCARTHY:** Wait, just a second.

21  What?

22         **THE CLERK:** Docket those exhibits?  Are they

23  being --

24         **MAGISTRATE JUDGE MCCARTHY:** Yeah, if there are any

25  that for any reason should not be docketed, let Debbie know --

1    **MS. HIGGINS:** They're all suitable for docketing.

2    **MAGISTRATE JUDGE MCCARTHY:** All right.

3    **MR. O'ROURKE:** Judge, was there something further on

4    the redacted version of the transcript?

5    **MAGISTRATE JUDGE MCCARTHY:** Well, I'm hoping the

6    Government will have that by the next status conference.

7    **MR. O'ROURKE:** Okay.

8    **MAGISTRATE JUDGE MCCARTHY:** Then we can decide where

9    we go from there.

10    **MR. O'ROURKE:** All right, thank you, Your Honor.

11    **MR. GRIEBEL:** Thank you, Your Honor.

12    **MAGISTRATE JUDGE MCCARTHY:** All right, thank you,

13    all.

14    (**WHEREUPON**, proceedings adjourned at 3:08 p.m.)

15    *    *    *

16    **CERTIFICATE OF TRANSCRIBER**

17    In accordance with 28, U.S.C., 753(b), I certify that

18    this is a true and correct record of proceedings from the

19    official electronic sound recording of the proceedings in the

20    United States District Court for the Western District of New

21    York before the Honorable Jeremiah J. McCarthy on March 6th,

22    2018.

23

24    S/ Christi A. Macri

25    Christi A. Macri, FAPR-CRR
     Official Court Reporter