UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,                        **REPORT AND
                                                 RECOMMENDATION**

v.                                                17-CR-00078(FPG)(JJM)

LAMEL WILLIAMS,
LATISHA WILLIAMS, and
IRIS CENTENO,
                          Defendants.
_____

        Defendants are charged with various narcotics and firearms related offenses

(Superseding Indictment [74]) arising from a March 21, 2017 search that was conducted pursuant

to a search warrant signed that day by Erie County Court Judge James Bargnesi for 198 Potomac

Avenue, upper right apartment, and the person of defendant Lamel Williams [121-2].[1] Before the

court are defendants' motions to suppress evidence arising from that search ([77], [86], Point

VIII, and [101]), defendant Lamel Williams' motion to dismiss Count 1 of the Superseding

Indictment [83], and defendant Iris Centeno's motion to suppress statements [86], ¶¶33-38.[2]

        Following an evidentiary hearing conducted on February 28 and March 6, 2018

[132, 134], post-hearing briefing [164, 165, 168-171, 175, 176], and oral argument [177], I

issued an Interim Decision and Order [178] concluding that there was no probable cause for the

search and scheduling a hearing to consider whether suppression of the evidence derived

therefrom is warranted.  That hearing was held on December 21, 2018 and January 10, 2019

_____

[1]        Bracketed references are to CM/ECF docket entries.  Unless otherwise indicated, page references
are to numbers reflected on the documents themselves rather than to the CM/ECF pagination.

[2]        Defendants Williams and Latisha Williams have several discovery related motions outstanding
[206, 224, 225], which the parties have been attempting to resolve. A conference to address any
remaining issues is scheduled for April 30, 2019 [227].  Defendant Williams also has a motion for
severance [81], which will be resolved by Judge Geraci, consistent with my Third Amended Scheduling
Order [79], ¶1.

[210, 211], followed by additional briefing [219-223] and oral argument on March 27, 2019

[226].  For the following reasons, I recommend that the motions be denied.


## BACKGROUND

Patrick McMahon, a Detective with the Erie County Sheriff's Office, testified that on March 21, 2017 he became involved in an investigation of defendant Lamel Williams. December 21, 2018 hearing transcript [210], p. 14.  Detective McMahon testified that his boss, Chief Daniel Granville, informed him "that there was someone coming in that could possibly help us in [a] narcotics capacity and wanted us to speak to him". January 10, 2019 hearing transcript [211], pp. 34, 79.  Between 3:00 and 4:00 p.m. that day, he met with a confidential informant ("CI") whom he had not previously met and believed had been arrested earlier that day. [210], p. 15; [211], pp. 32, 88-90; December 21, 2019 hearing transcript (attorneys' eyes only portion) [230-1], pp. 43, 45-46.[3]

Although Detective McMahon believed that knowing an informant's criminal history was important, he did not talk to the CI "about anything that he had going on criminally or otherwise", since he was not the arresting officer and was making no promises to the CI. [211], pp. 20-22.  He also did not run a criminal history check on the CI (id., p. 42) or determine if he/she had previously worked with law enforcement.  [230-1], p. 44.

---

[3]     At one point, Detective McMahon testified that he believed that the CI had been arrested "[a] few days prior", but then appeared to correct that, testifying "that day he was taken into custody", and then later reiterated that he believed that the CI was arrested on March 21, 2017.  [211], pp. 88-90.

The CI told Detective McMahon that defendant Williams[4] was involved in trafficking cocaine from 198 Potomac Avenue. [210], pp. 16-17.  Specifically, the CI identified defendant Williams using the upper right apartment "as you're looking at the building from the street". Id., p. 17.  Detective McMahon also learned from the CI that defendant Williams was on home confinement with an ankle monitor. Id., p. 18. The CI identified defendant Williams from a booking photograph. Id., p. 19; [211], p. 23.

Detective McMahon testified that after receiving this information from the CI, Detective Adam Imiolo performed a drive-by identification with the CI and informed him that the CI "positively identified 198 Potomac and described it as the upper right apartment as you're looking at the building". [210], pp. 19-20; [211], pp. 38-40; February 28, 2018 hearing transcript [132], pp. 19, 153.  However, Detective Imiolo testified that he did not recall working with the CI. March 6, 2018 hearing transcript [134], pp. 56-57.

 Detective McMahon "[r]an a criminal history, DMV information, prior complaints using his name", and learned that defendant Williams had prior felony drug convictions and was on federal supervised release, confirming what he learned from the CI. [210], pp. 20-21; [211], pp. 41, 118.  Defendant Williams' DMV records "came back to address on East Amherst Street and his supervised release address came back to an address on Landon" Street. [210], p. 21; [211], pp. 55-56.  Because this information differed from what Detective McMahon had learned from the CI, Chief Granville reached out to DEA Special Agent ("SA") Shane Nastoff, who indicated that defendant Williams was on supervised release at 198 Potomac

---

[4]     Unless otherwise specified, all references to defendant Williams are to defendant Lamel Williams.

Avenue, apartment no. 4 ([210], p. 22; [211], pp. 35-37; [132], pp. 21-22), but the United States Probation Office was not directly contacted until after defendant Williams' arrest ([211], p. 37) and no utility check was performed. [230-1], p. 21.[5]

## The Search Warrant Application

After he spoke to the CI, Detective McMahon began preparing the search warrant application without any review by the District Attorney's Office. [211], pp. 11, 34. Detective McMahon's Affidavit in support of the search warrant stated that he "received information from a confidential source that Lamel Williams was selling cocaine in the Buffalo, NY area and utilizing 198 Potomac Avenue, Apartment 4 (Upper Right)" to do so ([121-1], p. 1 of 3 (CM/ECF), ¶2), and that a criminal history check revealed that defendant Williams had "numerous felony drug related arrests including five felony drug convictions" and was currently on supervised release. Id., ¶3. Detective McMahon also stated that the CI "purchased cocaine from Lamel Williams within the past ten days at 198 Potomac Avenue, Apartment 4 (Upper Right)", and was "familiar with cocaine . . . and the manner in which it is packaged and sold". Id., p. 2 of 3, ¶3. [6] He further stated that the CI identified defendant Williams from a booking

---

[5]    Curiously, the Erie County Sheriff's Police Report from defendant Williams' March 21, 2017 arrest stated that his address was 240 Landon Street. [211], pp. 119-20. However, Detective McMahon testified that "there's recidivist information, when they've been arrested before, when they're in our system from previous arrests, previous addresses are listed. Probably just a clerical error. It auto populates date of birth, an address, Social Security number, whatever information is put in on a booking sheet or a police report previously, it just auto populates". Id., p. 120.

[6]    The paragraphs of Detective McMahon's Affidavit are not consecutively numbered.

photograph and "was driven to the area of Potomac Avenue . . . and did point out 198 Potomac Avenue . . . as the residence being utilized by Lamel Williams to distribute cocaine". Id., ¶4.

The search warrant application identified the premises to be searched as "198 Potomac Avenue, Apartment 4 (Upper Right)" [121-1 - 121-2]. Detective McMahon testified that he identified the apartment by both its location and number because "[i]t was the information we received from the [CI] along with information that we developed ourselves". [210], p. 33. At that point, Detective McMahon had not been inside of 198 Potomac Avenue, and was not certain whether the upper right apartment was apartment no. 4. Id.

After he was unable to reach the special term judges, Detective McMahon called Erie County Court Judge James Bargnesi and asked him if he was available to review a search warrant. [210], pp. 23-24; [211], p. 40. Judge Bargnesi agreed and arrived at Detective McMahon's office at some time between approximately 7:30 and 8:30 p.m. [210], pp. 24-25; [211], p. 40. Judge Bargnesi reviewed the application and Detective McMahon spoke to him for several minutes "giving him the background of [defendant] Williams and the residence". [230-1], p. 6. Detective McMahon did not recall telling Judge Bargnesi that the records checks had revealed two other possible addresses for defendant Williams. [211], pp. 57-58. However, he did inform him that his office had learned from the DEA that defendant Williams was on supervised release at 198 Potomac Avenue, apartment no. 4. [210], pp. 25, 28; [230-1], pp. 24-25. Detective McMahon explained that this information was not included in the application because it was "added to the warrant right before [Judge Bargnesi] had arrived". [210], p. 26. The CI was not present during these discussions, but was later placed in an interview room with Judge Bargnesi and Detective McMahon. Id., pp. 27-29.

## The *In Camera* Testimony

During the CI's *in camera* testimony, the CI stated that "Limell stays" at 198 Potomac Avenue and sells "cocaine . . . crack and occasionally heroin and weed from that location". [123], p. 2. The CI purchased cocaine from him at that location three days earlier and had previously done so "over several times". Id., p. 3.

The CI testified that he entered 198 Potomac Avenue through the front door. Id., pp. 3-4. In describing the location of the particular apartment used by defendant Williams, the following colloquy occurred:

"INFORMANT:  Come in through the door, come in, you have to go up the next set of stairs, it will be on this side. [motioning to his right]

JUDGE BARGNESI:  On the right?

INFORMANT:  Come in, when you get to the front, it will be on this side. [motioning to his right]

JUDGE BARGNESI:  Okay.

INFORMANT: You understand?  They have a picture of the house.

JUDGE BARGNESI: Yeah.

INFORMANT: I[f] you come in, come straight through, the stairs will be on this part . . . this is the Apartment 1 [motioning to his right] . . . Apartment 2 [motioning to his left], come up the stairs Apartment 3. [motioning to his right]

JUDGE BARGNESI: Okay.

INFORMANT:  If they was labeled as 1, 2, 3, it will be that one [motioning to his right] cause the fourth one is to the wall. [motioning to his left]

JUDGE BARGNESI: Okay." Id., p. 4.

During this exchange the CI appeared to be describing the location of the apartment from his vantage point within 198 Potomac Avenue, but his orientation (*i.e.*, facing

-6-

towards the back or the front of the house) was not clarified at that point. Immediately following this exchange, Detective McMahon interjected: "Describe it as the upper right as you look at the house." Id., p. 5. Judge Bargnesi then questioned, "The upper right"?, and although according to the transcript the CI responded "Yes", from reviewing the video I believe that it was Detective McMahon who offered that response. Id.

Detective McMahon testified that he interjected with that information "[t]o clear it up", since the CI "was having a tough time articulating what apartment it was to the judge". [210], pp. 31-32; [230-1], pp. 52-53. However, he did not believe that the CI was providing inconsistent information. [210], p. 32. Detective McMahon's intent was "[j]ust to clarify to the judge which apartment he was talking about". Id. Contesting the accuracy of the transcript, Detective McMahon also testified, "I did not tell him to describe anything", "I said described as upper right, past tense", thereby indicating "[t]hat it was described to me as the upper right as you look at the house". [211], pp. 24, 94-95; [230-1], pp. 52-53.

Detective McMahon provided no explanation (and Judge Bargnesi did not inquire) on the record as to the basis for his knowledge that it was the upper right apartment as you face the house. Tellingly, the CI could have also simply confirmed that it was the upper right apartment when viewed from Potomac Avenue (if that were so), but instead found it necessary, following that exchange, to stand up to demonstrate the layout of 198 Potomac Avenue:

"So you come in, you come to the door, Apartment 1 is there as soon as you open. Pivot [turning to his left] next door, first landing, Apartment 2 [pointing straight ahead]. Come to the stairway [completing a 180 degree turn and facing

in the opposite direction from his entry into the house], right here [pointing to the right]."[7]

Detective McMahon understood the CI to be saying that the subject apartment would be the "third door that he would encounter", rather than apartment no. 3. [211], pp. 27, 99, 121 ("I believe he was talking about the apartment door he encounters, not the actual apartment number").

Contrary to the search warrant and application which referred to "Apartment 4", the CI testified to Judge Bargnesi that the apartment "[d]oesn't have a number". [123], p. 5. At that point, Judge Bargnesi stated, "Door 3, okay . . . Upper right apartment. Going to cross that off just in case". Id., pp. 5-6. Judge Bargnesi then proceeded to cross off "Apartment 4" from the search warrant and from all references in Detective McMahon's supporting Affidavit, except for one, leaving the apartment identified in the search warrant as "Upper Right", without any specification of the vantage point – i.e., facing the house from Potomac Avenue. The changes to the Affidavit [121-1] were initialed by both the Judge and Detective McMahon.[8] Detective McMahon understood that the references to apartment no. 4 were stricken "[b]ecause the information that was relayed from the [CI] to the judge was that it was the upper right apartment of the building". [210], pp. 32-33. No further in camera testimony was taken and Judge Bargnesi and the CI had no further communications. Id., pp. 29-30, 35.

Although Judge Bargnesi signed Detective McMahon's supporting Affidavit, indicating that it was sworn to before him, Detective McMahon was never placed under oath

---

[7]    The portion of the transcript [123] from page 5, lines 11-15, is not entirely accurate. Therefore, I have relied on (and quote from) an unofficial chambers transcription.

[8]    Defendant Williams questions how Detective McMahon's initials appear on the documents when he is not seen in the video initialing the changes. Defendant Williams' Post Hearing Memorandum [220], p. 10.

[211], pp. 24, 92, 114.  Detective McMahon understood from his training that he should be placed under oath when providing information in support of a search warrant, but did not "second-guess" Judge Bargnesi because he viewed it as being "disrespectful". Id., pp. 23-24.

Detective McMahon testified that he did not question the CI's credibility and found him/her to be truthful because "[w]e were able to corroborate the information that was provided to us" and provided consistent information to him and Judge Bargnesi. Id., pp. 43-44.

**198 Potomac Avenue**

A video taken of the premises (def. ex. A) demonstrates that as you enter the front door from Potomac Avenue there is a door directly ahead.  As you proceed down the hall toward the rear of the premises there are two apartments at the end of the hall - one to the right (labeled apartment no. 1) and one to the left (labeled as apartment no. 2).



View looking into the front entry of 198 Potomac Avenue.[9]



Apartment no. 1 is to the rear right and Apartment no. 2 (not pictured) is directly across from apartment no. 1. The staircase is to the left.

---

[9]    The photographs of the interior of 198 Potomac Avenue are screenshots taken from Defense Exhibit A.

Beginning in front of apartment no. 2, there is a flight of stairs that run toward the front of the house to a landing.



View from in front of apartment no. 2
looking up at the staircase
toward the front of the house.

The landing at the top of the first flight of stairs leads to another small set of stairs that run toward the rear of the premises. At the top of the second flight of stairs, there is a hallway with a third apartment (labeled as apartment no. 4) situated to the rear right and a fourth apartment (labeled as apartment no. 3) directly across from apartment no. 4.





View toward the front of the house from apartment no. 4

View of the second floor hallway leading to apartment no. 4 on the right. Apartment no. 3 (not pictutred) is directly across from apartment no. 4.

### The Search

Before executing the search warrant, Detective McMahon met with the law enforcement officers assisting with the search and described the apartment that they were going to search as both the upper right apartment and apartment no. 4. [211], pp. 62-63 ("I'm sure that I described it both ways"); 71 ("we had applied for the search warrant 198 Potomac, Apartment 4, it's the upper right apartment that we'll be breaching"). Detective Imiolo, who participated in the briefing, likewise testified that Detective McMahon "said the search warrant was for 198 Potomac, Apartment 4, upper right". [134], p. 59.

As he approached the apartment door to execute the warrant, Detective McMahon observed that the apartment was clearly identified as no. 4. [210], pp. 45-46; [211], p. 74, 97; [132], p. 34; gov. ex. 5 [121-4].  When asked why he did not pause at that moment to clarify

whether he had the correct apartment, Detective McMahon testified "we knew that that was the upper right apartment". [211], p. 74.  He also learned that the CI's description of the apartment being "[a]t the very top of the stairwell" was not accurate, but when he learned that there was a hallway wall where the apartment should have been, he did not think to stop the search to explore the discrepancy. Id., pp. 73 (Q.  "[W]hen you . . . came to the spot where the informant specifically indicated in the interview . . . that the apartment is right here . . . you saw that . . . there was no apartment there, did you not?  A. Correct, we were looking for the third apartment door"); 132-33. He also learned that 198 Potomac Avenue had a rear entrance, but denied having knowledge of the rear entrance until the search warrant was executed. [132], pp. 82, 159.

Detective McMahon testified that he believed that the search warrant contained a sufficient showing of probable cause and was executed properly because "[w]e conducted an investigation of our own, corroborated information from the . . . informant, developed information on our own, positively identified the target, positively identified the residence". [210], pp. 50-51, 57-58.  Detective McMahon believed that the apartment searched was consistent with the information the CI conveyed to Judge Bargnesi:  "It was the upper right apartment from the vantage point of Potomac Avenue.  As you went up it was the third apartment door that you encountered, but it was the upper right apartment". [211], p. 110.

### Search of the Rear Landing

Detective Imiolo, who participated in the execution of the search warrant, testified that midway through the search, he went through an open door in the kitchen with a deadbolt lock that led to a "landing right off the kitchen door, then there's a set of stairs . . . going down to

. . . the intermediate landing". [134], p. 10, 52, 72-73; gov. ex. 24 [121-23].  On the "landing directly next to the kitchen entry door" there were "a lot of items". [134], pp. 15-16, 19, 50. However, he did not observe any contraband in plain view. Id., p. 68.  Detective Imiolo "moved a few items", which revealed the top of a cooler. Id., pp. 50 75.[10]  When he opened the cooler, he discovered a firearm inside of an opaque bag. Id., pp. 16-18, 51, 76; gov. exs. 25, 26, 27 [121-24] - [121-26].  Detective Imiolo testified that the landing where the cooler was located "looked like a storage area in close proximity to the apartment door". [134], p. 52.  He acknowledged that that the rear landing "was not named in the search warrant", but believed it was a common area. Id., p. 74.  However, Detective Imiolo never learned whether another apartment had access to the rear stairwell or whether it led to the rear entrance. Id., pp. 19-20, 47, 62.

## DISCUSSION

### A.    Defendants' Suppression Motions

Defendants seek to suppress the fruits of the entire search by challenging the validity of the search warrant, and also seek suppression of the firearm, which they argue was seized outside of the scope of the warrant.[11]

---

[10]    From the intermediate landing, Chief Granville recovered marijuana and drug paraphernalia contained in a black plastic bag. [134], pp. 12-14; gov. ex. 4 [121-3], p. 2 of 4 (CM/ECF).  Defendants only seek to suppress the firearm recovered from the landing adjacent to the kitchen door, not the items recovered from the intermediate landing.  *See* defendant Williams' Memorandum of Law [77-9], p. 4; defendant Williams' Post Hearing Memorandum [164], p. 17; defendant Latisha Williams' Post Hearing Brief [165], pp. 12-15 of 17.

[11]    For the first time in her Leon hearing submission, defendant Centeno argues that the search warrant "violated the New York Criminal Procedure Law §635(2) [*sic*] which requires that every search warrant be issued by a 'local criminal court'", since "the state search warrant was issued by a County Court judge who lacked jurisdiction to so". Defendant Centeno's Leon Hearing Submission [219], pp. 2-3

1.      Was the Search Warrant Valid?

Defendants raise two challenges to the search warrant.  First, they argue that by identifying the premises to be searched as the "Upper Right" apartment, the search warrant was not sufficiently particularized; and second, they argue that the search warrant lacked probable cause because the reliability of the CI was not sufficiently established.  Defendant Williams' Post Hearing Memorandum [168], pp. 9-11; defendant Latisha Williams' Post Hearing Brief [165], pp. 4-12 of 17 (CM/ECF); defendant Centeno's Post Hearing Brief [170], p. 2 of 13 (CM/ECF). The government disputes those arguments, and contends that even if the warrant was invalid, the exclusionary rule should not apply because "law enforcement acted in good faith reliance upon the warrant" pursuant to United States v. Leon, 468 U.S. 897 (1984), and that the cost of applying the exclusionary rule outweighs the benefits pursuant to Herring v. United States, 555 U.S. 135 (2009) and United States v. Julius, 610 F.3d 60 (2d Cir. 2010). Government's Post Hearing Brief [171], pp. 11-18; government's Post Hearing Reply [176], pp. 5-10, 12-14, 16-18.

---

of 8 (CM/ECF) *citing* Titus v. Hill, 134 A.D.2d 911, 912 (4th Dept. 1987).  Not only is that argument untimely, but defendant Centeno offers no authority that a violation of New York Criminal Procedure Law ("CPL") §690.35(2) occurred in this case or that suppression would be warranted for such a violation.  It is not evident from the record before me that Judge Bargnesi lacked jurisdiction to issue the search warrant.  *See* In re Property Under Control of John Kun, 190 Misc. 2d 470, 472 (Greene Cty. Ct. 2002) ("[t]his Court is empowered to sit as a local criminal court for purposes of entertaining search warrant applications (CPL 10.10(3)(g))"); People v. Carson, 216 A.D.2d 965, 965 (4th Dept. 1995) ("[a] 'county judge sitting as a local criminal court' is a '[l]ocal criminal court' (CPL 10.10[3][g] ) with the authority to issue search warrants. . . . CPL 690.35(2) . . .  expressly provides that an application for a search warrant may be made to a County Court Judge").  Defendant's reliance on Titus does not compel a different conclusion.  Distinct from the circumstances here, Titus dismissed a false arrest claim because the facially deficient arrest warrant failed "to follow the statutory form prescribed by CPL 120.10(2) in that it d[id] not state or contain the name of the issuing court".  134 A.D.2d at 912.

a.    **What Should be Considered in Evaluating the Search Warrant?**

The Fourth Amendment provides, in relevant part, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation". "These words are precise and clear." Stanford v. State of Texas, 379 U.S. 476, 481 (1965). The requirement of an oath is "to make the affiant legally responsible for any statements of fact relied upon by the Judge who issues the warrant." United States v. Tortorello, 342 F. Supp. 1029, 1035 (S.D.N.Y. 1972), aff'd, 480 F.2d 764 (2d Cir. 1973). Additionally, "[a]ll data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath". United States v. Falso, 544 F.3d 110, 122 (2d Cir. 2008) (internal quotation marks omitted)); United States v. Rubio, 727 F.2d 786, 795 (9th Cir. 1983) ("[t]he facts upon which the magistrate bases his probable cause determination must appear within the four corners of the warrant affidavit; the warrant cannot be supported by outside information"); United States v. Latimore, 2014 WL 3109183, *34 (N.D. Ga. 2014) ("'[p]robable cause affidavits are not to be supplemented with unsworn statements.'. . . As a result, the unsworn information . . . conveyed to the . . . Magistrate must be disregarded").

Here, the search warrant only partially complied with these requirements. Detective McMahon presented an Affidavit in support of the search warrant that was unsworn and provided additional information orally to Judge Bargnesi that was outside of the four corners of the search warrant application and likewise unsworn.[12] Therefore, my review of the search

---

[12]    These facts were not part of the record when I issued my Interim Decision and Order [178].

warrant is confined to what was properly before Judge Bargnesi - *i.e.*, the CI's sworn *in camera* testimony.

### b.    Was the Search Warrant Sufficiently Particularized?

The objective of the particularity requirement is that searches "should be as limited as possible". Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). "It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." Steele v. United States, 267 U.S. 498, 503 (1925); Velardi v. Walsh, 40 F.3d 569, 576 (2d Cir. 1994). However, "ambiguities in a warrant do not necessarily render a warrant invalid under the Fourth Amendment". United States v. Voustianiouk, 685 F.3d 206, 212 (2d Cir. 2012). For example, "[i]f . . . the police possess information that clarifies the ambiguity . . . a search of the 'proper' premises may be permitted". United States v. Jefferson, 2011 WL 6778620, *2 (D. Conn. 2011).

The government acknowledges that the description of the premises to be searched as the "Upper Right" apartment "did not offer the most precise description available". Government's Post Hearing Reply [176], p. 8. Instead, it argues that "the search was ultimately conducted in the place intended by the issuing judge and by the applying officer". Id. In support of that argument it relies on United States v. Williams, 69 Fed. Appx. 494 (2d Cir. 2003) (Summary Order), which it contends is "entirely analogous" to this case. Id.

In Williams, the premises were described as a "'two story multi-family . . . dwelling . . . with . . . a brown side entrance door'", but no particular apartment was identified. 69 Fed. Appx. at 495. In finding that the warrant was sufficiently particularized, the Second

Circuit relied on the fact that the officers who executed the warrant knew that the entrance door described in the warrant led only to the subject apartment because they had previously purchased drugs through an informant at that location and had surveilled the informant entering that apartment through that door.  Id. at 496.[13]  Under those circumstances, "the substance of what was presented to the issuing judge adequately supported the issuance of the warrant to search the particular premises and . . .  there was no reasonable probability that the executing officers would mistakenly enter the wrong premises." Id.

The circumstances here are readily distinguishable.[14]  There was no controlled buy or other direct corroboration of the location of the apartment.  Detective McMahon knew (or should have known) that the "upper right" apartment could mean either of the two upper apartments depending on your vantage point. While the government argues that Detective McMahon's knew that the CI identified it as the upper right apartment when facing the premises from Potomac Avenue (government's Post Hearing Reply [176], p. 7), that information was not presented to Judge Bargnesi, and also appeared to contradict the in camera testimony of the CI, who could have simply agreed with Detective McMahon that it was the upper right apartment

---

[13]     Appearing to analogize the circumstances here to those in Williams, the government argues that the officers executing the warrant in Williams "were familiar with the target premises because they too had purchased drugs there using an informant and had surveilled the informant's use of the . . . entrance door, which was specified in the warrant."  Government's Post Hearing Reply [176], p. 8 (emphasis added).  However, here there is no evidence that the CI conducted controlled buys at 198 Potomac Avenue or that the CI was surveilled entering the premises.

[14]     Even if Williams was similar to the circumstances here, the Second Circuit's Local Rules state that "[r]ulings by summary order do not have precedential effect" and generally prohibit parties from citing summary orders issued before January 1, 2007. See Second Circuit Local Rule 32.1.1(b)(2); United States v. Hatfield, 795 F. Supp. 2d 219, 230 (E.D.N.Y. 2011) ("[t]his Court has never really understood the Second Circuit's refusal to let parties cite pre–2007 summary orders as even persuasive authority. But the Court must respect the Second Circuit's wishes").

when facing the premises from Potomac Avenue, but instead found it necessary to re-describe

the layout of the building and appeared to indicate from that description that it was the upper left

apartment.[15]

"Even if the likelihood of error was roughly 50% . . . that is too great a risk under

the law, which requires '*no reasonable probability of searching another premises in error*'".

United States v. Bershchansky, 788 F.3d 102, 112 (2d Cir. 2015) (emphasis added). *See also*

Jones v. Wilhelm, 425 F.3d 455, 463 (7th Cir. 2005) ("[w]here a warrant is open to more than

one interpretation, the warrant is ambiguous and invalid on its face and, therefore, cannot be

legally executed by a person who knows the warrant to be ambiguous").  Nor can the fact that

the "correct apartment" was ultimately searched (government's Post Hearing Brief [171], p. 14),

validate the search. *See* Maryland v. Garrison, 480 U.S. 79, 85 (1987) ("the discovery of

contraband cannot validate a warrant invalid when issued"). Therefore, I conclude that the search

warrant was not sufficiently particularized.


### c.    Was the Search Warrant Supported by Probable Cause?

The government argues that "[a] search warrant issued by a neutral and detached

magistrate is entitled to substantial deference and doubts should be resolved in favor of

upholding the warrant".  Government's Post Hearing Reply [176], p. 9.  "Deference to the

magistrate, however, is not boundless . . . . reviewing courts will not defer to a warrant based on

---

[15]     It had been my impression from viewing the CI's movements during his/her *in camera* testimony
that he/she was facing toward Potomac Avenue when placing the apartment to his/her right, thereby
making it the upper left apartment when viewing the premises from Potomac Avenue.  However, the
video of the interior of 198 Potomac Avenue (def. ex. A) demonstrates that the CI would be facing toward
the rear of the house.

an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause." Illinois v. Gates, 462 U.S. 213, 239 (1983). Therefore, "[e]ven if the warrant application was supported by more than a 'bare bones' affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances". Leon, 468 U.S. at 914-15.

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Gates, 462 U.S. at 238-39.  "Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information, or if it is corroborated in material respects by independent evidence." United States v. Wagner, 989 F.2d 69, 72–73 (2d Cir. 1993). "If a substantial amount of information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that he provides, though uncorroborated, is also reliable." Id. at 73.

There was no information provided to Judge Bargnesi as to whether the CI had provided reliable information in the past. *See* Defendant Williams' Post Hearing Memorandum [168], p. 10.  Defendant Latisha Williams also notes that the CI's criminal record was not

elicited by Judge Bargnesi or supplied to him. Latisha Williams' Post Hearing Brief [165], p. 10 of 17 (CM/ECF).  Therefore, the CI's reliability turns on whether the information he/she provided was corroborated in material respects by independent evidence.  *See* Wagner, 989 F.2d at 72-73; United States v. Canfield, 212 F.3d 713, 720 (2d Cir. 2000) ("the corroboration of significant portions of [the informant's] statements demonstrates that [the informant] was truthful in this instance, regardless of [the informant's] criminal past").

        In support of the reliability of the CI, the government points to the fact that he/she was questioned before Judge Bargnesi in a "face-to-face setting".  Government's Post Hearing Reply [176], p. 10.  That factor supports the CI's reliability. *See* United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004) ("a face-to-face informant . . . runs the greater risk that he may be held accountable if his information proves false").  However, the CI was not asked why he/she providing information to law enforcement, what (if anything) he was receiving in return for providing information, or the particulars of the drug purchase that occurred at 198 Potomac Avenue (*e.g.*, description of the interior of the apartment, amount of cocaine purchased, amount paid, packaging, and other contraband observed).  *See* Defendant Williams' Post Hearing Memorandum [168], pp. 5, 10.  No other sworn testimony within the confines of the search warrant application was provided to corroborate the CI.[16] Therefore, I find that the search warrant was not supported by probable cause.

---

[16]      In any event, even if Detective McMahon's unsworn Affidavit was considered, I would still conclude, for the reasons set forth in my Interim Decision and Order ([178], pp. 10-12), that probable cause was lacking.

2.      Is Suppression Warranted?

"The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." Herring, 555 U.S. at 140.  "Indeed, exclusion has always been [the]last resort, not [the] first impulse". Id.  Therefore, evidence is not subject to suppression where it is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." Leon, 468 U.S. at 922.  "The Leon good faith exception has been applied when a warrant lacked particularity . . . [or] was not supported by probable cause". United States v. Smith, 2007 WL 2088938, *5 (W.D.N.Y. 2007). However, "[g]ood faith is not a magic lamp for police officers to rub whenever they find themselves in trouble". United States v. Reilly, 76 F.3d 1271, 1280 (2d Cir. 1996).  Hence, "[t]he burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant." United States v. Clark, 638 F.3d 89, 100 (2d Cir. 2011).

"[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." Leon, 468 U.S. at 922; Clark, 638 F.3d at 100 ("most searches conducted pursuant to a warrant would likely fall within its protection").  Nevertheless, "it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." Leon, 468 U.S. at 922-23. There are "four circumstances where an exception to the exclusionary rule would not apply: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so

facially deficient that reliance upon it is unreasonable." <u>Clark</u>, 638 F.3d at 99; <u>Leon</u>, 468 U.S. at 923.

<blockquote>a.    <strong>What Information Can be Considered in Evaluating the <u>Leon</u> Good-Faith Exception?</strong></blockquote>

The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal *in light of all of the circumstances*." <u>Herring</u>, 555 U.S. at 145 (emphasis added).  Thus, while my review of Judge Bargnesi's probable cause determination is restricted to the sworn testimony properly before him, "when assessing the officer's good faith reliance on a search warrant under the <u>Leon</u> good faith exception, [the court] can look outside of the four corners of the affidavit and consider the totality of the circumstances, including what the officer knew but did not include in the affidavit." <u>United States v. Farlee</u>, 757 F.3d 810, 819 (8th Cir. 2014); <u>United States v. Martin</u>, 297 F.3d 1308, 1318 (11th Cir. 2002) (the court "can look beyond the four corners of the affidavit and search warrant to determine whether [law enforcement] reasonably relied upon the warrant"); <u>United States v. Thomas</u>, 908 F.3d 68, 70 (4th Cir. 2018) ("[o]ur precedents make clear that in assessing an officer's objective good faith in executing a search warrant, we may consider facts known to the officer, but inadvertently omitted from a warrant affidavit"). *See also* <u>United States v. Rosa</u>, 626 F.3d 56, 64 (2d Cir. 2010) ("[w]hile we may no longer rely on unincorporated, unattached supporting documents to cure a constitutionally defective warrant, those documents are still relevant to our determination of whether the officers acted in good faith, because they contribute to our assessment of the officers' conduct in a particular case"); <u>United States v. Williams</u>, 350 F. Supp. 3d 261, 275 (W.D.N.Y. 2018) ("although the *in camera* testimony may not be relied upon to evaluate the sufficiency of the warrant for probable cause

because it was not referenced in the warrant, it is relevant to the determination of whether the officers acted in good faith").

Some Circuits have taken a narrower view of what may be considered in evaluating good-faith reliance. *See, e.g.*, United States v. Knox, 883 F.3d 1262 (10th Cir. 2018) ("a suppression court's assessment of an officer's good faith is confined to reviewing the four corners of the sworn affidavit and any other pertinent information actually shared with the issuing judge under oath prior to the issuance of the warrant, as well as information relating to the warrant application process").  In any event, in the absence of any Second Circuit authority directly addressing this issue or objection by defendants to consideration of the entire record, much of which extends beyond the confines of the sworn testimony presented to Judge Bargnesi, I will consider all of the credible evidence before me in evaluation whether there was good-faith reliance upon the search warrant.

### b.    Was Judge Bargnesi Knowingly Misled?

In arguing that Judge Bargnesi was knowingly misled, defendant Williams points to the fact that the individual he believes to be the CI "has an extensive criminal record, including crimes that involve deceit" and was in custody at points in March 2017, possibly when the alleged sale with defendant Williams occurred.  Defendant Williams' unredacted Post Hearing Memorandum [168], p. 6; Griebel Declaration [169], ¶6.  He also notes that Detective McMahon did not disclose the conflicting information about where defendant Williams resided. Defendant Williams' Post Hearing Memorandum [220], pp. 7-9.

There can be no good-faith reliance on a warrant "if the magistrate . . . was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." <u>Leon</u>, 468 U.S. at 923. "[T]he exclusionary rule is designed not to redress minor overstatements or simple negligence by the police, but to deter deliberate, reckless, or otherwise inexcusable violations." <u>United States v. Raymonda</u>, 780 F.3d 105, 120 (2d Cir. 2015). "The same is true of 'omissions'". <u>Clarke v. City of New York</u>, 1999 WL 608857, *9 (E.D.N.Y. 1999) (*quoting* <u>United States v. Colkley</u>, 899 F.2d 297, 301 (4th Cir.1990)). Since "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation", <u>United States v. Awadallah</u>, 349 F.3d 42, 67–68 (2d Cir. 2003), the exclusionary rule only applies to omissions "'that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate.'" <u>Clarke</u>, 1999 WL 608857 at *9 (*quoting* <u>Colkley</u>, 899 F.2d at 301) (emphasis omitted).

Here, it is difficult (if not impossible) to conclude that Detective McMahon deliberately withheld information concerning the CI's criminal history, when he himself did not seek or possess that information. Detective McMahon was aware, however, of two additional addresses associated with defendant Williams and failed to convey that information to Judge Bargnesi. That omission can certainly be criticized, but I am unable to conclude that Detective McMahon deliberately or recklessly omitted that information. As Detective McMahon explained, when he was confronted with the conflict between the CI's information about defendant Williams' residence and what he had learned from the records checks, he was able to resolve that conflict by relying on the additional information provided by SA Nastoff concerning defendant Williams' supervised release location. Hence, I conclude that there was no knowing or reckless

-24-

attempt by Detective McMahon to mislead Judge Bargnesi by not disclosing that records checks revealed other addresses associated with defendant Williams.

### c.    Did Judge Bargnesi Abandon his Judicial Role?

Defendant Williams argues that Judge Bargnesi abandoned his judicial role by engaging in off-the-record discussions, becoming a "scribe for" Detective McMahon, and failing to swear in Detective McMahon. Defendant Williams' Post Hearing Memorandum [220], pp. 9-10. The issuing judge must "perform his neutral and detached function" as a judicial officer "and not serve merely as a rubber stamp for the police". Leon, 468 U.S. at 914. "[T]he law will not hastily assume a magistrate's surrender of his judicial independence to the police or prosecution." Clark, 638 F.3d at 101. *See also* Archer v. Chisholm, 870 F.3d 603, 614 (7th Cir. 2017) ("[p]roving that a judge was not 'neutral and detached' is difficult to do; such arguments rarely succeed because they demand exceptional circumstances"). Thus, it is only when an issuing judge "'wholly abandon[s] his judicial role in the manner condemned in Lo–Ji Sales, Inc. v. New York, 442 U.S. 319 (1979)'" by "ceas[ing] to act 'as a judicial officer' and assum[ing] the role of 'an adjunct law enforcement officer'", that law enforcement "cannot reasonably rely" on the warrant. Clark, 638 F.3d at 100-01.

The defendants focus heavily on the fact that Judge Bargnesi never placed Detective McMahon under oath. Defendant Williams' Post Hearing Memorandum [220], pp. 9-10. However, the government argues - and defendants fail to dispute - that the "failure to require an oath or affirmation [is] . . . an oversight that d[oes] not preclude application of the good faith exception". United States v. Moore, 968 F.2d 216, 223 (2d Cir. 1992); United States v. Matias,

836 F.2d 744, 747 (2d Cir. 1988) ("[b]ecause the failure to put the agent formally under oath was obviously an oversight, the agents' reliance on the facially valid warrant was clearly reasonable under the circumstances"); U-Series International Services, Ltd. v. United States, 1996 WL 87239, *4 (S.D.N.Y. 1996) ("the failure of a magistrate judge to place the presenting agent under oath is an oversight and a technical violation, one insufficient to support the suppression of evidence"); United States v. Gordon, 2016 WL 680542, *4 (N.D. 2016), aff'd, 686 Fed. App'x 702 (11th Cir. 2017) ("circuits have uniformly applied the Leon good faith exception where the warrant issued despite the failure of the issuing magistrate to swear the affiant"); United States v. Dedeaux, 2013 WL 4012656, *12 (N.D. Ind. 2013) ("[c]ourts have routinely applied the good faith exception in cases where a search warrant affidavit was unsworn"). "The exclusionary rule is designed to prevent police, not magistrate, misconduct.  Because 'there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment,' any procedural errors committed by the issuing magistrate are irrelevant to the executing officer's good faith in cases where the defendant has failed to show that the magistrate abandoned his judicial role." United States v. Frazier, 423 F.3d 526, 538 (6th Cir. 2005). *See also* United States v. Hessman, 369 F.3d 1016, 1022 (8th Cir. 2004) ("[t]he error in this case belonged to the issuing magistrate. Deputy Suhr did not attempt to avoid swearing a formal oath. Applying the exclusionary rule here would not serve a deterrent purpose, because '[t]he rare occasion when a magistrate accidently fails to administer an oath cannot be eliminated by suppressing the evidence in that situation'").

　　　　　Ultimately, there were some deficiencies in Judge Bargnesi's handling of the search warrant, including his off-the-record discussions with Detective McMahon about the

investigation, but collectively those deficiencies, while troubling, are not sufficient to demonstrate that he *wholly* abandoned his judicial role or assumed the role of an adjunct law enforcement officer.  *See* United States v. Morris, 509 Fed. App'x 58, 61 (2d Cir. 2013) (Summary Order) ("even if probable cause were lacking . . .  Judge Hannah's failure to record the CI's testimony in accordance with state law, and his decision to credit the CI's testimony despite his active drug use, would not manifest an abandonment of Judge Hannah's judicial role so as to preclude reliance on Leon").

### d.    Was the Search Warrant Application so Lacking in Indicia of Probable Cause as to Render Reliance Upon it Unreasonable?

"[O]fficers cannot reasonably rely on a warrant issued on [information] 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Clark, 638 F.3d at 103 (*quoting* Leon, 468 U.S. at 923).  "Such a concern most frequently arises when affidavits are bare bones, *i.e.*, totally devoid of factual circumstances to support conclusory allegations. . . . At the opposite end of the spectrum are cases in which a defective warrant issued based on an affidavit providing detailed factual allegations in support of probable cause. Such cases almost invariably demonstrate reasonable reliance." Id.  On this spectrum, the search warrant here falls somewhere in between.

For the reasons discussed above, insufficient information was presented to Judge Bargnesi to establish the CI's reliability.  However, "the absence of information establishing the informant's reliability or basis of knowledge does not necessary preclude an officer from manifesting a reasonable belief that the warrant was properly issued . . . particularly when the officer takes steps to investigate the informant's allegation."  United States v. Danhauer, 229

F.3d 1002, 1007 (10th Cir. 2000). *See* United States v. Fountaine, 2008 WL 4239950, *3

(W.D.N.Y. 2008) ("[t]he good faith exception to the exclusionary rule has been applied to cases,

where . . . the record does not reflect a basis for finding the unnamed information was reliable");

United States v. Erwin, 2008 WL 4534058, *6 n. 3 (N.D.N.Y. 2008).

   Here, while the record before Judge Bargnesi was deficient in establishing the

reliability of the CI, Detective McMahon took at least some steps to confirm the reliability of the

CI, including by corroborating defendant Williams' address with SA Nastoff, confirming the CI's

description of defendant Williams wearing an ankle monitor with the records check revealing

that he was on supervised release, and having the CI identify defendant Williams from a booking

photograph and his residence from a drive-by. *See* United States v. Nelson, 2018 WL 6715360,

*6 (W.D.N.Y. 2018) ("[t]he face-to-face testimony of the confidential informant under oath was

somewhat corroborated by Detective['s] . . . conclusory references to the two recent controlled

buys. While there was no detailed testimony by a law enforcement officer about the reliability of

the confidential informant or the controlled buys, the Court finds no reason to conclude it was

objectively unreasonable for the executing law enforcement officers to have relied upon [the]

Justice['s] . . . authorization of the search warrant"); United States v. Barnes, 399 F. Supp. 2d

169, 181 (W.D.N.Y. 2005) ("[d]efendant . . . does not contest an informant did appear before

Judge Givens. Defendant's argument, accordingly, reduces itself to a request that this court

'second-guess' Judge Givens's judgment. Such argument is, however, defeated by Illinois v.

Gates . . . and its progeny").

   Recognizing that courts do "not condone a search that was conducted . . .

pursuant to a warrant which a reasonably well trained officer could rely, but the actual officer

who executed the warrant subjectively knew that it failed to state probable cause", United States v. Williams, 181 F. Supp. 2d 267, 278 (S.D.N.Y. 2001), defendants appear to argue that the observations Detective McMahon made in the course of executing the warrant should have made clear to him that the CI was not reliable. *See* Defendant Latisha Williams' Post Hearing Submission [222], p. 4 ("Deputy McMahon . . . simply proceeded to execute [the search warrant] when he knew and/or subsequently learned that the informant had provided erroneous information"); Defendant Centeno's Leon Hearing Submission [219], p. 6 of 8 (CM/ECF) ("[t]he Detective knew or should have known that such an objective and direct contradiction of the CI's description meant that . . . the CI had lied, or that the CI was completely mistaken about the apartment from which he claimed to have purchased drugs"). In support of that argument, they note that the CI "described the apartment as 'apartment 3'", "swore that the stairway was on the 'righthand side' upon entering the building", and that "the target apartment was at the top of the first 'set' of stairs that you go up and that it was right there on the right hand side" - all facts later proven to be false. Defendant Latisha Williams' Post Hearing Submission [222], p. 3; Defendant Centeno's Leon Hearing Submission [219], pp. 5-6 of 8 (CM/ECF).

That is only partially correct. Reviewing the CI's testimony, he/she appears to be stating that the apartment is to the right, not the staircase. [123], p. 4.[17] Nor did the CI identify the apartment as the as being "apartment 3", but rather the third door if they were labeled. Id. While it was actually the fourth door one would encounter, rather than the third, it remains the third apartment door. Moreover, even if the CI expressly stated that the apartment door was

---

[17]    Defendant Centeno states that "Detective McMahon admitted in his testimony that the CI claimed the stairway to the second floor was on the right hand side as one enters the building". Defendant Centeno's Leon Hearing Submission [219], p. 5 of 8 (CM/ECF). However, the transcript page she cites in support of that statement (December 21, 2018 hearing transcript [210], p. 60) is inapposite.

immediately at the top of the stairs, the upper right apartment remains the first apartment one would encounter on the second floor.

In any event, these are relatively minor variances when compared to portions of the layout the CI accurately described - *e.g.*, two apartments downstairs, a switchback staircase (*i.e,* two parallel flights of stairs connected by a landing that required a 180 degree turn), and it being the first apartment you encounter on the second floor. In light of all the information known to law enforcement by the time they encountered the upper right apartment, the handful of minor variances in the CI's description of the layout of the building, fail to demonstrate that law enforcement did not act in an objectively reasonable manner by entering the upper right apartment.

### e.    Was the Search Warrant So Facially Deficient that Reliance Upon it was Unreasonable?

"[A] warrant may be so facially deficient - *i.e.*, in failing to particularize the place to be searched . . . that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923. As discussed above, Detective McMahon possessed a variety of information that supported his objective good-faith belief that he was searching the correct apartment. As the government repeatedly noted at oral argument, the apartment that was ultimately searched was the upper right apartment, and while that description may not have been sufficiently particularized because it hinged on one's vantage point, Detective McMahon knew that the CI identified it as the upper right apartment when viewing the premises from Potomac Avenue.

While the CI's attempts to describe the interior layout of the premises created confusion as to which apartment he/she was referring to, the video of the layout of 198 Potomac

Avenue (def. ex. A) demonstrates that the CI's testimony was generally accurate. There were two apartments on the first floor, with a set of switchback stairs, leading to two more apartments on the second floor, the first of which being the upper right apartment.

Much of the defendants' argument centers on the fact that by striking apartment no. 4 from the search warrant and application, Judge Bargnesi intended to prohibit law enforcement from searching apartment no. 4, thereby creating an ambiguity when law enforcement learned that the upper right apartment was identified as no. 4. *See* Latisha Williams' Post Hearing Submission [222], pp. 4-5 ("[a]ny will trained officer . . . would have seen that 'apartment 4' was stricken form the warrant by the judge . . . . [and] would have stopped and refrained from search 'apartment 4' without further inquiry"). However, it is more likely that an objective reasonable law enforcement officer would have understood that Judge Bargnesi merely opted for the more general description of it being the upper right apartment, "just in case" it was not identified as apartment no. 4 ([123], p. 6), and did not preclude a search of apartment no. 4, so long as it was the upper right apartment. In fact, that is how Detective McMahon interpreted it: "We applied for Apartment No. 4, which is described as the upper right apartment. The judge issued the warrant for the upper right apartment and that's the door that we had to hit". [211], p. 71.

There are several cases that have concluded under similar circumstances that the good-faith exception to the exclusionary rule was not applicable. For example, defendants rely on Bershchansky, supra, and Voustianiouk, supra. *See* Defendant Centeno's Leon Hearing Submission [219], p. 5 of 8 (CM/ECF); defendant Williams' Post Hearing Memorandum [220], pp. 12-14. In Bershchansky the warrant described a two-family dwelling with a door on the left

that led to apartment no. 1 and a door on the right that led to apartment no. 2, but only authorized

a search of apartment no. 2. 788 F.3d at 106. When executing the warrant, the officers entered

the door to the right, but it led to an apartment "clearly marked '1'", which they searched. Id. at

107.  In declining to apply the good-faith exception to the exclusionary rule, the Second Circuit

relied on several factors, including that "the officers ignored the warrant's clear authorization to

search only Apartment 2 and searched an apartment they were not authorized to search". Id. at

113.

   Likewise, in Voustianiouk, police[18] obtained a search warrant for "2424

Cambreleng Avenue, Apt. 1, Bronx, New York", which was described in the supporting affidavit

as the "ground floor apartment" of the two-story structure. 685 F.3d at 209. Because neither

doorbell was marked with an apartment number, the officers rang both. Id. at 209-10.  When the

defendant answered the door, they showed him the warrant and he led them to his second floor

apartment, which was searched. Id. at 210.  Based on these facts, the Second Circuit was "unable

to conclude that the officers . . . reasonably relied on the warrant in their possession - which on

its face explicitly authorized the search of the first-floor apartment - to conduct a search of the

apartment on the second floor. . . . Nothing in the warrant or accompanying affidavit provided

any reason for these officers to conclude that the magistrate judge had authorized them to search

the building's second floor". Id. at 215.

   My Interim Decision and Order [178] also cited to United States v. Fahey, 2008

WL 239152 (N.D. Ill. 2008). There, the search warrant described the premises as "'Apartment

D'", and being "'on the left at the top of the stairs'". 2008 WL 239152, *1.  Much like in

---

[18]  Coincidentally (or not), the agent that applied for and executed the warrants in both Bershchansky
and Voustianiouk was the same officer.

Bershchansky, in the course of executing the warrant, the officers learned that the upper left apartment was identified as unit "C,"  but proceeded to search that unit.  Id. at *2. Under those circumstances, the court concluded that "the officers circumvented the magistrate judge and resolved the warrant's ambiguity based on information that was not disclosed to the magistrate who issued the warrant", which "constitutes 'a violation of clearly-established, constitutional rights.'" Id. at*3 (*quoting* Jones, 425 F.3d at 465).  Since "the officers (1) executed a warrant they knew to be facially ambiguous prior to the execution of the warrant and (2) circumvented the magistrate judge and resolved the ambiguity amongst themselves based on information that was not disclosed to the magistrate who issued the warrant" the court determined that the good-faith exception did not apply. Id. at*5.

While somewhat similar, the circumstances here fall short of those in Bershchansky, Voustianiouk and Fahey.  Unlike those cases, here, law enforcement abided by the warrant's authorization to search the upper right apartment and did not venture beyond the confines of the search warrant by searching any other apartment.  Since none of the four circumstances identified in Leon exist here, I conclude that the good-faith exception to the exclusionary rule applies, and recommend that defendants' motions to suppress the evidence seized as a result of the March 21, 2017 search warrant be denied.


**3.     Was the Execution of the Search Warrant Overbroad?**

Defendants argue that the firearm recovered from the closed cooler located on the landing immediately adjacent to the rear door of the apartment should be suppressed because the rear landing was not within the scope of the search warrant.  Defendant Williams' Post-

Suppression Hearing Memorandum [164], p. 17.  In support of the motion, Defendant Williams submitted an Affidavit stating that "[f]rom time to time, I used that landing" and "had some personal belongings there.  I had privacy there as well".  Defendant Williams' Affidavit [77-2], ¶7.

Courts "regard the area immediately surrounding and associated with the home - what our cases call the curtilage - as part of the home itself for Fourth Amendment purposes." Florida v. Jardines, 569 U.S. 1, 6 (2013).  As government argues, "'[a] lawful search of a fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.'" Government's Post Hearing Reply [176], p. 11 (quoting United States v. Ross, 456 U.S. 798, 820–21 (1982)).  "That area includes areas within the curtilage of the premises."  United States v. Brooks, 2016 WL 1749394, *9 (W.D.N.Y.), adopted, 2016 WL 3742318 (W.D.N.Y. 2016) (Geraci, J.). Therefore, "a warrant authorizing a search of a dwelling authorizes a search of the inside and surrounding exterior areas of the house, regardless of whether the application includes any factual assertions relating to the exterior of the house". Brooks, 2016 WL 1749394 at *9–10. See United States v. Pugh, 2003 WL 21220333, *3 (D. Conn. 2003) ("there is no reason . . .  to exclude the exterior of the building from the area that could be legally searched, as nothing in the warrant's description of the building . . . limited the search to only the interior of the structure. Here, the evidence was seized from the roof of the very structure described in the warrant, and it was within an arm's reach of an interior room"); United States v. Dowling, 2019 WL 1053607, *8 (D.V.I. 2019) ("numerous courts have held that a search warrant for a defendant's 'residence' or 'premises,' also authorizes the search of the

accompanying curtilage - even if the latter is not specifically listed in the warrant"). These principles also apply in a multi-family dwelling.  *See* United States v. Bain, 155 F. Supp. 3d 107, 118 (D. Mass. 2015), aff'd, 874 F.3d 1 (1st Cir. 2017) ("[i]n a modern urban multifamily apartment house, the area within the 'curtilage' is necessarily much more limited than in the case of a rural dwelling subject to one owner's control This does not mean that the concept of curtilage does not . . . have any applicability in the apartment context"). *See also* United States v. Fagan, 577 F.3d 10, 14 (1st Cir. 2009) (finding that a locked closet located on a landing in close proximity to the front door of an apartment was an appurtenant structure to the apartment and could be searched pursuant to a search warrant for the apartment).

Here, the landing was immediately adjacent to the rear entry of the apartment in an area physically removed from the other units in the building and utilized by defendant Williams.  Under these circumstances, I conclude that it was within the curtilage of the apartment. Though Detective Imiolo testified that he believed that the rear landing was a common area ([134], p. 74),[19] "Fourth Amendment reasonableness is predominantly an objective

---

[19]    Although the government does not argue that the rear landing was a common area over which defendants could have no expectation of privacy, had it done so, I would have agreed.  For example, in Barnes, supra, a search warrant authorized a search of the upper apartment of a two unit dwelling and officers searched a milk box (a closed container located in the wall) located in common hallway on the first floor. 399 F. Supp.2d at 183. Under these circumstances, the court rejected the upstairs tenant's suppression motion, concluding, *inter alia*, that "the milk box's location in a common area renders Defendant without a legitimate expectation of privacy given that 'it is the established law of this Circuit that common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors.' United States v. Holland, 755 F.2d 253, 255 (2d Cir.1985) . . . . Accordingly, if the milk box is considered part of the common area of the dwelling . . . then no search warrant was required to search it." Id. at 184.

inquiry." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 736 (2011). Therefore, I conclude that the rear landing was within the scope of the search warrant for the apartment.[20]

   In any event, even if the search exceeded the scope of the search warrant, I would find that the good-faith exception prevents the application of the exclusionary rule. "Although an officer will usually behave unreasonably by exceeding the scope of a search warrant . . . the good faith exception may nevertheless apply. . . . if it was objectively reasonable for the officer to believe that the warrant authorized him to search a particular area, even though it is later determined that the search exceeded the strict textual scope of the warrant". <u>United States v. Swinton</u>, 2016 WL 6162426, *3 (W.D.N.Y. 2016), <u>adopted</u>, 251 F. Supp. 3d 544 (W.D.N.Y. 2017). For the reasons discussed above, I conclude that it would be objectively reasonable for an officer to believe that the search warrant authorized the search of the rear landing, and recommend that this portion of defendants' motions be denied.[21]

## B.  Defendant Williams' Motion to Dismiss

   Defendant Williams moves to dismiss Count 1 of the Superseding Indictment [74], alleging a conspiracy between the defendants to distribute cocaine and cocaine base from July 14, 2014 to March 21, 2017, in violation of 21 U.S.C. §846, as being duplicitous by "plac[ing] two conspiracies into a single count". Defendant Williams' Memorandum [83-2], pp.

---

[20]  Based on this recommendation, it is unnecessary for me to address the government's alternative inevitable discovery argument. *See* Government's Post Hearing Reply [176], pp. 15-16.

[21]  Based upon my recommendation, I need not determine the government's challenge to defendant Latisha Williams' standing to contest the search. Government's Post-Hearing Brief [171], pp. 18-24.

1-3; Statement Relative to the Motion [83-1], ¶¶3-6.  In response, the government argues, *inter alia*, that this a question for a properly instructed jury.  I agree.

"[L]apses of time, changes in membership, or shifting emphases in the locale of operations [do not] necessarily convert a single conspiracy into multiple conspiracies" and "a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990); United States v. DeLaRosa, 700 Fed. App'x 13, 17 (2d Cir. 2017) (Summary Order). Where, as here, "the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury. For that reason 'courts in this Circuit have repeatedly denied motions to dismiss a count as duplicitous." United States v. Mangano, 2018 WL 851860, *6 (E.D.N.Y. 2018). *See also* United States v. Nicolo, 523 F. Supp. 2d 303, 314 (W.D.N.Y. 2007), aff'd, 421 Fed. App'x 57 (2d Cir. 2011) ("even if an indictment is duplicitous, and even if that duplicity presents some risk of prejudice to the defendant, that risk can often be avoided through jury instructions making clear to the jurors that they must unanimously agree on the particular conduct underlying the conviction").  Therefore, I recommend that this motion be denied.

### C.    Defendant Centeno's Motion to Suppress Statements

Defendant Centeno moves to suppress "possible statements" made to law enforcement, including on March 21, 2017.  Torre Affidavit [86], ¶33.  In response, the government states "[u]pon information and belief, the defendant did not make any statements

within the purview of Rule 16(a)(1)(A)", but agrees to provide such statements should it become aware of any. Government's Response [90], pp. 12-13. Nothing further has been presented to me as to whether the government has produced any post-arrest statements from defendant Centeno.

In any event, defendant's motion is not supported by an affidavit (or declaration) from defendant and it is settled law that a motion seeking a suppression hearing must be accompanied by an affidavit from someone having *personal* knowledge of the facts justifying the hearing. *See* United States v. Gillette, 383 F.2d 843, 848–49 (2d Cir. 1967). Ignoring this longstanding requirement, which is expressly set forth in all of my Scheduling Orders, defendant fails to provide an affidavit (or declaration) from an individual with personal knowledge justifying a basis for a suppression hearing. *See* Id. ("[t]he affidavit submitted for appellant is insufficient in that it does not . . . allege personal knowledge on the part of appellant's attorney; accordingly, there was no factual issue to be resolved and the denial of a hearing was correct"); United States v. Militello, 2013 WL 6498961, *2 (W.D.N.Y. 2013) ("[a]n attorney's affidavit made without personal knowledge is insufficient to create an issue of fact requiring an evidentiary hearing"); United States v. Perryman, 2013 WL 4039374, *6 (E.D.N.Y. 2013) ("[c]ourts in this Circuit have repeatedly denied motions to suppress without a hearing where defendants have failed to provide affidavits alleging facts based on personal knowledge" (citing cases)). Therefore, I recommend that this motion be denied without a hearing.

## CONCLUSION

For these reasons, I recommend that defendants' motions to suppress evidence ([77], [86], Point VIII, and [101]), defendant Williams' motion to dismiss Count 1 of the Superseding Indictment [83], and defendant Centeno's motion to suppress statements ([86], ¶¶33-38) be denied.  Unless otherwise ordered by District Judge Geraci, any objections to this Report and Recommendation must be filed with the clerk of this court by May 9, 2019.  Any requests for extension of this deadline must be made to Judge Geraci.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(c)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(c)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or  identifying the new arguments and explaining why they were not

raised to the Magistrate Judge". Failure to comply with these provisions may result in the

district judge's refusal to consider the objection.

Dated: April 25, 2019

<u>/s/ Jeremiah J. McCarthy</u>
JEREMIAH J. MCCARTHY
United States Magistrate Judge